# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

SHILISA RHODES,             )

                                  )

               Plaintiff,       )

                                  )

           v.                     )       Civil Action No. 12-0449 (BAH)

                                  )

UNITED STATES OF AMERICA,     )

                                  )

              Defendant.      )

---

## MEMORANDUM OPINION SETTING FORTH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff Shilisa Rhodes brought this medical malpractice action against the United States, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, for damages allegedly sustained from negligent medical treatment provided by Unity Health Care, Inc. ("Unity") and Jamie Hill-Daniel, M.D., from December 2009 to March 2011. Pending before the Court is the plaintiff's claim that Dr. Hill-Daniel and Unity acted negligently by failing to refer her in a timely manner for diagnostic testing of her breasts and for failing to take certain other steps to ensure the timely diagnosis of her breast cancer. During a week-long bench trial, the Court heard evidence on the plaintiff's claim against the defendant. [1] For the reasons

---

[1] The Court's jurisdiction over this suit is not disputed. The parties agree that Unity and Dr. Hill-Daniel are deemed to be employees of the Public Health Service eligible for Federal Tort Claims Act malpractice coverage pursuant to 42 U.S.C. § 223(g) because Unity is a grantee of the Department of Health and Human Services. Def.'s Proposed Concls. of Law at 1 n.1; Pl.'s Corrected Proposed Concls. of Law at 1 n.1. The FTCA also requires as a jurisdictional predicate that the plaintiff exhaust her administrative remedies. *See* 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 107 (1993); *GAF Corp. v. United States*, 818 F.2d 901, 904 (D.C. Cir. 1987). In this case, the defendant does not dispute that the plaintiff has exhausted her administrative remedies. *See* Compl. ¶ 2 (plaintiff alleges that on September 19, 2011, the plaintiff presented claims to the U.S. Department of Health & Human Services and that the U.S. Department of Health and Human Services failed to issue any determination on the plaintiff's claim within the mandatory six-month administrative waiting period); Answer ¶ 2 (defendant admits that the plaintiff presented claims to the U.S. Department of Health & Human Services on or about September 19, 2011 and that the U.S. Department of Health & Human Services has failed to issue an determination of the plaintiff's claim).

explained below, the Court concludes that the plaintiff has sustained her burden of proof on the negligence claim, that judgment must be entered for the plaintiff, and that damages will be awarded in the amount of $4,458,582.17.

## I.     PROCEDURAL BACKGROUND

On March 23, 2012, the plaintiff initiated this medical malpractice lawsuit by filing a complaint against the United States alleging that the defendant was negligent in multiple respects, including:

1. Failing to timely diagnose and treat the plaintiff's breast cancer;

2. Failing to timely and appropriately order and obtain diagnostic studies in light of the plaintiff's medical history, complaints, signs, and symptoms;

3. Failing to appreciate the seriousness of the plaintiff's condition;

4. Failing to provide appropriate and timely follow-up care;

5. Failing to timely and appropriately examine the plaintiff;

6. Failing to timely and appropriately obtain, interpret, and act upon the plaintiff's medical history and physical findings;

7. Failing to timely and appropriately assess the plaintiff's condition;

8. Failing to timely and appropriately obtain consultations and/or interventions from other health care providers;

9. Failing to make timely and appropriate referrals for diagnostic testing, care, and treatment; and

10. Failing to take timely and appropriate steps to protect the health and well-being of the plaintiff.

Compl., ECF No. 1, ¶ 18.

At the plaintiff's request, the Court imposed an expedited discovery and motions schedule, *see* Scheduling Order, ECF No. 9, and an expedited trial date, *see* Pretrial Order, ECF

No. 20.[2]  Shortly before trial, the defendant moved to amend its answer to the complaint to add a

defense of contributory negligence, and the plaintiff moved to preclude the defendant from

newly asserting the affirmative defense of contributory negligence and any claim of negligence

on the part of a third-party, Providence Hospital.  *See* Pl.'s Mot. to Preclude New Assertions of

Contributory Negligence Defense and Any Claims of Negligence By Providence Hosp., ECF No.

36; Def.'s Mem. Opp. to Pl.'s Mot. to Preclude Assertion of Contributory Negligence and Any

Claims of Negligence by Providence Hospital and Mot. to Am. Answer, ECF No. 40.  For the

reasons stated at the hearing on these motions, on June 18, 2013, the Court granted the plaintiff's

motion in part and denied the defendant's motion, precluding as untimely the defendant's

assertion of a contributory negligence affirmative defense but permitting the defendant's

admission of evidence regarding negligence on the part of Providence Hospital.  *See* Minute

Order (June 18, 2013).[3, 4]

---

[2] The schedule was subsequently modified upon requests made by both parties.  *See* Minute Order (August 22, 2012) (granting joint motion to amend scheduling order); Minute Order (November 16, 2012) (granting consent motion for extension of time to complete discovery and for the defendant's expert witness disclosures); Minute Order (March 11, 2013 (granting joint motion to extend scheduling order); Minute Order (April 22, 2013) (granting joint motion for extension of time to complete discovery and to file motions *in limine*).

[3] The Court relied on Federal Rule of Civil Procedure 8(c), which requires a defendant to state any affirmative defenses, including contributory negligence, in a pleading responsive to the complaint.  The purpose of that requirement is to give the opposing party notice of the defense and to permit the opposing party to develop in discovery and present both evidence and argument before the district court responsive to the defense.  Failure to comply with Rule 8(c)'s timing requirement generally results in the waiver of that defense and its exclusion from the case.  *Harris v. Secretary*, 126 F.3d 339, 343 (D.C. Cir. 1997) (citing *Banks v. Chesapeake & Potomac Tele. Co.*, 802 F.2d 1416, 1427 (D.C. Cir. 1986)).  The Court, however, recognized that "the purpose of pleading is to facilitate a proper decision on the merits," *id.*, and that a defendant should be granted leave to amend an answer "when justice so requires," in accordance with Federal Rule of Civil Procedure 15.  FED. R. CIV. P. 15(a)(2).  Courts in this Circuit evaluate when "justice so requires," by looking to a number of factors, including whether the moving party engaged in undue delay and whether undue prejudice to the opposing party would result by virtue of allowance of the amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Assessing the circumstances of this case, the Court found that both undue delay and unfair prejudice would result if the defendant were permitted to amend its answer more than nine months after the deadline set out in the applicable Scheduling Order for such amendments, and just two weeks before the bench trial was scheduled to commence.  The plaintiff convincingly argued that her approach in discovery would have differed had she known of the defendant's intention to prove contributory negligence – which, in this jurisdiction, operates as a complete bar to recovery – and with discovery closed at the time that the defendant finally raised it, the plaintiff had lost that opportunity.  *See Atchinson v. District of Columbia*, 73 F.3d 418, 427 (D.C. Cir. 1996); (upholding the district court's denial of the plaintiff's motion for leave to amend a complaint because the district court found that the change would be prejudicial, and noting that the plaintiff had filed

3

Over the course of the one-week bench trial, the plaintiff testified on her own behalf and presented the testimony of two of her treating physicians, four medical experts, and three damages witness. In response, the defendant called the plaintiff's primary care physician, two Unity employees, one employee of Providence Hospital, one of the plaintiff's treating physicians, and three medical expert witnesses. The defendant also played the videotaped *de bene esse* deposition of one damages expert witness. Following the conclusion of the bench trial, both parties submitted proposed conclusions of law. *See* Pl.'s Corrected Proposed Concls. of Law, ECF No. 63;[5] Def.'s Proposed Concls. of Law, ECF No. 65. In addition, the parties submitted three iterations of a Proposed Findings of Fact Table ("FOF Table"), in which they proposed individual findings of fact, and noted which facts were in dispute. *See* Order, ECF No. 45 (explaining FOF Table); *see also* Proposed Findings of Fact, ECF No. 54 ("1st FOF Table"); Proposed Findings of Fact, ECF No. 64 ("2d FOF Table"); Proposed Findings of Fact, ECF No. 68 ("3rd FOF Table"). The Court has considered these submissions along with the testimony and exhibits at trial.[6]

---

his motion for leave to amend "on the eve of trial, when discovery was complete," that discovery would likely have differed and that the strategy and nature of the defendant officer's defense probably would have also differed); *cf. Does I through III v. District of Columbia*, 815 F. Supp. 2d 208, 216 & n.4 (D.D.C. 2011) (granting the plaintiff leave to amend his complaint because discovery on the merits was not closed and the proposed amendment would not substantially alter the defendant's discovery); *Dove v. Wash. Metro. Area Transit Auth.*, 221 F.R.D. 246, 249 (D.D.C. 2004) (granting the defendant leave to amend its answer to assert a new affirmative defense when litigation was in its early stages before the parties had appeared for an initial scheduling conference or even commenced discovery); *Morgan v. Fed. Aviation Admin.*, 262 F.R.D. 5, 10 (D.D.C. 2009) (granting defendant leave to amend its answer to assert the new affirmative defenses of claim preclusion and issue preclusion when the "litigation [was] in its nascent stages").

[4] This case was re-assigned to the presiding Judge on June 17, 2013.
[5] The plaintiff timely filed her original proposed conclusions of law on July 5, 2013, ECF No. 54, but with leave of the Court, filed a corrected proposed conclusions of law on July 16, 2013, ECF No. 63.

[6] The Court received the following exhibits into evidence during the bench trial: fifty-eight Plaintiff's Exhibits: 1, 3, 6, 8, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 31, 33, 34, 35, 36, 38, 39, 40, 41, 44, 50A, 50 B, 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 64, 67, 68, 73, 104, 106A, 106B, 106C, 112, 113, 114, 115, 116, 117, 118; and sixteen Defendant's Exhibits: 1, 2, 3, 5, 7, 8, 15, 21, 24, 25, 26, 28, 29, 36, 37, 38.

Based upon the testimony presented and exhibits admitted at the trial, the Court makes the findings of fact set forth below and further states its conclusions of law. *See* FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

## II.     FINDINGS OF FACT

### A.     OVERVIEW OF WITNESSES

#### 1.     *Plaintiff's Witnesses*

The plaintiff presented the testimony of the following ten witnesses, whose testimony is briefly summarized below: Shilisa Rhodes; her treating oncologist, Dal Yoo, M.D.; the radiologist who interpreted two of her diagnostic images, Joel Bowers, M.D.; two expert witnesses in the national standard of care, John Sutherland, M.D., and Katherine Margo, M.D.; one expert witness in pathology, F. Lee Tucker, M.D.; one expert witness in oncology, Peter Pushkas, M.D.; one expert witness in the psychology of loss and grief, Mila R. Tecala, MSW, ACSW, LICSW, DCSW; one expert witness in end of life costs, Terri Sue Patterson, RN, MSN, CRRN; and one expert witness in economics, Richard J. Lurito, Ph.D. Plaintiff also played an audio recording of excerpts from the deposition testimony of her primary care physician, Dr. Hill-Daniel.

##### a)     *John Sutherland, M.D.*

Dr. Sutherland is a board-certified family physician, who maintained private practices in Minneapolis and St. Paul, Minnesota, for eleven years, and has practiced in academic institutions in Minneapolis, Illinois, and Iowa for the past thirty-three years. Pl.'s Ex. 35 (Dr. Sutherland's

CV); Trial Tr. ECF No. 69 at 31:2–:5, 34:3–:5.  Dr. Sutherland testified as one of two medical

experts for the plaintiff on the national standard of care applicable to a family practice physician

regarding a primary care physician's appropriate response to a patient's breast complaints,

including the steps necessary to ensure that diagnostic testing and specialty consultations are

performed on a timely basis.  *Id.* at 32:22–33:5.  Specifically, Dr. Sutherland opined that Dr.

Hill-Daniel breached the national standard of care by:  (1) failing to fully investigate the

plaintiff's breast complaints on December 3, 2009; (2) failing either to schedule a return visit for

the plaintiff thirty to sixty days after the December 3, 2009 visit to reassess her complaints, or to

refer the plaintiff immediately for diagnostic imaging studies on that date; (3) delaying the

plaintiff's diagnosis by cancelling and rescheduling appointments multiple times; and (4) failing

to take measures to expedite diagnostic testing after Dr. Hill-Daniel palpated a mass in the

plaintiff's left breast and lymph nodes under her left armpit on October 18, 2010.  *Id.* at 37:9–

:24, 50:18–55:5.

> b)      *Shilisa Rhodes*

The plaintiff testified about her visits with Dr. Hill-Daniel regarding her breast

complaints, when Dr. Hill-Daniel allegedly failed to take the steps that would have led to an

earlier diagnosis of her breast cancer.  Trial Tr. ECF No. 55 at 78:11–83:25, 92:10–98:12.  She

also testified about her experiences with Unity, her medical history, the referral process that she

went through to receive diagnostic imaging, and the harm that her diagnosis of Stage IV breast

cancer has caused.  *Id.* at 76:16–77:4, 84:1–91:25, 96:22–108:12.

> c)      *F. Lee Tucker, M.D.*

Dr. Tucker is board-certified in anatomical and clinical pathology, and is currently the

president and chief medical officer of Virginia Biomedical Laboratories, LLC.  Pl.'s Ex. 36, at 2

(Dr. Tucker's CV). Dr. Tucker testified as the plaintiff's expert about the behavior and pathology of breast cancer, and its prognosis, diagnosis, staging, and curability. He opined that the plaintiff's breast cancer was Stage I in December 2009, and that if it had been diagnosed and treated at that point, it would most likely have been cured. Trial Tr. ECF No. 55 at 11:14–:19. He also opined that sometime between July and November 2010, her cancer became Stage II by metastasizing to the lymph nodes, and that it became Stage IV incurable cancer by metastasizing to her bone sometime between December 2010 and February 2011. *Id.* at 47:14–48:11, 49:17–:25.

### d) *Katherine Margo, M.D.*

Dr. Margo is a board-certified family doctor who has practiced family medicine for thirty-one years and is currently a faculty member at the University of Pennsylvania with a family medicine practice. Pl.'s Ex. 34, at 1–2. She has been a member of the American Academy of Family Physicians since 1982. *Id.* at 3. Dr. Margo testified as the second of plaintiff's two expert family medicine witnesses about the national standard of care that applied to Dr. Hill-Daniel when the plaintiff presented to her first in December 2009 and again in October 2010. She opined that Dr. Hill-Daniel breached the national standard of care by (1) not considering breast cancer as a possible diagnosis at the plaintiff's initial visit; (2) not scheduling a follow-up visit for the plaintiff four to six weeks after that visit; and (3) not ensuring that the plaintiff's cancer was diagnosed within two to three weeks after her return visit on October 18, 2010. Trial Tr. ECF No. 70 at 52:16–53:1, 60:20–61:2, 61:20–:23, 64:22–65:22, 81:18–82:25.

### e) *Mila R. Tecala, MSW, ACSW, LICSW, DCSW*

Ms. Tecala is a social worker licensed to practice in the District of Columbia and Virginia. Trial Tr. ECF No. 70 at 91:8–:11. She works in private practice and serves as a

consultant to several area agencies and hospitals, including Montgomery Hospice, the National Cancer Institute, Hospice Care of D.C., and Loudoun County Social Services. Pl.'s Ex. 39, at 2. Her practice specializes in loss and grief, Trial Tr. ECF No. 70 at 91:5–:7, and she has experience with individuals who have been diagnosed with Stage IV metastatic cancer. *Id.* at 93:16. Ms. Tecala testified that she evaluated the plaintiff in 2012 and again in 2013 at the plaintiff's lawyers' request. *Id.* at 94:13–:16. Based on these evaluations, Ms. Tecala diagnosed the plaintiff with depression in 2012 and reaffirmed that diagnosis in 2013. *Id.* at 95:23, 99:4–:24. Ms. Tecala also testified that the plaintiff was experiencing grief and feelings of loss due to the loss of her health, loss of her breast, loss of body experiences through pain and suffering, and future loss of life. Trial Tr. ECF No. 56 at 9:18–:25. Ms. Tecala testified regarding her recommendation that the plaintiff attend counseling sessions once per week. *Id.* at 14:11–:19.

f)    *Dal Yoo, M.D.*

Dr. Yoo is an oncologist who practices in the Internal Medicine, Hematology and Oncology Department at Providence Hospital in Washington, D.C. Pl.'s Ex. 116, at 2 (Dr. Yoo's CV). Dr. Yoo has been the plaintiff's treating oncologist since January 30, 2012, when he assumed responsibility for this case from another oncologist. Trial Tr. ECF No. 56 at 20:20–:21. Dr. Yoo testified that the plaintiff has hormone-dependent cancer that has metastasized to her bones. *Id.* at 22:21–:25, 30:21–:23. He also testified that during the time he has treated plaintiff, she has had two different courses of hormone therapy, as well as courses of radiation therapy, and chemotherapy. *Id.* at 22:13–26:15, 28:2–33:24. He testified that all of the plaintiff's treatments are palliative and that at some point all treatments will stop working for her. *Id.* at 34:13–36:1.

g)      *Joel Bowers, M.D.*

Dr. Bowers is the diagnostic radiologist at Providence Hospital who interpreted MRI images of plaintiff's pelvis from May 12, 2011 and July 15, 2011, and wrote the corresponding reports.  Trial Tr. ECF No. 56 at 49:7–:10, 57:12–:15; *see also* Pl.'s Ex. 115 (Dr. Bowers's CV).  Dr. Bowers testified that the MRI taken on May 12, 2011 showed three early metastatic lesions on the plaintiff's pelvic bone.  Trial Tr. ECF No. 56 at 50:16–51:20, 55:10–56:11.  He also testified that the MRI taken on July 15, 2011 showed marked improvement, which signified a good response to chemotherapy.  *Id.* at 57:14–58: 11.

h)      *Peter Pushkas, M.D.*

Dr. Pushkas is board-certified in internal medicine and medical oncology.  Pl.'s Ex. 38, at 2 (Dr. Pushkas's CV); *see also* Trial Tr. ECF No. 56 at 61:16–:17.  Dr. Pushkas testified as one of plaintiff's expert witnesses about the staging and progression of breast cancer.  Dr. Pushkas opined that in December 2009, the plaintiff had Stage I breast cancer, that it progressed to Stage II sometime between July and August 2010, and that it progressed to Stage IV sometime between December 2010 and March 2011.  Trial Tr. ECF No. 56 at 67:16–69:5, 74:16–:24.  Dr. Pushkas also opined that if the plaintiff's breast cancer had been diagnosed and treated while Stage I, she would likely have had a 98% chance of survival, *id.* at 77:14–78:6; and while Stage II, a chance of survival in the 70% range.  *Id.* at 78:14–:23.  He also opined that with her Stage IV breast cancer diagnosis, she has only a 15–17% chance of five-year survival.  *Id.* at 83:8–:25.

i)      *Terri Sue Patterson, RN, MSN, CRRN*

Nurse Patterson is a licensed professional nurse and a specialist in rehabilitation nursing.  Pl.'s Ex. 40, at 1.  Nurse Patterson testified about the "cost and services for hospice care and palliative care" for the plaintiff through the end of the plaintiff's life.  Trial Tr. ECF No. 56 at

93:9–:15. In evaluating medical costs for the plaintiff's care, Nurse Patterson examined palliative and hospice care, medical care, counseling services, and home care and/or hospice inpatient treatment. *Id.* at 94:13–17. Based on Ms. Tecala's recommendation that the plaintiff attend weekly counseling sessions with a psychologist or social worker, Nurse Patterson estimated the cost of counseling for the plaintiff as $175 per week for 18 months, for a total of $13,650. *Id.* at 94:20–:22, 95:11; Pl.'s Ex. 53 at 10. Nurse Patterson also opined that patients usually require palliative and hospice care for the last six months of life. Trial Tr. ECF No. 56 at 94:13–:17. On that basis, she estimated the cost of six months of hospice care at $200 per day for ninety days of in-home care ($18,000 total), and $700 per day for ninety days of inpatient care, ($63,000 total). *Id.* at 96:6–:10, 96:25–97: 2; Pl.'s Ex. 53 at 10. For the plaintiff's medical costs, Nurse Patterson estimated that during the last six months of her life, the plaintiff will require an oncologist's care at $200 per visit, twice per month, for a total cost of $2,400; a primary care physician's care twice per month at $70 per visit, for a total cost of $840; and a pain management specialist once a month at $500 per visit, for a total cost of $3,000. Trial Tr. ECF No. 56 at 97:15–18; Pl.'s Ex. 53 at 10. Nurse Patterson estimated the cost of a twenty-four-hour per day in-home health aide for the last three months of the plaintiff's life at $23 an hour, for a total of $49,680. Pl.'s Ex. 53 at 10. In total, Nurse Patterson estimated the cost of the plaintiff's future care needs at $150,570. Trial Tr. ECF No. 56 at 98:17; Pl.'s Ex. 53 at 11.

j)      *Richard J. Lurito, Ph.D.*

Dr. Lurito is a consultant and economist with a Ph.D. in economics. Pl.'s Ex. 41, at 1. He specializes in the area of determining economic loss. Trial Tr. ECF No. 71 at 10:18–:20. Dr. Lurito testified that the plaintiff could expect to suffer three types of economic loss: loss of earnings, loss of household services and future care costs. Trial Tr. ECF No. 71 at 12:14–:23.

As to loss of earnings, Dr. Lurito testified that the plaintiff would earn $737,715 in today's dollars if her income stayed the same for the rest of her working life, which he assumed would end at age 65. Trial Tr. ECF No. 71 at 13:13–:15; 14:1–:20; 15:14–:25. Dr. Lurito testified that he applied a discount rate of 3.5 percent to all of his calculations to reflect the interest on the judgment. Trial Tr. ECF No. 71 at 16:16–22; 17:16-:21; 23:4–:11; 25:24–26:1. Dr. Lurito calculated the economic value of the loss of the plaintiff's household services – which Dr. Lurito generally defined as the ability to provide childcare services to the plaintiff's children – to be between $508,121 and $652,939. Trial Tr. ECF No. 71 at 20:5–:13; 21:13–18. Dr. Lurito testified that the range represents the difference between household services being provided until the plaintiff's youngest child reaches age eighteen or age twenty-one. Trial Tr. ECF No. 71 at 21:5–:9. Finally, Dr. Lurito testified that the plaintiff's future care costs, i.e., the costs of her treatment until her death, were between $146,682 and $149,886.[7] Trial Tr. ECF No. 71 at 25:5–:11.

### 2. *Defendant's Witnesses*

The defendant presented the testimony of the following nine witnesses, whose testimony is briefly summarized below: Dr. Hill-Daniel; Terita Jones; Diana Lapp, M.D.; Richard Carter, M.D.; Marshal Williams; two medical expert witnesses in the national standard of care, William McLaurin Bethea Jr., M.D., and Edward Graeme Koch, M.D.; one medical expert witness in oncology, John M. Feigert, M.D.; and one expert witness in economics, Gloria Hurdle, Ph.D. (by video deposition).

### a) *Jamie Hill-Daniel, M.D.*

---

[7] Dr. Lurito applied a 3.75 or 4 percent "escalation rate" to some of the estimates Nurse Patterson provided to reflect the increase in costs over the time in which the plaintiff would need future care, as well as applying a 3.5 percent discount rate to the costs to develop a present cost estimate that differs slightly from Nurse Patterson's estimate.

Dr. Hill-Daniel is a board-certified family medicine doctor with a practice at Unity's Congress Heights location. Trial Tr. ECF No. 71 at 60:10–:16, 61:15–:19, 64:23–:25. Dr. Hill-Daniel testified that she also works as an assistant clinical professor for the Georgetown School of Medicine, the George Washington School of Medicine, and the Georgetown Residency Program, and that she acts as both a staff physician and an attending physician at Providence Hospital, with admitting privileges. *Id.* at 61:23–64:3. Dr. Hill-Daniel testified about her treatment of the plaintiff as her primary care physician and, in particular, for the plaintiff's complaints about pain, tenderness and knots in her breasts. Dr. Hill-Daniel testified that even in hindsight, she would not have responded to the plaintiff's breast complaints any differently than she did. Trial Tr. ECF No. 58 at 47:4–:15.

b)  *Terita Lynette Jones*

Terita Jones is a care management support person for Unity at the Congress Heights location. Trial Tr. ECF No. 72 at 8:23–9:8. Ms. Jones testified about how Unity processes referrals and obtains insurance authorizations. She testified that she processes over fifty referrals per day for Dr. Hill-Daniel and three other physicians, and that she processed the referrals and authorizations for the plaintiff to obtain diagnostic tests at Providence Hospital. *Id.* at 9:12–:14, 26:7–:8. She also testified that she re-processed the plaintiff's paperwork on November 3, 2010 after the plaintiff appeared for her appointment at Providence Hospital to obtain a diagnostic ultrasound but could not obtain the test because Dr. Hill-Daniel had entered the wrong code on the plaintiff's referral and authorization forms. *Id.* at 22:14–31:21.

c)  *Diana Lapp, M.D.*

Dr. Lapp is the Deputy Chief Medical Officer and Vice President for Medical Administration for Unity, and she testified about the policies and procedures in place to handle

the between 550 and 600 patients seen each week at Unity's Congress Heights location.  Trial Tr. ECF No. 72 at 71:16–:20; 77:13–:15.  Dr. Lapp testified that at a typical visit to Unity, a patient will generally see a registration assistant for check-in, then a medical assistant who takes down her complaints, and then the doctor.  *Id.* at 84:5–86:13.  A patient may see a doctor either by making an appointment or walking in.  *Id.* at 83:1–:6.

d)      *Richard Carter, M.D.*[8]

Dr. Carter is an emergency medicine doctor at Howard University Hospital who treated the plaintiff for breast complaints on May 19, 2010.  Trial Tr. ECF No. 72 at 119:13–:15.  Dr. Carter testified that his records of the visit reflect that the plaintiff's chief complaint was tenderness in her left breast.  *Id.* at 119:11–:12.  He performed a physical exam and found multiple tender breast cysts – one of which was particularly large – and no signs of infection.  *Id.* at 122:6–123:23.  Dr. Carter testified that he told the plaintiff to follow up with her primary care physician.  *Id.* at 123:24–124:9.

e)      *Marsha Williams*

Ms. Williams is employed as a front desk registration clerk at Providence Hospital with responsibility for performing intake for patients who have appointments for diagnostic mammograms, regular mammograms, ultrasounds, and bone-density scans.  Trial Tr. ECF No.

---

[8] Dr. Carter was subpoenaed to appear at trial by counsel for the defendant.  Before he took the stand to testify, plaintiff's counsel raised an objection that defendant's counsel had improperly spoken with Dr. Carter about the plaintiff's care without proper authorization under the Health Insurance Portability and Accountability Act of 1966 ("HIPAA").  Trial Tr. ECF No. 72 at 108:12–:24.  Two lead attorneys for the defendant orally represented to the Court that they had never spoken to Dr. Carter.  *See id.* 108:25–109:2, 109:20–:24.  The Court determined that the best course was to proceed with Dr. Carter's examination, which would clarify the factual dispute about whether Dr. Carter had, in fact, been interviewed by defense counsel, and permit the parties to brief the issue of the alleged HIPAA violation after conclusion of the trial.  *Id.* at 111:20–112:3.  Just moments before Dr. Carter took the witness stand, however, a third attorney for the defendant, who did not examine any of the witnesses at trial, came forward and identified himself as the defense counsel who had interviewed Dr. Carter at the express direction of one of the two lead attorneys.  Neither of the two lead defense attorneys, when denying any contact with Dr. Carter, had indicated to the Court that they had knowledge of any contact by another defense counsel with Dr. Carter or that another attorney on the defense team had actually been directed to interview him.  These blatant omissions by the two lead defense attorneys fall short of the level of candor that this Court expects under Rule 3.3 of the D.C. Rules of Professional Conduct.

72 at 141:4–:21. Ms. Williams testified that she was working when the plaintiff came in for an ultrasound test on November 3, 2010, but the plaintiff could not have the procedure done because the code on her referral and insurance authorization was not accepted by Providence Hospital. *Id.* at 144:21–146:6, 147:9–148:24. Ms. Williams also testified that in 2010 to 2011, ultrasound appointments were scheduled about a week in advance, but if there were a need, they could be scheduled within a couple of days, and that mammograms could be scheduled within a week or two. *Id.* at 146:19–147:4.

f) *Gloria Hurdle, Ph.D.*

Dr. Hurdle is an economist with a Ph.D. in economics. Def.'s Ex. 28, at 1. Dr. Hurdle's videotaped *de bene esse* deposition was played during the bench trial and a transcript of Dr. Hurdle's deposition was introduced into evidence as Defendant's Exhibit 36. Dr. Hurdle testified about the plaintiff's lost net earnings, lost household services, and future care costs. Def.'s Ex. 36 at 11:12–:24. Dr. Hurdle testified she calculated the plaintiff's lost net income by assuming that the only change to the plaintiff's salary over time would be inflation and by subtracting a discount rate of 8.98 percent, to reflect the "riskiness" of the plaintiff's ability to earn future wages. *Id.* at 15:3–:5, 18:14–19:12, 21:9–:17. In calculating these lost wages, Dr. Hurdle used work-life expectancy tables to estimate that the plaintiff would have worked twenty-seven years between 2012 and retirement at age sixty-five. *Id.* at 29:2–5. She further reduced the lost net income estimate by subtracting the amount of the plaintiff's "consumption" during her lifetime. *Id.* at 15:9–:12. In estimating the loss of household services, Dr. Hurdle applied the same discount rate of 8.98 percent and estimated the pecuniary loss to the plaintiff as between $166,521 (if calculated up to the plaintiff's youngest child turning eighteen) and $191,239 (if calculated up to the plaintiff's youngest child turning twenty-one). *Id.* at 27:4–:7, 27:19. Dr.

Hurdle calculated the plaintiff's total cost of future care as between $90,434 (if the plaintiff uses in-home hospice care) and $111,889 (if the plaintiff uses inpatient hospice care). *Id.* at 37:12–13.

g) *William McLaurin Bethea Jr., M.D.*

Dr. Bethea is board-certified in internal medicine and practiced in Norfolk Virginia from 1977 until his retirement in 2012. Def.'s Ex. 24, at 2 (Dr. Bethea's CV). Dr. Bethea testified as a defense expert witness regarding the national standard of care regarding a family medicine doctor's responsibility to investigate and diagnose a patient's complaints for breast cancer. Dr. Bethea opined that Dr. Hill-Daniel satisfied the national standard of care at the plaintiff's first visit for breast complaints in December 2009 by reassuring her of the benign nature of her concerns, advising her to change her bra, and prescribing pain medication, and that Dr. Hill-Daniel also satisfied the national standard of care in her treatment of the plaintiff at subsequent visits in early 2010 when she did not ask the plaintiff about the status of any breast complaints. Trial Tr. ECF No. 73 at 21:12–:19, 35:21–36:10. He also testified that Dr. Hill-Daniel did not deviate from the standard of care after the plaintiff's October 18, 2010 visit, when Dr. Hill-Daniel palpated a mass in the plaintiff's left breast and lymph nodes under her left armpit, despite permitting five-months to elapse between the visit and the diagnosis of breast cancer, although he conceded that Dr. Hill-Daniel's treatment at that time did not meet best practices. *Id.* at 40:14–45:23.

h) *Edward Graeme Koch, M.D.*

Dr. Koch is board-certified in obstetrics and gynecology. Def.'s Ex. 25, at 1(Dr. Koch's CV). He has practiced as an obstetrician and gynecologist since 1975 and currently contracts as a gynecologist at the OB/GYN department of Walter Reed National Military Medical Center,

and has a private gynecology practice. *Id.*; *see also* Trial Tr. ECF No. 73 at 66:21–68:7. Dr. Koch testified as a defense expert witness regarding the national standard of care for a family medicine physician to assess and diagnose a patient's breast complaints. Dr. Koch opined that Dr. Hill-Daniel did not deviate from the applicable standard of care by treating the plaintiff's symptoms at the December 3, 2009 visit and ensuring the plaintiff that the symptoms were benign, by not following-up on the plaintiff's breast complaints at her subsequent visits, by ordering a six week follow-up period after referring the plaintiff for a diagnostic ultrasound, and by then proceeding to order a mammogram and a biopsy in that progression. Trial Tr. ECF No. 73 at 76:9–79:6, 85:5–:18, 95:20–98:14, 99:1–105:9.

i)   *John M. Feigert, M.D.*

Dr. Feigert is a hematologist oncologist who is board-certified in internal medicine, hematology, and oncology. Def.'s Ex. 26, at 1(Dr. Feigert's CV); *see also* Trial Tr. ECF No. 57 at 22:20–23:7. He currently works in private practice in Arlington, Virginia. Def.'s Ex. 26, at 1; Trial Tr. ECF No. 57 at 23:14–:18. Dr. Feigert testified as a defense expert on the character, qualities, staging, and prognosis of breast cancer. Dr. Feigert opined that as of December 3, 2009, the plaintiff's cancer was at least Stage III-B because it had already infiltrated her skin, and that it was likely Stage IV because it had probably also metastasized into her bone. Trial Tr. ECF No. 57 at 30:13–:18. He also testified that, based upon his opinion about the staging of the plaintiff's cancer, if diagnosed in December 2009, the plaintiff's chance of survival would have been less than 50%. *Id.* at 61:10–:25.

## B.   CREDIBILITY ASSESSMENT

**1.** The majority of the witnesses who provided testimony during the bench trial were expert witnesses and the plaintiff's treating physicians. The witnesses generally testified credibly.

Ms. Jones, Dr. Lapp, and Ms. Williams also testified as non-party fact witnesses and they presented the facts of which they had first-hand knowledge in a frank and candid manner.

**2.** The Court found the plaintiff to be entirely credible. Her testimony was consistent. For example, despite a lengthy and aggressive cross-examination about how long she had been feeling knots in her breast when she visited Dr. Hill-Daniel in December 2009, her recollection that she only began feeling them around the time of that visit never wavered. *See* Trial Tr. ECF No. 55 at 108:24–109:1 ("Q: Did you tell [Dr. Hill-Daniel] that you had been having the knot for three years before [December 3, 2009]? A: No."); *id.* at 113:6–:9 ("So, if you went back to Fort Washington in August 2010, and if we are counting back three years from 2010, would you agree that you knew about those knots in 2007? A: No, I did not know about the knots in 2007."); *id.* at 113:11–:15 (Responding to a question from defense counsel about whether she testified at her deposition that she had been feeling the knots for three years prior to the December 3, 2009, visit, the plaintiff replied "I mean, I probably didn't understand the question. But I know in 2007, I did not have no knots on my left breast. . . . I mean, I wouldn't agree that I had the knots in 2006 because I know I didn't have no knots in 2006."); Trial Tr. ECF No. 70 at 43:6–44:1 (On redirect, the plaintiff's counsel quoted this passage from the deposition transcript: "Question: Right. But you told them that you had them for three years? This is August of 2010. Answer: I had the knot when I seen Dr. Hill-Daniel, so more, I mean came at that time. [Question:] Did you have those lumps for three years prior to August of 2010? Answer: Not that I recall. I had them at the time I went to see Hill-Daniel. So I don't know if they – it wasn't there before I went to see her, like the first visit I complained about the knot. [Question:] You had them before that? . . . Answer: No, I didn't. The first time that I seen, actually seen the knot was the first

time I visited her in December of 2009.  Question:  And you – your testimony is that you did not have any lumps in your breast prior to December of 2009?  Answer:  I had – I haven't had no lumps before – I mean before that December visit that I know of.").  All the while, the plaintiff's demeanor was firm, but not defensive.

3.  Furthermore, despite an unexplained lapse in memory regarding her visit to the emergency room at Howard University Hospital on May 19, 2010, the plaintiff was forthcoming and straightforward.  She readily admitted when she did not personally remember an event, and she did not appear to substitute speculation about what might have occurred for actual memory.  *See, e.g.*, Trial Tr. ECF No. 55 at 82:19–:23 ("The Court:  Were you, during [the January 8, 2010] visit, still having pain and tenderness in your breasts?  Do you recall?  The Witness:  I don't remember at that time.  But I know I just remembered what she told me about the problems that I had with the knot and the pain in my left breast."); *id.* at 83:15–:25 ("Q:  Let's talk about the April 30th, 2010 visit with Dr. Hill-Daniel.  Do you recall going to see Dr. Hill-Daniel on this date for a checkup and problems with your eyes?  A:  Yes.  Q:  Okay.  At that time, do you recall if Dr. Hill-Daniel asked you if you were having any problems with your breasts?  A:  No.  Q:  Were you having any problems with your breasts?  A:  Actually, no.  Q:  Was the knot still present?  A:  It was the same thing as from the first visit in 2009.").

4.  The Court also found Dr. Hill-Daniel to be credible in some areas and not in others.  Despite Dr. Hill-Daniel's insistence that she remembered her encounters with the plaintiff first-hand, it was clear to the Court that her memory of the events giving rise to this case – particularly those that took place in 2009 and early 2010 – was based on what was written in the patient progress notes, and generalizations about her patients.  *See, e.g.*, Trial Tr. ECF No. 58 at

50:13–:24 ("Q: Do you recall testifying in your deposition that you had no recall of conversations that were not recorded in the medical records? Do you recall giving that testimony? A: At the beginning of the deposition, yes, I said I didn't recall other than what was in the chart. But by the end of the deposition, even [the plaintiff's counsel] noted that I did recall other instances with more interactions with [the plaintiff] than came out during the deposition. Q: And apparently since the deposition, you've had further recall about the conversations that you had with [the plaintiff]; is that accurate to say? A: Yes."). Dr. Hill Daniel sees an average of twenty to twenty-two patients per day, five days per week, Trial Tr. ECF No. 71 at 65:6–8; Trial Tr. ECF No. 58 at 88:2–14, and there was nothing about the plaintiff's December 2009, January 2010, or April 2010 visits that seemed particularly notable to Dr. Hill-Daniel at the time. Moreover, when asked questions about what happened during the plaintiff's various visits, Dr. Hill-Daniel often responded by referring to what was written in the progress note. *See, e.g.*, Trial Tr. ECF No. 58 at 4:6–:12 ("Q: And what history did the patient give you [on December 3, 2009]? A: As noted in the chart, [the plaintiff] came in with . . . ."); *id.* at 20:13–:17 ("Q: What course of action did you take to resolve the complaints [at the January 8, 2010 visit]? A: Well, as you see from the history, when someone comes in basically questioning fertility, we do counseling for family planning."). Sometimes Dr. Hill-Daniel responded to questions about her interactions with the plaintiff by referring to her general practices. *See, e.g.*, *id.* at 10:3–:15 (Q: Dr. Hill-Daniel, would you show us how you did the physical examination of Ms. Rhodes' breasts? How did you examine her breasts? . . . A: Sure. To do a clinical breast exam, we ask the woman to disrobe from the waist up. So, I asked her to take her shirt and her bra off . . . . When I came in the room, I have the patient sit on the examination table. The first part of the

exam is observation. So, I look at her breasts while she is sitting . . . . And then I have the

patient lie supine on the table and I begin the exam."). These characteristics cast some doubt

on the credibility of Dr. Hill-Daniel's testimony regarding details of the plaintiff's early visits

that were not recorded in the progress notes, and the Court has some concern that her

testimony about those visits was based on wishful speculation rather than personal memory.

5.  In addition, Dr. Hill-Daniel displayed some signs of dissembling, such as the evasive nature

of her answers to questions about whether she was or was not the plaintiff's primary care

physician, *see, e.g.*, *id.* at 48:3–:15 (stating that "as I stated before in my deposition, at the

time I didn't necessarily consider her my patient," but conceding that in accordance with

Unity policy, "I would have considered her my patient by then"), and her inadequate

explanations about certain notations in the plaintiff's medical records, *see, e.g.*, *id.* at 6:19–

7:10 (asked by the Court why she wrote "no history of cancer in first degree relatives"

despite her testimony that she asked Ms. Rhodes "if she had any family history of breast

cancer," Dr. Hill-Daniel responded with an explanation of the medical significance of family

history in first-degree relatives and stated "So, it's very, I guess for myself, I wanted to be

clear of what she is saying, that even though she is saying that there is no family history, but

there's definitely – she's definitely denying any first degree relative").

### C.  PLAINTIFF'S BACKGROUND

1.  At the time of the bench trial, the plaintiff was 27-years old. *See* Trial Tr. ECF No. 55 at

6:2–:5. She is a high school graduate, *id.* at 6:12–:15, who was employed as a food service

worker at United Medical Center from 2009 until March 2013. *Id*. 6:8–:11, 104:8–13. She

stopped working in March 2013 because the pain she experienced from her breast cancer,

which had metastasized to her bones, prevented her from standing for the amount of time her

job required.  *Id*. 103:14–104:1.  Since then, she has interviewed for other jobs, *id.* 103:5–:7, and she was recently hired by a cleaning company, *id.* 103:7–:9.  At the time of the bench trial, she was waiting for that job offer to be finalized.  *Id.*  She is not married and has two children, who at the time of the bench trial were eight and nine years old.  *Id.* 75:4–:11.

**2.**  Both of the plaintiff's grandmothers were diagnosed with breast cancer before the events that gave rise to this action.  Trial Tr. ECF No. 55 at 75:21–76:11.  Her paternal grandmother died of breast cancer in 1994, *id*. at 76:1–:6, and her maternal grandmother was diagnosed with breast cancer in her thirties and was living at the time of trial, *id*. at 76:5–:11.

### D.     DR. HILL-DANIEL'S PRACTICE AND UNITY PROCEDURES

**1.**  Dr. Hill-Daniel sees an average of about twenty to twenty-two patients per day as a family practice physician at the Congress Heights location of Unity.  Trial Tr. ECF No. 71 at 65:6–:8; Trial Tr. ECF No. 58 at 88:2–:14.  Each patient is allotted a fifteen-minute visit.  Trial Tr. ECF No. 71 at 65:11–:12.  Dr. Hill-Daniel performs breast exams regularly as part of the annual exams for women, called "well-woman visits," and when a patient has a specific breast complaint.  *Id.* at 66:6–:8, 73:7–:10.  It is very rare for Dr. Hill-Daniel to see a woman under the age of thirty for a specific breast complaint.  *Id*. at 66:9–:11.

**2.**  Dr. Lapp, a representative of Unity, testified that when a patient first comes in to the Congress Heights location of Unity, the patient is seen by a registration assistant, and then speaks with a medical assistant before seeing the provider. Trial Tr. ECF No. 72 at 84:5–:9.  The registration assistant records information related to the visit – i.e. type of visit, established patient or new patient – in the electronic medical record under "reason for appointment."  *Id.* at 84:22–85:5.  The patient then sees a medical assistant, who asks why the patient has come in for a visit and records the patient's answer in the electronic medical

record, also under "reason for appointment." *Id.* at 85:5–:7. Dr. Lapp testified that

communication between the medical assistant and the physician is largely done electronically

or by paper, *id.* at 85:20–86:3, and that by the time the physician sees the patient, the medical

assistant has already turned to the next patient. *Id.* at 86:4–:13.

3.  Dr. Hill-Daniel first saw the plaintiff as a patient for a well-woman visit on July 25, 2008.

Def.'s Ex. 1, at 3; Trial Tr. ECF No. 71 at 73:5–:12. Dr. Hill-Daniel saw the plaintiff again

in September 2008, April 2009, and August 2009 for complaints unrelated to the plaintiff's

breasts. Def.'s Ex. 1, at 4–6; Trial Tr. ECF No. 71 at 75:9–:22, 76:10–:17, 77:6–:19. Dr.

Hill-Daniel testified that although the plaintiff was never formally assigned as a patient to Dr.

Hill-Daniel, doctors at Unity assume the role of primary care physician for a particular

patient after seeing the patient three times. Trial Tr. ECF No. 58 at 48:18–:21. By the time

of the plaintiff's December 2009 visit to the Unity clinic, Dr. Hill-Daniel had seen her at least

four separate times. *Id.* at 48:22–25.

### E.   THE PLAINTIFF'S VISIT WITH DR. HILL-DANIEL ON DECEMBER 3, 2009

1.  The plaintiff visited the Congress Heights location of Unity on December 3, 2009, for a

scheduled visit with Dr. Hill-Daniel. Trial Tr. ECF No. 55 at 78:17–:25; Pl.'s Ex. 1, at 1066.

There is some dispute as to whether the plaintiff told the Unity healthcare providers that she

felt a knot specifically in her left breast or whether she described feeling knots in both

breasts.

   a)   The plaintiff testified that she told Dr. Hill-Daniel that she had soreness and

tenderness in both of her breasts, and a pain and a knot in her left breast. Trial Tr.

ECF No. 55 at 78:12–:16 (the plaintiff's testimony that the reason for her visit was

"soreness and tenderness in both of [her] breasts and pain and a knot in [her] left

breast"); *see also id.* at 17:19–:22.  She testified that the pain had started about a month before the appointment.  *Id.* at 78:20–79:2. There is no dispute that the plaintiff asked Dr. Hill-Daniel for a mammogram.  *Id.* at 78:14–:15 (plaintiff's testimony that she asked Dr. Hill-Daniel for a mammogram); Trial Tr. ECF No. 58 at 13:23–:24 (Dr. Hill-Daniel's testimony that at the December 3, 2009 appointment, the plaintiff asked her "if she needed a mammogram for her complaint").

b) Dr. Hill-Daniel denied that the plaintiff complained of a knot in the left breast, but testified that she complained that both breasts were sore and had knots in them.  Trial Tr. ECF No. 58 at 4:7–:12 ("[The plaintiff] held under her breasts and basically just motioned that both breasts were tender and felt lumpy.").  According to Dr. Hill-Daniel, she specifically asked if there was any particular place where the plaintiff felt the "knot," and the plaintiff did not identify any specific location.  *Id.* at 18:18–:23 ("So, during the course of our exam, I asked her, you know, is there a particular place, you know, where do you feel the knot?  And she couldn't give me any specific place.  And when I asked her, she just, again, said, they're all over.  So basically saying that both breasts felt sore and knots in them, not one specific knot.").

c) The Unity progress note for the plaintiff's December 3, 2009 visit lists as the reason for appointment as "1. Medical – Adult Est Patient 2. Sore, tender breasts 3. Knots in them."  Def.'s Ex. 1, at 8; Pl.'s Ex. 1, at 1013.  Dr. Hill-Daniel testified that the individual who recorded the plaintiff's "reason for appointment" was the medical assistant with whom she was working on December 3, 2009.  Trial Tr. ECF No. 58 at 3:17–:21.  The progress note for the December 3, 2009, visit also contains Dr. Hill-Daniel's notes, which stated in pertinent part: "Patient presents for new complaint of

23

breast tenderness and lumpiness.  Pt states tender all the time denies pregnancy and

no change with menstrual cycle.  Pt also concerned that breast are [sic] lumpy."

Def.'s Ex. 1, at 8; Pl.'s Ex. 1 at 1013.

2.   Dr. Hill-Daniel testified that her note "tender all the time" meant to her that the patient did

not feel pain that is waxing and waning.  Trial Tr. ECF No. 58 at 6:3–6 ("[I]t's not waxing

and waning, the pain is not in the morning versus in the evening.  She is specifically saying

that she feels uncomfortable all the time with the pain.").  She further interpreted her note,

"no change with menstrual cycle," explaining this meant that there was no change in the

symptoms associated with the patient's menstrual cycle, and her observation that the plaintiff

was menstruating during the time of the visit.  *Id*. at 5:15–:21.

3.   The defendant disputes whether the plaintiff told Dr. Hill-Daniel or the medical assistant

about her family history of breast cancer, and whether Dr. Hill-Daniel asked the plaintiff

about her family history of breast cancer beyond her first-degree relatives.

a)   The plaintiff testified emphatically that, at the December 3, 2009 appointment, she

told one of the health care providers with whom she spoke about her family history of

breast cancer.  Trial Tr. ECF No. 55 at 79:13–:16 ("Q:  And you mentioned that you

had discussion with Dr. Hill-Daniel about cancer.  Would you describe for us what

the nature of the discussion was?  A:  I told her I had two grandmothers that had

breast cancer."), 128:17–:18 ("Yes, I told them at Unity that I had a family history of

breast cancer."), 129:5–:6 ("I told them numerous times when I was, when I seen the

nurse before I seen Dr. Hill-Daniel.").  Indeed, the plaintiff explained that the fact that

both her grandmothers suffered from breast cancer worried her when she felt a knot in

her breast and is the reason that she made the appointment to see Dr. Hill-Daniel in December 2009 and expressly requested a mammogram. *Id.* at 78:11–:16.

b) The note prepared by the medical assistant makes no mention of the plaintiff's grandmothers' breast cancer. The progress report from the December 3, 2009 appointment prepared by Dr. Hill-Daniel states only that "Pt denies family hx of breast ca in first degree relative." Def.'s Ex. 1 at 8. Dr. Hill-Daniel testified that the first-degree relative is "a mother, sister, father." Trial Tr. ECF No. 58 at 6:17. A grandparent is a second degree relative. *Id.* at 7:14.

c) Although Dr. Hill-Daniel's progress note indicates information only about cancer in a "first-degree relative," Dr. Hill-Daniel testified that she recalls asking the plaintiff more broadly whether she had any family history of breast cancer, to which the plaintiff said "no." Trial Tr. ECF No. 58 at 6:4–:5.

4. Dr. Hill-Daniel performed a clinical breast exam on the plaintiff, which the plaintiff described as "a quick pat-down," Trial Tr. ECF No. 55 at 79:4–:9; Trial Tr. ECF No. 58 at 9:16–:20, and found no abnormalities, Trial Tr. ECF No. 58 at 62:6–:9. Dr. Hill-Daniel did not feel, or palpate, a mass in the plaintiff's breast or her lymph nodes during the exam, nor did she find any retractions. Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8; Trial Tr. ECF No. 70 at 58:7–:15. A retraction looks like a pucker in the skin, and can be a symptom of breast cancer if the cancer is close to the skin. Trial Tr. ECF No. 70 at 58:7–:15. Dr. Hill-Daniel testified that she did not write down any differential diagnosis – the list of possible diagnoses – in the progress note. Trial Tr. ECF No. 58 at 15:1–16:7. Nevertheless, she testified that her top two possible diagnoses were fibrocystic changes related to hormones and underwire bra. *Id.* at 55:15–:17. The term "fibrocystic changes," also called fibrocystic disease, means normal

breast tissue that is tender and feels lumpy due to hormonal changes with a woman's menstrual cycle. *Id.* at 56:14–:17. Dr. Hill-Daniel acknowledged, however, that she did not record "fibrocystic changes" as her diagnosis on the progress note; rather, she entered the diagnostic code "breast disorder not otherwise specified." *Id.* at 13:2–:22; Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8. Dr. Hill-Daniel testified that breast cancer was not on her differential diagnosis. Trial Tr. ECF No. 58 at 55:11–:14.

5. The plaintiff testified that Dr. Hill-Daniel told her that she was too young to have breast cancer and too young for a mammogram. Trial Tr. ECF No. 55 at 79:10–:19. Dr. Hill Daniel denied telling the plaintiff that she was too young to have breast cancer, Trial Tr. ECF No. 58 at 14:18–:24, but acknowledged that she reassured the plaintiff that her concerns were benign, *id.* at 13:21–:22. The progress note reflects that Dr. Hill-Daniel "reassured [the plaintiff] about the benign nature of her concern" and determined that "no imaging [was] warranted at this time." Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8. Dr. Hill-Daniel recommended that the plaintiff change her bra to non-underwire, and prescribed 800 mg of Ibuprofen three times per day with one refill. Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8; Trial Tr. ECF No. 58 at 14:5–:9.

6. On the progress note, the letters "PRN," which means "as needed," are written under the title "follow-up." Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8; Trial Tr. ECF No. 58 at 16:8–:9. Dr. Hill-Daniel testified that she asked the plaintiff "to follow up if she didn't have any relief of the pain, or if her symptoms persisted." Trial Tr. ECF No. 58 at 16:12–18. She did not schedule or direct the plaintiff to return for a follow-up appointment within any specific time frame. Trial Tr. ECF No. 70 at 61:15–:23. The plaintiff testified that Dr. Hill-Daniel never told her that she should follow-up under any circumstances. *Id.* at 20:22–21:7.

**7.** The standard of care experts disagreed as to what the national standard of care required Dr. Hill-Daniel to do for a patient presenting with the plaintiff's symptoms.

    a)  The plaintiff's expert, Dr. Sutherland, testified that when a patient presents complaining of a knot in one breast and noncyclic pain, and with a family history of two grandmothers with breast cancer, the national standard of care for a family care doctor requires the doctor to order diagnostic imaging, even if the doctor does not palpate a mass. Trial Tr. ECF No. 69 at 47:12–:23. At the very least, the national standard of care requires the doctor to schedule a follow-up visit for the patient thirty to sixty days later to determine whether the symptoms persist and still warrant imaging. *Id.* at 37:19–:24.

    b)  The plaintiff's expert, Dr. Margo, testified that when a patient presents complaining of a palpable lump, tenderness and pain – even if the doctor does not feel a mass herself – the national standard of care for a family care doctor requires the doctor to include breast cancer in her differential diagnosis and schedule a follow-up visit for the patient for four to six weeks later to ensure that the problem has gone away and to reexamine the patient at a different stage in her menstrual cycle. Trial Tr. ECF No. 70 at 60:22–61:2 ("[T]he national standard required her to make sure she had a follow-up visit to make sure the problem went away and that she informed the patient of the possibility that this wasn't benign, that maybe it probably was, but that we can't be sure until we follow it through."), 61:15–62:3 ("Q: And what specific follow-up was Dr. Hill-Daniel required to order? A: To make sure she had an appointment to follow up in the next four to six weeks."), 64:4–:8 ("[B]reast cancer has to be on the diagnosis since that's the most dangerous thing to miss.").

According to Dr. Margo, the national standard of care does not require the doctor under those circumstances to order imaging before the follow-up visit.  *Id.* at 62:24–63:2.

c) The defendant's expert, Dr. Bethea, testified because the patient was a twenty-four year old woman presenting with soreness and knots in both breasts, and upon examination the physician felt no masses, but made "bilateral fibrocystic findings," Dr. Hill-Daniel met the national standard of care for a family practice physician by prescribing pain medication and a different bra.  Trial Tr. ECF No. 73 at 22:9–:11, 30:14–:24.  He testified that under those circumstances, the national standard of care for a family practice physician does not require referral for imaging.  *Id.* at 29:21–30:5.  He also testified that it would be inappropriate to list cancer on the differential diagnosis because cancer would be "so far down on the list of probabilities."  *Id.* at 31:24–32:14.

d) The defendant's expert, Dr. Koch, testified that because the patient is a twenty-four year old woman complaining of "sore, tender breasts, plural . . . and she feels knots in them," has no family history of breast cancer, and upon physical examination the physician finds no masses, no retractions, and no lymph nodes, Dr. Hill-Daniel met the national standard of care by advising the patient to change the type of bra she wears, prescribing pain medication, and asking her to follow up if the problem does not go away.  Trial Tr. ECF No. 73 at 77:9–79:3, 83:2–:18, 86:19–87:7.  He testified that under those circumstances, the national standard of care for a family practice physician does not require referral for imaging.  *Id.* at 80:1–:3, 85:10–86:17.  He also testified on cross-examination, in concurrence with the plaintiff's experts, that it

would violate the national standard of care for a physician under those circumstances not to tell the patient to come back if the breast problems continue. *Id.* at 128:8–:17. Moreover, in further concurrence with the plaintiff's experts, Dr. Koch opined that if a patient presents with bilateral tenderness in her breast and a discrete lump or knot, and pain in one breast, and the physician could not feel the lump, the national standard of care would require the physician to bring the patient back within six weeks to three months for follow-up. *Id.* at 129:3–:25.

### F. THE PLAINTIFF'S MEDICAL HISTORY FROM JANUARY 2009 TO AUGUST 2010

1. The plaintiff returned to Unity on January 8, 2010 – thirty-six days after her December 3, 2009 visit – for an appointment with Dr. Hill-Daniel regarding fertility issues. Trial Tr. ECF no. 58 at 19:12–:14, 20:8–:12; Pl.'s Ex. 1, at 1064; Def.'s Ex. 1, at 9. Dr. Hill-Daniel did not ask the plaintiff about her breast symptoms during that visit or examine her breasts. Trial Tr. ECF No. 58 at 21:7–:9, 71:25–72:11. The Ibuprofen prescribed by Dr. Hill-Daniel for the plaintiff at the previous appointment appears on the progress note for the January 8, 2010 visit as a "current medication," Pl.'s Ex. 1, at 1064; Def.'s Ex. 1, at 9, and Dr. Hill-Daniel testified that she was aware that the plaintiff was continuing to take the Ibuprofen. Trial Tr. ECF No. 58 at 19:12–:14, 20:8–:12.

2. The plaintiff returned to Unity again on April 30, 2010, for a check-up and for problems with her eyes. Pl.'s Ex. 1, at 1062; Def.'s Ex. 1, at 11. Dr. Hill-Daniel testified that she did not recall any conversation with the plaintiff about her breasts during that visit, Trial Tr. ECF No. 58 at 21:17–22:18, 48:17–:25. She also testified that during that visit, she did not specifically ask the plaintiff if she was having problems with her breasts, Trial Tr. 53:17–:22, although she testified from recollection that she did ask the plaintiff if she had any other

issues or complaints, to which the plaintiff responded "no," *id.* at 23:2–:4. The plaintiff's testimony confirmed that Dr. Hill-Daniel did not inquire about her breasts at this follow-up visit: when asked if she recalled whether Dr. Hill-Daniel asked her if she was having any problems with her breasts at the April 30, 2010 visit, the plaintiff responded, "no." Trial Tr. ECF No. 55 at 83:15–:21.

3. On May 19, 2010, the plaintiff was seen by an emergency physician, Dr. Carter, at Howard University Hospital. Pl.'s Ex. 104, at 23061; Def.'s Ex. 3, at 68; Trial Tr. ECF No. 72 116:5–:11. The chief complaint as documented on the record for that visit is "knot on l[ef]t breast," Pl.'s Ex. 104, at 23061; Def.'s Ex. 3. The medical history recorded by Dr. Carter included "left breast tenderness for greater than a year," and indicated that the pain was "continual." Pl.'s Ex. 104, at 23062; Def.'s Ex. 3, at 69; Trial Tr. ECF No. 72 at 119:11–:12, 119:21–:24. Dr. Carter's notes also state that he found no discharge from the nipple, no warmth, and no redness – meaning no signs of infection. Pl.'s Ex. 104, at 23062; Def.'s Ex. 3, at 69; Trial Tr. ECF No. 72 at 122:18–123:2. There is no indication in the notes that the plaintiff had any ulcerations or skin nodules on her breasts. Pl.'s Ex. 104, at 23062; Def.'s Ex. 3, at 69. Dr. Carter testified that he palpated the plaintiff's breasts and found tender cysts in both breasts, with one large tender cyst in the left breast, and tenderness in both breasts. Trial Tr. ECF No. 72 at 123:5–:8, 134:2–:5. Dr. Carter documented the results of the exam with a diagram in the patient record. Pl.'s Ex. 104, at 23062; Def.'s Ex. 3, at 69. Dr. Carter testified that he wrote, "Patient advised to follow up with primary care provider for full evaluation, possible biopsy" in the plaintiff's record, which means that he probably told the plaintiff to see her primary care doctor and get a further workup. Trial Tr. ECF No. 72 at 123:7–:8, 124:1–:18; Pl.'s Ex. 104, at 23062; Def.'s Ex. 3, at 69. He prescribed 800mg of

Motrin and Tylenol with Codeine.  Pl.'s Ex. 104, at 23065; Def.'s Ex. 3, at 72.  The plaintiff

signed the discharge form and was given a copy to take home.  Pl.'s Ex. 104, at 23065;

Def.'s Ex. 3, at 72; Trial Tr. ECF No. 72 at 135:12–:16.  Among the "additional notes"

written on the discharge form was, "Follow up with your primary care doctor."  Pl.'s Ex.

104, at 23065; Def.'s Ex. 3, at 72.  The plaintiff testified that she did not remember this visit

to Howard University Hospital.  Trial Tr. ECF No. 55 at 84:6–:8 ("Q:  Do you recall going to

Howard University Hospital on May 19th, 2010?  A:  I don't remember that visit."); *id.* at

87:22–:25 ("The Court:  Now, Ms. Rhodes, it's clear from your responses to the last several

questions that you don't have a memory of going to Howard on May 19th, 2010, right?  A:

Right.").

4.  On August 9, 2010, the plaintiff visited the emergency room at Fort Washington Hospital.

Pl.'s Ex. 6, at 6003.  The patient record for the plaintiff's visit, which was completed by a

health care provider, lists her complaint as "knot in left breast x 3 years."  *Id.*  The plaintiff

testified that she went to Fort Washington because she "had soreness and tenderness in [her]

breast and pain and a knot in [her] left breast."  Trial Tr. ECF No. 55 at 89:21–:24.  She

further testified that she did not recall telling anyone that the knots had been present for three

years, and that the knots had only been present since 2009.  *Id.* at 89:21–:24, 90:6–:8.

According to the plaintiff, the emergency room doctors at Fort Washington Hospital told her

to set up an appointment with her primary care doctor for a mammogram because something

very serious was going on with her left breast.  *Id.* at 90:12–:18.  The discharge paper from

that visit lists the diagnosis as "left breast lumps," and under "discharge instructions," is

written, "you need f/u for further evaluation.  Very important."  Pl.'s Ex. 6, at 6002, 6004.

The plaintiff testified that this was the first time that a doctor had told her to schedule an

appointment for a mammogram and that it was important to do so.  Trial Tr. ECF No. 55 at 91:22–:25.

### G.    PLAINTIFF'S VISIT WITH DR. HILL-DANIEL ON OCTOBER 18, 2010

1.  On August 10, 2010 – the day after her visit to Fort Washington Hospital – the plaintiff called Unity and asked for the first available appointment to see Dr. Hill-Daniel because she needed a mammogram.  Trial Tr. ECF No. 55 at 92:1–:13.  She was given an appointment for September 9, 2010.  Pl.'s Ex. 33.  Unity cancelled that appointment shortly before it was scheduled to take place because Dr. Hill-Daniel was scheduled to be on hospital rounds that week.  Pl.'s Ex. 33; Trial Tr. ECF No. 58 at 25:2–:16, 107:21–22.  Unity rescheduled the appointment for September 24, 2010.  Pl.'s Ex. 33.  The September 24, 2010 appointment was also cancelled by Unity.  Pl.'s Ex. 33; Trial Tr. ECF No. 58 at 25:2–19, 107:24–108:4.  Dr. Hill-Daniel testified that Unity cancelled the appointment on the day it was scheduled to take place because she was called to the hospital.  Trial Tr. ECF No. 58 at 25:17–:19.  Unity rescheduled the appointment for October 18, 2010.  Pl.'s Ex. 33.  Dr. Hill-Daniel testified that the plaintiff could have seen another doctor or come in to Unity as a walk-in patient if she did not want to wait to see Dr. Hill-Daniel.  Trial Tr. ECF No. 58 at 25:25–26:15.  The defendant presented no evidence that the plaintiff was told that these options were available to her at the time, nor did the defendant present any evidence that the personnel at Unity, who spoke to the plaintiff about the original or the re-scheduled appointments, made any inquiry about why the plaintiff was requesting an mammogram as soon as possible in order to evaluate the urgency of the need for an appointment.

2.  The plaintiff was seen by Dr. Hill-Daniel on October 18, 2010, more than two months after her initial call to Unity to schedule an appointment.  Pl.'s Ex. 33.  The Unity progress note

for that appointment and Dr. Hill-Daniel's testimony reflect that the plaintiff presented with a "new complaint of bumps in her breast," and that the plaintiff could feel bumps in her left breast that had been getting bigger. Def.'s Ex. 1, at 12; Trial Tr. ECF No. 58 at 24:15–:18. The progress note also reflects that the plaintiff had been seen in the emergency room regarding the bumps and that she was told to follow up with her doctor to get a referral for a mammogram. Def.'s Ex. 1, at 12; Trial Tr. ECF No. 58 at 24:18–:21. The plaintiff testified that she showed the papers from Fort Washington Hospital to Dr. Hill-Daniel "for her actually to believe me about what I was saying about my breasts . . . because they had seen something on my breasts that she didn't see, for me to get a mammogram." Trial Tr. ECF No. 55 at 96:1–:10.

3. At the October 18, 2010, visit, Dr. Hill-Daniel performed a breast exam and palpated multiple nodules in the plaintiff's left breast and an enlarged lymph node in her left axilla (under her armpit). Trial Tr. ECF No. 58 at 27:10–:15; Def.'s Ex. 1, at 12. Dr. Hill-Daniel also observed multiple scars on the left breast, some of which were overlying nodules. Trial Tr. ECF No. 58 at 27:10–:13; Def.'s Ex. 1, at 12. Dr. Hill-Daniel testified that an enlarged lymph node can be a sign of infection or breast cancer. Trial Tr. ECF No. 58 at 27:16–:25. She also testified that she was not sure if the plaintiff had an infection, abscess, or cancer, but that she found no indication of any infection, such as drainage from the site, fever, or chills. *Id*. 28:2–:4, 28:10–:13. The assessment or diagnosis that Dr. Hill-Daniel wrote on the progress note was "breast neoplasm not otherwise specified." Def.'s Ex. 1, at 12.

4. Dr. Hill-Daniel ordered a referral for the plaintiff to get a breast ultrasound. Def.'s Ex. 1, at 12. The progress note for the October 18, 2010 appointment reflects a "follow up" timeframe of six weeks. *Id.* Dr. Hill-Daniel testified that she "felt six weeks was enough

time for [the plaintiff] to get the referral, make her appointments, get the exam done, and report back to [her]."  Trial Tr. ECF No. 58 at 29:3–:5.

**5.** The parties dispute whether Dr. Hill-Daniel discussed the urgency of obtaining an ultrasound with the plaintiff.

    a) Dr. Hill-Daniel testified that she "basically stressed the importance of her to get the study done and come back to me for the results so we could figure out what else we needed to do."  Trial Tr. ECF No. 58 at 29:1–:3; *see also id.* at 95:16–:18 ("I told her that she needed to get [the ultrasound] done.  And I told her, because of this I'm going to give you the referral now so you can go ahead and schedule."), 95:22–:24 ("I told her that I didn't know what the mass was, that she needs to get the ultrasound done so we could figure out what was going on.").

    b) When asked whether Dr. Hill-Daniel told her how quickly she was supposed to have the ultrasound performed, the plaintiff testified that she did not discuss the ultrasound with her.  Trial Tr. ECF No. 55 at 97:3–:6 ("She didn't give me no discussion about the ultrasound.").  There is no indication on the progress note that Dr. Hill-Daniel told the plaintiff why she needed an ultrasound or with what urgency.  The plaintiff emphasizes that this is significant because when Dr. Hill-Daniel counseled the plaintiff that her complaints were "benign" during the December 3, 2009, visit, she documented the conversation on the progress note.  Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8.

### H.    UNITY'S REFERRAL PROCESS

**1.** The plaintiff was insured by D.C. Chartered Health Plan ("D.C. Chartered") for the entire period of time relevant to this action.  *See* Pl.'s Ex. 55 (D.C. Chartered Health Plan referral

verifications for Shilisa Rhodes).  D.C. Chartered requires Unity to obtain an insurance authorization, called a "DIVA," before a patient can receive a referral for an ultrasound or mammogram at Providence Hospital.  *See* Trial Tr. ECF No. 58 at 29:21–24, 30:18–:24; Trial Tr. ECF No. 72 at 144:8–:10.  Unity employs care management support persons to process referrals and obtain authorizations.  Trial Tr. ECF No. 72 at 9:11.  Terita Jones is the care management support person who works with Dr. Hill-Daniel, as well as three other doctors, to process over fifty referrals each day.  *Id.* at 14:12–:17, 26:3–:8.  Ms. Jones testified that the doctors send referral forms to her electronically.  *Id*. at 14:12–:17, 16:9–:23. She then prints out the form, called the "Unity Physician Referral" form ("Referral"), calls the insurance company, and inputs the referral information by following the prompts on the telephone.  *Id.* at 18:13–:22.  She then enters the authorization code on the Referral electronically, and D.C. Chartered faxes the DIVA to her.  *Id.* at 16:9–:23.  The patient needs to present both the Referral and the DIVA at Providence Hospital to obtain an ultrasound or mammogram.  Trial Tr. ECF No. 58 at 30:18–:24.

2. The Referral and the DIVA contain two numeric codes:  the ICD-9 and the CPT.  Trial Tr. ECF No. 72 at 143:13–:15, 143:20–:24.  The ICD-9 code corresponds to the diagnosis given to the patient.  Trial Tr. ECF No. 58 at 30:5–:13.  The CPT code corresponds to the medical procedure being ordered.  *Id.* at 30:14–:16.  The codes on the DIVA and the Referral must match; if they don't match, the patient cannot have the procedure.  Trial Tr. ECF No. 72 at 151:19–:25.  The referring doctor is responsible for choosing the correct codes.  Trial Tr. ECF No. 58 at 102:21–103:1.

3. The patient must pick up the DIVA and referral from the care management support person, who in this case was Ms. Jones, and bring those forms to Providence at the time of the

scheduled referred procedure.  Trial Tr. ECF No. 58 at 30:18–:24.  Sometimes Unity

provides the patient with the DIVA and referral on the same day as the patient's visit, and

sometimes the patient has to return to Unity a few days later to pick the forms up.  Trial Tr.

ECF No. 72 at 88:7–:11.  The referring physician may mark a referral "urgent."  Trial Tr.

ECF No. 58 at 44:25.  In that case, the care management support person is supposed to take

the referral out of turn and work on it immediately to get the authorization, and provide the

patient with the forms quickly.  *Id.* at 44:25–45:4.  If the forms are prepared on a different

day than the patient's visit with Unity, Ms. Jones calls the patient by phone to advise that the

forms are ready for pick-up.  Trial Tr. ECF No. 72 at 25:20–26:18.  Ms. Jones does not

communicate with the patient about the urgency of the referred procedure and the scheduling

of the referred procedure with Providence or other health care facility remains the patient's

responsibility.  *Id.* at 27:2–:21, 88:7–:22.

**4.**  Marsha Williams, a Providence Hospital front desk registration clerk who schedules

appointments for diagnostic and screening mammograms and breast ultrasounds, testified

that in 2010, Providence Hospital kept a schedule of mammograms for up to a period of

ninety days into the future.  Trial Tr. ECF No. 72 at 156:11–:13.  She also testified that the

scheduling clerk determines an available date for imaging studies, which depends upon the

urgency of the test.  *Id.* at 144:11–:20.  Ms. Williams testified that in 2010 and 2011,

ultrasounds were generally scheduled about a week out, mammograms about a day out, and

diagnostic mammograms, about two to three days out.  *Id.* at 146:19–147:4.  Ultrasounds

take longer to schedule because the technician works only 8:00 a.m. to 11:00 a.m., which

means that Providence is able to perform only five ultrasounds per day.  *Id.* at 145:20–

146:11.

# I.     THE PLAINTIFF'S DIAGNOSTIC TESTS

1. Dr. Hill-Daniel generated a referral for Ms. Jones to obtain an ultrasound at Providence Hospital on the day of the plaintiff's October 18, 2010 visit, and she asked Ms. Jones to obtain the authorization so that the plaintiff could leave Unity with the Referral and DIVA in-hand. Trial Tr. ECF No. 58 at 29:8–:11; Def.'s Ex. 2, at 1. Ms. Jones was not instructed to, and did not, tell the plaintiff anything about the urgency in making the ultrasound appointment, how long she should take before making the appointment, or when the appointment should be scheduled. Trial Tr. ECF No. 72 at 67:7–:16. The Referral lists the authorization end date for the ultrasound as January 16, 2011, or three months from the date of the plaintiff's October, 2010 visit. *Id.* at 68:6–:15. Def.'s Ex. 1, at 12. The Referral allows the patient to make an appointment between the date of issuance and the referral verification authorization end date. 3rd FOF Table ¶ 121; Pl.'s Ex. 55, at 55004; Trial Tr. ECF No. 72 at 67:17–68:5.

2. Providence Hospital does not have a record of when the plaintiff called to schedule her ultrasound appointment, but it is undisputed that the appointment was scheduled for November 3, 2010, at 10:30 a.m. Pl.'s Ex. 1, at 1059; Def.'s Ex. 2, at 3. The plaintiff went to Providence Hospital that morning, but she was unable to have the ultrasound because the Referral contained an IDC-9 code, which had been provided by Dr. Hill-Daniel, that was incorrect. Trial Tr. ECF No. 58 at 103:2–:13; ECF No. 72 at 145:7–:11, 157:13–:14. Ms. Williams testified that the IDC-9 code on the plaintiff's Referral was "239.3," which is an unspecific diagnosis code that Providence Hospital does not use because it does not tell the hospital exactly what is wrong with the patient. Trial Tr. ECF No. 72 at 157:18–158:9. Ms. Williams called Unity at 10:30 a.m. that day and spoke with Ms. Jones. *Id.* at 22:14–:23;

Pl.'s Ex. 1, at 1059.  She told Ms. Jones that the plaintiff was at Providence Hospital, and that the ICD-9 code needed to be changed for the plaintiff to get the ultrasound.  Trial Tr. ECF No. 72 at 22:15–:16.

3.  Ms. Jones testified that she notified Dr. Hill-Daniel about the need for the code change by sending her an electronic alert through the electronic records system, which signaled Dr. Hill-Daniel that she had a message.  Trial Tr. ECF No. 72 at 23:13–24:3.  The message stated, "Patient is at appt ICD-9 code needs to be changed if you can please change code so that pt can be seen her appt is at 10:30 tech person leaves at 11:00 am this is for mammo procedure code should be 611.72."  *Id.* at 23:2–:10; Pl.'s Ex. 1, at 1059.  Ms. Jones also testified that she went to Dr. Hill-Daniel's office to tell her that about the electronic alert, but Dr. Hill-Daniel was not in her office.  Trial Tr. ECF No. 72 at 24:4–:10, 25:4–:11.  Dr. Hill-Daniel changed the code at 12:37 p.m. and sent the Referral back to Ms. Jones.  *Id.* at 24:11–:18.  Ms. Jones faxed the Referral and DIVA back to Providence sometime between 1:00 p.m. and 3:23 p.m. the same day.  *Id.* at 29:15–30:8, 30:20–:25. By that time, however, the technician at Providence Hospital had left for the day.  *Id.* at 23:2–:10.  After faxing the referral and DIVA to Providence Hospital, Ms. Jones called the plaintiff and told her that the Referral had been faxed to Providence Hospital and that she could pick up a copy from Unity.  *Id.* at 31:2–:16.  Ms. Jones testified that it was necessary for the plaintiff to pick up the Referral from Unity at that point because it had been faxed to Providence after 11:00 a.m. *Id.* at 31:17–:21.  The plaintiff picked up the referral the next day on November 4, 2010.  *Id.* at 34:4–:22.

4. The ultrasound was rescheduled for December 14, 2010, and was performed that day, almost two full months after Dr. Hill-Daniel had palpated left breast lumps and an enlarged lymph node.  Pl.'s Ex. 13, at 1; Def.'s Ex. 5, at 1.

5. The ultrasound report of December 14, 2010, describes the left breast as having a solid mass at one o'clock, which corresponds to the palpable mass, small focal calcifications within the mass, and small nodules in the breast tissues which correspond to dark skin lesions.  Pl.'s Ex. 13, at 1; Def.'s Ex. 5, at 1.  The report stated that "while the [large mass with calcifications] may be a fibroadenoma, more aggressive lesion cannot be excluded."  *Id.*  The radiologist recommended a left mammogram and noted, "[u]nfortunately this exam cannot be authorized at this time and needs to be scheduled."  *Id.*  Dr. Hill-Daniel testified that she assumed the radiologist meant that the plaintiff did not have the DIVA authorization necessary to perform the recommended mammogram.  Trial Tr. ECF No. 58 at 39:22–40:4.

6. Dr. Hill-Daniel received the ultrasound report in the mail almost two weeks later, on December 27, 2010.  Trial Tr. ECF No. 58 at 41:7–8 She generated a referral for a mammogram three days later, on December 30, 2010, sent it to Ms. Jones for authorization, and asked Ms. Jones to call the plaintiff when it was ready.  Trial Tr. ECF No. 58 at 41:11–:15.  Although Dr. Hill-Daniel marked the Referral "urgent" on December 30, 2010 so the authorization would be completed before the end of the day, the plaintiff was not notified that it was ready for pick up until January 7, 2011, more than a week after Dr. Hill-Daniel approved the referral and more than three weeks after the ultrasound showed the possibility of an "aggressive lesion."  Trial Tr. ECF No. 72 at 39:12–:25, 40:25–41:2.

7. Ms. Jones did not receive the referral from Dr. Hill-Daniel until January 6, 2011, because she had been on vacation from December 28, 2010 to January 5, 2011.  Trial Tr. ECF No. 72 at

36:3–:12.  On January 6, 2011, at 4:18 p.m., Ms. Jones tried to get the DIVA authorization, but was unsuccessful because the CPT code used by Dr. Hill-Daniel was, again, wrong.  *Id.* at 36:9–:25, 37:1–:12.  The code could not be changed at that time because Dr. Hill-Daniel had already left for the day.  *Id.* 36:23–37:9.  Dr. Hill-Daniel corrected the code the following day, January 7, 2011.  *Id.* at 37:1–:12.  The same day, the plaintiff was notified by phone that the referral was ready to be picked up.  *Id.* at 39:1–:7.

8.  Dr. Hill-Daniel did not call the plaintiff or otherwise directly communicate with the plaintiff about the mammogram referral.  Trial Tr. ECF No. 58 at 97:22–98:2, 99:10–:14.  She did not communicate the urgency of the need to get a mammogram to the plaintiff, did not tell Ms. Jones to communicate the urgency to the plaintiff, and did not write anything on the mammogram Referral that would indicate how quickly the mammogram should be done.  Trial Tr. ECF No. 58 at 98:3–99:9.  The "urgent" notation that communicates the urgency of processing the Referral to Ms. Jones does not appear on the forms that the patient receives.  Trial Tr. ECF No. 72 at 39:15–:25.  Ms. Jones also did not communicate to the plaintiff about the urgency of obtaining the mammogram.  *Id*. at 40:18–:23.  The Referral for the mammogram listed the authorization end date as October 18, 2011, providing a nine-month period to obtain the mammogram.  Pl.'s Ex. 57, at 1061; Def.'s Ex. 2, at 5.

9.  The plaintiff received a mammogram at Providence Hospital on February 9, 2011.  Trial Tr. ECF No. 58 at 43:2–:5.  The next day, on February 10, 2011, the radiologist called Dr. Hill-Daniel and reported his concerns that the mammogram was highly suspicious for cancer and recommended that Dr. Hill-Daniel send the plaintiff for a biopsy.  *Id.* at 43:13–:22.  Dr. Hill-Daniel telephoned the plaintiff to let her know that she was generating a referral to a surgeon so that the plaintiff could get a biopsy.  *Id.* at 111:8–:10.  Dr. Hill-Daniel referred the plaintiff

to Providence surgeon Mark Johnson, M.D. for the biopsy. Pl.'s Ex. 44, at 110:21–111:7; Def.'s Ex. 2, at 6. Although Dr. Hill-Daniel testified that she could have called the Providence Hospital radiology department – where she had admitting privileges – to try to get the plaintiff's appointment moved up, Dr. Hill-Daniel did not contact Dr. Johnson or his office to expedite the scheduling of the biopsy. Trial Tr. ECF No. 58 at 116:8–117:4; Pl.'s Ex. 44, at 110:21–111:17. Dr. Hill-Daniel generated the referral, and the plaintiff was responsible for picking it up from the Unity clinic, calling Dr. Johnson's office, and scheduling the biopsy. Pl.'s Ex. 44, at 108:18–:22.

10. The plaintiff saw Dr. Johnson in his office on March 2, 2011, for a consultation. Pl.'s Ex. 1, at 1040; Def.'s Ex. 7. The breast biopsy was performed one week later, on March 8, 2011. Pl.'s Ex. 3, at 3001; Def.'s Ex. 8, at 3001. The results of the breast biopsy indicated that the mass in the plaintiff's left breast was invasive ductal carcinoma. Pl.'s Ex. 3, at 3001; Def.'s Ex. 8, at 3001.

11. Both parties agree that when the plaintiff was diagnosed with breast cancer on March 8, 2011, she had advanced stage incurable breast cancer. 3rd FOF Table ¶ 333 (citing Trial Tr. ECF No. 55 at 111:7–:9). A PET scan performed on March 28, 2011 and a bone scan performed on March 31, 2011 showed that the cancer had metastasized to bones in her right shoulder and left scapula. Pl.'s Ex. 8 at 8097, Trial Tr. ECF No. 57 at 65:12–:16. Dr. Feigert testified that the March PET scan showed that the cancer had metastasized to at least eight different sites in her bones. Trial Tr. ECF No. 57 at 30:6–:8. Plaintiff does not dispute this. 3rd FOF Table ¶ 374.

**12.** The experts dispute whether Dr. Hill-Daniel's role in the five-month delay between the plaintiff's October 18, 2010 visit and her breast cancer diagnosis violated the applicable standard of care.

> a) The plaintiff's experts, Dr. Sutherland and Dr. Margo, opined that Dr. Hill-Daniel's failure to expedite the diagnostic tests violated the national standard of care for a family care doctor. Dr. Sutherland testified that in light of Dr. Hill-Daniel's findings during the plaintiff's October 18, 2010 visit, the national standard of care required her to ensure that the plaintiff got a diagnostic ultrasound within a week, Trial Tr. ECF No. 69 at 54:2–:12, and to obtain a diagnosis within two to three weeks of the October visit, *id*. at 54:19–55:5. He testified that it was Dr. Hill-Daniel's responsibility to keep track of the patient and follow-up herself, or ask her staff to follow-up, if she did not receive the diagnostic test results within this time period. *Id.* at 56:13–57:7. Dr. Margo opined that Dr. Hill-Daniel ordered the tests in the correct order – ultrasound, then mammogram and, finally, biopsy – but that the national standard of care required Dr. Hill-Daniel to ensure that the ultrasound was performed within two weeks of the October visit, and that the final breast cancer diagnosis was made within two to three weeks of the October visit. Trial Tr. ECF No. 70 at 82:4–83:5.

> b) The defendant's expert, Dr. Bethea, testified that Dr. Hill-Daniel did not violate the national standard of care by ordering an ultrasound, mammogram, and biopsy in that progression. Trial Tr. ECF No. 73 at 41:4–:13, 43:3–:9, 43:18–44:9. In response to questions from the Court, however, Dr. Bethea testified that Dr. Hill-Daniel's detection of lymph node involvement was a "game-changer," and that, with that

finding, it was not appropriate to wait six weeks before an ultrasound was performed. *Id.* at 40:24–41:4. He also testified that "if you have an isolated lesion and an axillary node, you can skip both [the ultrasound and mammogram] and go straight to biopsy and be well in the standard of care." *Id.* at 42:5–:8.

c) Notably, while the progression of diagnostic tests may have been satisfactory, Dr. Bethea was not so sanguine about the timing of the diagnostic tests in this case. Dr. Bethea testified that the timing of the tests did not satisfy "best practices," which is the standard of care that he conforms to as a physician. Trial Tr. ECF No. 73 at 45:15–:17 ("If we were speaking best practice, I would not be here defending this situation."). Nonetheless, by drawing a distinction between "best practices" and "the national standard of care," Dr. Bethea testified that the timing of the tests did satisfy the standard of care, which he defined as taking into consideration the circumstances under which the care is delivered. *Id.* at 45:4–:10 ("The standard of care, as I said earlier, is what a patient has the right to expect under the circumstances in which it's delivered. There are very different sets of circumstances within the medical world, and it's becoming more and more different as time goes on, unfortunately."); 46:19–:23 ("These days, unfortunately, doctors lose control of the situation in big medical centers, such as where this occurred. They don't lose control of it in a practice like mine. So it's two entirely different circumstances."); 47:5–:11 ("So there are all sorts of situations, medical, political, insurance, money. The whole situation is changing the approach, in my opinion, much for the worse. This is a good example of that. So you can be within the standard of care, as I think this situation was, but be far outside the best practice model.").

d) The defendant's expert, Dr. Koch, testified that Dr. Hill-Daniel satisfied the national standard of care on October 18, 2010, by prescribing a six-week follow-up period for the plaintiff to obtain an ultrasound. Trial Tr. ECF No. 73 at 101:25–102:7. He testified that the plaintiff's failure to follow up within that timeframe was her responsibility. *See id.* at 105:17–:22. He also testified that Dr. Hill-Daniel acted within the national standard of care by ordering an ultrasound, mammogram, and biopsy in that order, *id.* at 103:19–104:8, and that the physician had no responsibility to act to expedite the plaintiff's appointments for diagnostic tests, *id.* at 110:22–111:20 ("The national standard of care, in its basic tenet, is that if you find something and you give the patient an order to get it and give the instructions of the phone number and how to get it, then it becomes the patient's responsibility to follow through and get the test done."). He did concede, however, that "there's certainly an obligation on a physician's part to impart some need to expedite things." *Id.* at 113:2–:3.

**13.** After her breast cancer diagnosis, the plaintiff had a series of imaging studies and scans, including CT scans of her brain on March 24, 2011 and February 1, 2012, Pl.'s Ex. 15, 25; a CT scan of her chest, abdomen, and pelvis on March 24, 2011, Pl.'s Ex. 16; PET/CT scans on March 28, 2011, April 3, 2011, and September 17, 2012, Pl.'s Ex. 17, 19, 28; a whole body bone scan on March 31, 2011, Pl.'s Ex. 18; MRIs of the pelvis on May 12, 2011, and July 15, 2011, Pl.'s Ex. 21, 23; an MRI of both breasts on April 4, 2011, Pl.'s Ex. 20; an MRI of the thoracic spine and lumbar spine on May 28, 2011, Pl.'s Ex. 22; a CT scan of the thorax on July 18, 2011, Pl.'s Ex. 24; and a CT scan of her neck on February 1, 2012, Pl.'s Ex. 26.

**14.** Ms. Rhodes's cancer treatment began on March 25, 2011, when she began receiving

hormone therapy with the drug Tamoxifen.  Pl.'s Ex. 8, at 8098.

### J.      THE PROGRESSION OF THE PLAINTIFF'S BREAST CANCER

**1.**  The parties agree that the plaintiff has both ductal carcinoma *in situ* and invasive ductal

carcinoma.  3rd FOF Table ¶ 339 (citing Trial Tr. ECF No. 55 at 17:5–:9).  The plaintiff's

expert, Dr. Tucker, testified that only invasive ductal carcinoma is used for staging because it

is the only type of breast cancer that invades into adjacent cells and the only part that is

potentially lethal.  Trial Tr. ECF No. 55 at 18:24–:25.  The natural tendency of breast cancer

when it becomes invasive is to migrate to lymph nodes and then to distant metastatic sites.

*Id*. at 20:24–21:1.

**2.**  The parties also agree that staging of cancer is important to define the patient's prognosis and

treatment options.  Trial Tr. ECF No. 57 at 28:20–25.  The staging convention used for breast

cancer in the United States is the American Joint Committee on Cancer ("AJCC") Staging

Protocol.  3rd FOF Table ¶ 337 (citing Trial Tr. ECF No. 55 at 12:10–:12).  Under that

protocol, there are four stages of breast cancer, with Stage I being the least severe and Stage

IV being the most severe.  Trial Tr. ECF No. 55 at 12:13–:14.  The size and extent of the

invasive component is what is relevant to staging.  *Id*. at 19:21–:23.  If invasive breast cancer

goes untreated, it will eventually evolve from Stage I to Stage IV.  *Id*. at 20:20–:22.  AJCC

stage is the single most important predictor of outcome.  *Id.* at 21:24–:25.

**3.**  The stage of a patient's cancer is determined by three characteristics, called the "TNM

classification."  Trial Tr. ECF No. 55 at 12:15–:18; Trial Tr. ECF No. 57 at 28:9–:14.  T

stands for the tumor size and extent within the breast; N stands for lymph node involvement;

and M stands for distant metastases, meaning the spread of the cancer into other areas, such

as bone, brain, lung, liver, etc.  Trial Tr. ECF No. 55 at 12:17–:22.  Stage I denotes a small tumor size (T1 to T2), no lymph node involvement (N0), and no metastatic disease (M0).  *Id.* at 13:13–:18.  Stage II denotes a bigger tumor size (T1, T2, or T3), possible early lymph node metastasis, but confined to just a few lymph nodes (N1), and no evidence of metastatic disease (M0).  *Id.* at 13:19–:23.  Stage III denotes any size tumor (T1, T2, T3, or T4), greater nodal involvement, meaning more lymph nodes involved and bulkier lymph nodes, but no metastatic disease (M0).  *Id.* at 14:8–:12.  When the cancer tumor has invaded the skin, the cancer is defined as T4, which is at least Stage III.  Trial Tr. ECF No. 57 at 39:4–:5.  Finally, Stage IV is defined by the presence of metastatic disease (M1).  Trial Tr. ECF No. 55 at 14:13–:16.  The experts also agreed that breast cancers have a relatively uniform growth rate. *Id.* at 31:22–:23.

**4.**  Both parties agree that when the plaintiff was diagnosed with breast cancer in March 2011, she had advanced stage incurable breast cancer.  3rd FOF Table ¶ 333 (citing Trial Tr. ECF No. 55 at 11:7–:9).  They disagree, however, about how and when her cancer progressed through the stages.

### General Progression

**5.**  The plaintiff's expert, Dr. Tucker, opined that the plaintiff progressed from Stage I cancer by first developing lymph node metastases, and then subsequently developing distant metastases.  Trial Tr. ECF No. 55 at 47:18–:22.  That is a representative progression in patients with invasive duct carcinoma and it is the progression seen in the great majority of patients.  *Id.* at 47:18–:23.  According to Dr. Tucker, based upon this progression, the plaintiff's breast cancer was curable in December 2009, and progressed to advanced stage incurable cancer before March 2011, *id.* at 11:6–:9 (Dr. Tucker's testimony that "it is my

46

opinion that the breast cancer was curable in December of 2009, but by the time March 2011 had arrived, it was advanced stage, which meant that it was incurable at that point in time").

**6.** The defendant's expert, Dr. Feigert, testified that by December 2009, the plaintiff already had Stage III or, more likely, Stage IV incurable breast cancer. Trial Tr. ECF No. 57 at 30:13–:18.

> ***Stage of cancer in December 2009***

**7.** Dr. Tucker testified that in his opinion, in December 2009, the plaintiff had Stage I cancer with a T value of 1, an N value of 0, and an M value of 0. Trial Tr. ECF No. 55 at 32:5–:20, 44:15–:18, 45:11–:14.

> a) To discern the T value, Dr. Tucker estimated the size of the plaintiff's tumor in December 2009. Since no imaging studies of the plaintiff's breasts were done at that time, he extrapolated from measurements of her tumor size that were taken in December 2010 and March 2011. Trial Tr. ECF No. 55 at 33:18–34:12. The December 2010 measurement (1.9 centimeters) was taken from the plaintiff's December 14, 2010 ultrasound, and the March 2011 measurements were taken from the March 24, 2011 CT scan (2.8 centimeters) and a March 28, 2011 PET CT scan (2.6 centimeters).[9] *Id.* Dr. Tucker considered each of these tests to be reliable tools for measuring tumor size. *Id.* at 33:18–34:12. Dr. Tucker plotted the size of the tumor at the times of the ultrasound, the CT scan, and the PET CT scan on a graph with time on one axis and tumor size on the other. *Id*. at 34:13–:19. Then, because cancer has a relatively constant growth rate – a characteristic that both parties acknowledge, *see* 3rd FOF Table ¶ 353 –, he drew a straight line connecting the three

---

[9] Dr. Tucker explained the .2 centimeter difference between the March 24, 2011 measurement and the March 28, 2011 measurement as a result of the fact that tumors are not spherical and just a slight rotation of the body can cause small incremental changes in imaging size. Trial Tr. ECF No. 55 at 34:7–:12.

data points and extending on both ends. According to Dr. Tucker, the point on the line that corresponded with December 2009 also corresponded to a tumor size of approximately one half to one centimeter. Trial Tr. ECF No. 55 at 34:13–:21. Because Dr. Tucker considered the tumor to be fast growing – a characterization about which the defendant's expert disagrees – he opined that the tumor was nominally around one centimeter at its greatest dimension in December 2009 and well under the two centimeter ceiling for the AJCC T1 category. *Id.* at 35:1–:6.

b) Dr. Tucker opined that in December 2009, the plaintiff's cancer had an N value of 0 because: (1) he found no evidence of nodal metastatic disease in the records of the plaintiff's December 2009 appointment; and (2) the incidence of lymph node metastasis in a patient with a one or two centimeter tumor is low. Trial Tr. ECF No. 55 at 44:17–45:10.

c) Dr. Tucker further opined that in December 2009, the plaintiff cancer had an M value of 0 because: (1) if the plaintiff had metastatic disease in December 2009, she likely would not be alive today; (2) the plaintiff had a high growth rate cancer; and (3) the plaintiff would have developed symptoms of metastases, such as pain, dizziness, headaches, seizure, or liver disease, in the fifteen-month period before her December 2009 appointment and when her cancer was finally diagnosed. Trial Tr. ECF No. 55 at 45:17–46:20.

**8.** The defendant's expert, Dr. Feigert, opined that by December 2009, the plaintiff already had Stage III or, more likely, Stage IV incurable breast cancer. Trial Tr. ECF No. 57 at 30:13–:18. Dr. Feigert described the following grounds for his opinion: (1) the extent of the cancer that was discovered sixteen months later on an MRI; (2) the slow to average growth rate of

the tumor, as evidenced by the tumor's average mitotic rate and low Ki-67 value, and (3) the

favorable genetic profile of the cancer as hormonal receptor positive, HER2 negative.  Dr.

Feigert testified that the plaintiff's April 4, 2011 MRI report showed a tumor over ten

centimeters in size and "very extensive involvement of the plaintiff's skin with cancer over a

very large portion of the breast."  *Id*. at 31:22–32:5, 34:2–:20, 37:8–:13, 38:9–:10.  Dr.

Feigert testified that the radiologist's report describes "generalized advanced thickening of

the skin" over the entire breast, which is visible on the MRI image.  *Id.* at 34:12–:20.  He

viewed as significant the radiologist's notations in the report of "evidence of extensive

carcinoma of the breast is noted with skin invasion" and "immediately direct extension into

the skin is felt to be present superiorly."  *Id*. at 35:1:10, 36:23–37:7.  Dr. Feigert testified that

since no imaging of the plaintiff's breast from December 2009 exists, he had to work

backward from the imaging that was available.  *Id.* at 37:19–38:6.  Due to the extensive

nature of the skin involvement in April 2011, Dr. Feigert opined that it was "exceedingly

likely that there would have been at least one cancerous cell in the skin" in December 2009.

*Id*. at 38:6–:22.  Dr. Feigert also pointed to (1) Dr. Hill-Daniel's note in the plaintiff's

progress note of October 18, 2010, identifying "multiple scars on left breast with some

overlying nodules"; (2) the note on the report from the plaintiff's December 14, 2010

ultrasound, stating "sub centimeter nodules in the upper outer quadrant of the left breast

correspond to skin lesions," as evidence of the extent of skin involvement.  *Id*. at 40:7–41:20.

According to Dr. Feigert, since even a single cancer cell in the skin makes the patient a Stage

III-B, T4, the plaintiff likely had at least Stage III-B cancer in December 2009.  *Id.* at 38:15–

:22 ("[A]ll you need is a single cancer cell in the skin, as of December of '09 to make this

patient a Stage III-B, the T4, with skin invasion.  That's why I wanted to demonstrate on this

MRI how extensive it was in April of '11 to make a rational argument that there would have certainly been at least a microscopic and in my opinion macroscopic disease in the skin 16 months earlier."). Dr. Feigert testified that the misdiagnosis of a Stage III or Stage IV cancer as Stage I is "all too common." *Id*. at 49:4–50:1 ("[I]n hindsight the explanation for why the cancer comes back is there must have been metastases before the surgery.").

9. The plaintiff's expert, Dr. Pushkas, testified that in his opinion, the plaintiff had Stage I breast cancer in December 2009. Trial Tr. ECF No. 56 at 67:22–68:2. He testified that T4 tumors are tumors that extend directly into the skin or chest wall and cause ulcerations and nodules on the skin. *Id.* at 80:13–:14. He also testified that these ulcerations or nodules are usually visible or, if not, there may be confounding skin abnormalities. *Id*. at 80:18–:23. Dr. Pushkas testified that there was no indication in Dr. Hill-Daniel's notes from the plaintiff's December 2009 or October 2010 visits, or in the notes from the plaintiff's visits to Howard University or Fort Washington Medical Center, that would suggest direct extension of the cancer into the skin by ulceration or visible nodules on the skin. *Id.* at 81:3–:13. He further testified that he saw no evidence in any of those medical records between December 2009 and the end of 2010 that would suggest T4 cancer. *Id.* at 81:14–82:9.

### *Progression of cancer after December 2009*

10. The plaintiff's expert, Dr. Tucker, testified that, in his opinion, the cancer progressed from Stage I to Stage II, meaning the plaintiff developed lymph node metastases, sometime between July and November 2010. Trial Tr. ECF No. 55 at 47:24–48:11. Dr. Tucker also testified that the cancer progressed to Stage IV sometime between December 2010 and February 2011. Dr. Tucker relied on the extent of the distant metastasis shown on the March 24, 2011, PET CT scan and a subsequent technetium 99 scan. *Id.* at 49:20–50:5. According

to Dr. Tucker, the metastatic disease was distributed among bony sites, but the sites were few in number and there was no evidence of visceral involvement (brain, lungs, liver, or other body sites). *Id*. at 50:10–:15. Metastases take time to develop, but how long this takes is a function of the cancer's growth rate. *Id*. at 50:16–23. Based on his opinion that the plaintiff's cancer has a high growth rate and the extent of the metastases in March 2011, Dr. Tucker calculated that the plaintiff's cancer would have metastasized distantly between July and November 2010. *Id.* at 48:1–:3.

11. The plaintiff's expert, Dr. Pushkas, opined that the plaintiff's disease probably became Stage II disease during the summer of 2010, probably in July or August. Trial Tr. ECF No. 56 at 74:23–:24. The grounds for his opinion were that no lymph nodes were felt in December of 2009, but they were easily palpable ten months later, in October 2010, and showed on the later imaging studies, and that lymph node involvement is dependent on the size of the primary tumor. *Id.* 74:20–75:16.

12. Dr. Bowers, the diagnostic radiologist who interpreted the plaintiff's pelvis MRIs from May 12, 2011 and July 15, 2011, and who wrote the corresponding reports, testified that the May 12, 2011, MRI showed three early metastatic lesions. Trial Tr. ECF No. 56 at 53:16–:25. These pelvis lesions were not present on the March 2011 CT scan nor was abnormal activity in those areas reflected on the bone scan conducted on March 31, 2011. *Id*. at 54:5–:15. Accordingly, he testified that he considered the metastatic lesions to be new as of May 2011. *Id*. at 54:16–:18. On the report, he wrote that his impression was "several lesions . . . that are suspicious for early bony metastatic disease." Pl.'s Ex. 21.

13. The defendant's expert, Dr. Feigert, agreed with the plaintiff's experts that by March 31, 2011, the plaintiff's cancer had metastasized into the bone, Trial Tr. ECF No. 57 at 65:4–:6,

65:12–:16, based on his opinion that her cancer was already at a Stage III-B or IV by December 2009, *id.* at 67:18–68:12.

### *The growth rate of the plaintiff's cancer*

14. Both parties agree that the growth rate of a cancer will contribute to stage progression. Trial Tr. ECF No. 55 at 24:6–:7. The parties' experts disagreed, however, about the growth rate of the plaintiff's cancer. The plaintiff's expert, Dr. Tucker, testified that the plaintiff's cancer is fast growing, *id.* at 46:9–:10, whereas the defendant's expert, Dr. Feigert, testified that it has an average to slow growth rate, Trial Tr. ECF No. 57 at 93:3–:6.

15. Dr. Tucker and Dr. Feigert agreed that breast cancer's histopathological grade provides useful prognostic information that helps with treatment decisions. Trial Tr. ECF No. 55 at 22:2; Trial Tr. ECF No. 57 at 46:23–:25, 48:4–:6. The grading of breast cancer is correlated to the aggressiveness of the cancer. Trial Tr. ECF No. 57 at 46:23–:25, 48:4–:6. The grading system endorsed by the AJCC is the Scarff Bloom Richardson System (also referred to as the Nottingham grading scheme), which has three grades. Trial Tr. ECF No. 55 at 22:8–:13, 71:23–72:1. The grade of the cancer is determined by measuring three characteristics of the cancer cells under a microscope: the tubules, the atypia, and the mitotic rate. *Id.* at 24:11–25:5. The tubule component describes how well the cancer makes small ducts that give the tumor its origin. *Id*. at 24:12–:14. The atypia component describes how typical the nucleus of the cancer cell is. *Id*. at 24:14–:19. The mitotic rate component describes the number of cells in the process of dividing. *Id*. at 24:19–:22. Each of these components is scored on a scale of one to three, and the sum of the scores determines the grade. *Id*. at 24:22–25:5. A total score of three, four, or five equals a grade one; a total score of six or seven equals a

grade two; and a total score of eight or nine equals a grade three. *Id.* at 25:6–:13. The higher

the grade, the more aggressive the tumor. *Id.* at 24:6–:9; Trial Tr. ECF No. 57 at 46:23–:25.

**16.** The treating pathologists at Providence Hospital graded the plaintiff's tumor as a grade three,

or the most aggressive type of tumor. Trial Tr. ECF No. 57 at 78:19–:23. This grade was

calculated from a tubule score of 3, an atypia score of 3 and a mitotic rate score of 2. Def.'s

Ex. 8, at 3001; Pl.'s Ex. 3, at 3001.

**17.** The experts disagreed about the importance of the grade for describing the cancer's growth

rate, the independent significance of each of the individual component scores, and the

importance of certain other indicators for predicting the growth rate of the cancer.

    a) The plaintiff's expert, Dr. Tucker, testified that the grade is the second most

        important predictor of outcome with breast cancer and that the higher the grade of the

        cancer, the faster the growth. Trial Tr. ECF No. 55 at 22:2, 23:24–24:5. According

        to Dr. Tucker, because the plaintiff's cancer is grade three, the plaintiff's breast

        cancer has a high growth rate. *Id.* at 32:2–:3. Dr. Tucker also testified that all three

        characteristics (tubules, atypia, and mitotic rate) are necessary to determine the

        growth rate of the cancer and no individual component of the grade is a significant

        predictor of the cancer's growth rate on its own. *Id.* at 25:14–:25. Dr. Tucker

        testified that the level of Ki-67 – a "proliferation marker" that measures expression of

        synthesizing DNA – cannot be used to predict tumor growth rate. *Id.* at 63:12–:22

        (use of Ki-67 to measure the growth rate of a tumor is a "misuse of the marker.").

    b) The defendant's expert, Dr. Feigert, testified that the grade of the cancer is a measure

        of its aggressiveness, which is distinct from growth rate. Trial Tr. ECF No. 57 at

        92:18–:21 ("[W]e often see aggression correlating with growth rate, but not always.

Aggression could be a slow growing cancer that is invading into the tissues. So as medical oncologists we distinguish the two."). According to Dr. Feigert, while the plaintiff's cancer is aggressive, it is not particularly fast growing. *Id*. at 46:22–48:8, 52:20–:22, 53:10–:12. Dr. Feigert also testified that the part of the grading system that indicates the cancer's growth rate is the mitotic rate because it reflects how fast the cells are dividing. *Id*. at 46:22–47:14. The plaintiff's mitotic rate was determined by the physicians at Providence Hospital to be a two out of three. *Id*. at 79:11–:12. According to Dr. Feigert, that level indicates that while the plaintiff's tumor is aggressive, its growth rate is average. *Id*. at 79:11–:13. Dr. Feigert also testified that the level of Ki-67 is a predictor of tumor growth rate and that the plaintiff's Ki-67 value indicates a slow-growing cancer. *Id*. at 75:15–:19, 77:14–:19, 79:11–:12. Dr. Feigert acknowledged, however, that the Ki-67 level was developed to predict the responsiveness of a cancer to particular treatment options. *Id*. at 76:4–:10. He further acknowledged that the AJCC has rejected the incorporation of proliferation markers such as Ki-67 into its staging system, and that the Ki-67 level does not seem to reliably predict prognosis. *Id.* at 76:11–77:4. Dr. Feigert attempted to bolster his description of the plaintiff's cancer by noting that the genetic profile of her cancer, Luminal A, suggests a relatively slow growth rate. *Id.* at 63:18–:24.

### K. Breast cancer prognoses

1. The parties agree on the basic probabilities of survival at the various stages of breast cancer. Dr. Pushkas testified that the SEER Survival Monograph on Breast Cancer ("SEER database") is a reliable and authoritative source for determining the probability of survival from breast cancer in its various stages, Trial Tr. ECF No. 56 at 63:5–:19, which the

defendant does not dispute, 3rd FOF Table ¶ 390.  The SEER database represents a compilation of data from over 300,000 cases reported from all over the United States.  Trial Tr. ECF No. 56 at 62:17–:21, 63:13–:19.  According to the SEER Survival Monograph, the average overall survival for Stage I breast cancer is ninety-eight percent, *id*. at 77:14–:16; the average ten-year survival for Stage II breast cancer is in the low- to mid-seventy percent range, *id.* at 78:7–:13, and the five-year survival for Stage IV breast cancer is fiteen percent, *id*. at 83:5–84:1.

2.  The plaintiff's expert, Dr. Pushkas, testified that in his opinion, given what he knows about the plaintiff and the nature of her cancer, the plaintiff would have had a ninety-eight percent survival rate when her cancer was Stage I, Trial Tr. ECF No. 56 at 77:22–78:6, and a seventy percent ten-year survival when her cancer was Stage II, *id.* at 78:14–:23.  If the plaintiff's breast cancer had been diagnosed at Stage I or Stage II, there is a substantial probability that her cancer would have been cured.  *Id*. at 79:5–:13.

3.  The plaintiff's expert, Dr. Tucker, testified that the cure rate for Stage I breast cancer is eighty to eighty-five percent over five years, and for Stage II breast cancer is over fifty percent, Trial Tr. ECF No. 55 at 49:11–:13.  The defendant's expert, Dr. Feigert, testified that the chance of survival for a patient with Stage III-B or Stage IV breast cancer is less than fifty percent.  Trial Tr. ECF No. 57 at 61:24–:25.

### L.  The plaintiff's medical treatment

1.  Dr. Yoo, the plaintiff's oncologist since January 30, 2012, Trial Tr. ECF No. 56 at 20:20–:21, testified that since her diagnosis, the plaintiff has undergone hormone treatment, chemotherapy, mastectomy, and radiation therapy, and has been medically induced into menopause.  Pl.'s Ex. 8, at 8113–14.  Her treatment began with hormone therapy, using a

drug called Tamoxifen, from March 25, 2011 to April 12, 2011, followed by neoadjuvant chemotherapy until July 2011. Pl.'s Ex. 8 at 8098. A CAT scan taken at that time showed that the mass in the plaintiff's breast mass had significantly decreased with the chemotherapy. *Id.* The plaintiff underwent a mastectomy of her left breast at Providence Hospital on September 13, 2011. *Id.* The plaintiff's treatments have been modified numerous times since then based on the changing nature of her reactions and the cancer's reactions to them. Trial Tr. ECF No. 56 at 27:24–34:9. Since the plaintiff's cancer is incurable, her treatment has been palliative and directed to pain management. *Id.* at 28:20–:25, 34:13–:20. At some time in the future, no more treatments will be available to the plaintiff. *Id.* at 34:10–:16.

2. The plaintiff's expert, Dr. Pushkas, opined that if the plaintiff's breast cancer had been diagnosed sometime between December 2009 and mid-February 2010, her course of treatment would have been different. Trial Tr. ECF No. 56 at 71:22–72:12. In his opinion, an imaging study would have showed an abnormal finding. *Id.* at 72:5. The physician then would have ordered a biopsy for tissue confirmation. *Id.* at 72:5–:9. Once the biopsy revealed cancer, she would have been evaluated for the metastatic disease spread elsewhere in the body, which in Dr. Pushkas's opinion would not have been found. *Id.* at 72:10–:13. Next, the plaintiff would have undergone a mastectomy to remove the breast and the lymph nodes in the armpit. *Id.* at 72:12–:20. In light of his opinion that the cancer would not have spread to the lymph nodes by that time, the plaintiff would have been treated either with hormone treatment alone – because her cancer has been shown to be hormone dependent for its growth – or chemotherapy. *Id.* at 72:21–73:12. Due to the plaintiff's young age at the time, Dr. Pushkas would have recommended a twenty-four week course of chemotherapy

instead of hormone treatment.  *Id*. at 73:2–12.  He opined that this course of treatment would have cured the plaintiff of cancer, with only repeated examinations as the necessary follow-up.  *Id*. at 73:11–:12.

3. Dr. Pushkas also testified that if the plaintiff's breast cancer had been diagnosed at or around when she was Stage II, the treatment protocol would have been largely the same as the treatment he recommended at Stage I.  Trial Tr. ECF No. 56 at 76:4–:10.  The only difference, in his opinion, is that if the plaintiff had ten or more involved lymph nodes in the armpit, a radiotherapist would have recommended radiation treatment after the mastectomy.  *Id*. at 76:9–:15.  In Dr. Pushkas's opinion, however, the plaintiff would not have had more than ten involved lymph nodes in the armpit.  *Id.* at 76:18–:5, 77:24–78:5.

4. The opinions of the pathology and oncology expert witnesses, as well as the plaintiff's treating oncologist, regarding the stage of, prognosis of, and recommended treatment for, the plaintiff's breast cancer at the times of the alleged acts of negligence by Dr. Hill-Daniel and Unity are summarized by the Court in the following chart:

| Time of Diagnosis | Corresponding Event | Witness | Cancer Stage | Prognosis | Recommended Course of Treatment |
|---|---|---|---|---|---|
| **December 2009–April 2010** | The plaintiff visits Dr. Hill-Daniel three times: <br><br> -December 3, 2009, for her first breast complaints, <br><br> -January 8, 2010, for fertility problems, and <br><br> -April 30, 2010, for a check-up and eye problems. | Dr. Tucker (Plaintiff's expert) | Stage I | 80-85% cure rate over five years | |
| | | Dr. Pushkas (Plaintiff's expert) | Stage I | 98% survival. Substantial probability of cure. | Imaging study, biopsy, mastectomy, 24-weeks of chemotherapy |
| | | Dr. Feigert (Defendant's expert) | Stage III -B (invasion of the skin) to Stage IV | Less than 50% survival. | |
| **August–November 2010** | August 10, 2010: The plaintiff calls to schedule an appointment with Dr. Hill-Daniel for a mammogram referral after her visit to Fort Washington Emergency Room. Her appointment is rescheduled by Unity twice. <br><br> October 18, 2010: The plaintiff visits Dr. Hill-Daniel, who feels a mass in the plaintiff's left breast and enlarged lymph nodes, and refers her for ultrasound. | Dr. Tucker | Stage I to Stage II | Stage I: 80-85% cure rate over five years; Stage II: Over 50% cure rate. | |
| | | Dr. Pushkas | Stage II | 70% ten-year survival rate. Substantial probability of cure. | Imaging study, biopsy, mastectomy, 24-weeks of chemotherapy |
| | | Dr. Feigert | Stage III-B to Stage IV | Less than 50% survival. | |
| **December–March 2011** | December 14, 2010: Breast Ultrasound performed. <br><br> February 9, 2011: Mammogram performed. <br><br> March 8, 2011: Biopsy performed. | Dr. Tucker | Stage IV | Incurable | |
| | | Dr. Pushkas | Stage IV | 15% five-year survival rate. Incurable. | |
| | | Dr. Feigert | Stage IV | Incurable | |
| | | Dr. Yoo (Plaintiff's treating oncologist) | Stage IV | Incurable | Hormone treatment, chemotherapy, mastectomy, radiation therapy, induced menopause, other palliative treatments, hospice care |

**M.      The Plaintiff's Economic Damages**

**1.** Through expert witnesses, both parties presented an estimate of the economic damages the plaintiff incurred as a result of the delayed diagnosis of her breast cancer.  Pl.'s Exs. 31, 53, 54; Def.'s Exs. 36, 37.  Both parties' economic expert witnesses analyzed the economic losses the plaintiff would be expected to incur from loss of wages, loss of household services, and the cost of future care.  *See id.*

   a)   The plaintiff's expert, Dr. Lurito, assumed the plaintiff would work until retirement at age sixty-five, based on the information he had been given regarding the plaintiff's intentions.  Trial Tr. ECF No. 71 at 13:13–:16.  He conservatively assumed that the plaintiff's wages would be static, increasing only to keep pace with inflation, throughout that entire period.  *Id.* at 14:9–:14.  Dr. Lurito applied a 3.5 percent after-tax discount rate to his estimates of the plaintiff's lost future wages.  *Id.* at 17:19–:21.  The discount rate Dr. Lurito used took into account the amount of interest the plaintiff could earn on the lump sum of wages provided so as not to overcompensate the plaintiff.  *Id.* at 16:16–22; 17:5–:7.  Dr. Lurito did not deduct any personal maintenance or consumption costs from his estimate because the plaintiff is still alive.  *Id.* at 19:18–:24.  Based on these calculations, Dr. Lurito opined the plaintiff's lost wages amount to $737,715. *Id.* at 15:21–:23.

   b)   The defendant's expert, Dr. Hurdle, agreed with one of the plaintiff's expert's assumptions, namely, that the plaintiff's wages would remain static, adjusted for inflation, over her lifetime.  Def.'s Ex. 36 at 15:3–8. She differed in three other assumptions, however.  First, Dr. Hurdle assumed a shorter length of the plaintiff's work life expectancy and estimated this period to be twenty-seven more years, in

reliance on statistical work life tables that measure the average working life of a woman with the plaintiff's age and education background. Def.'s Ex. 36, at 29:2–:3. Second, Dr. Hurdle differed from the plaintiff's expert in the after-tax discount rate, for which Dr. Hurdle used 8.98 percent. *Id.* at 21:15–16. That rate, according to Dr. Hurdle, took into account the "riskiness of the future earnings that the plaintiff would have but-for this injury." *Id.* at 18:16–:19. She based this discount rate on the rate for which one could obtain a two-year, unsecured loan or the rate a credit card company would charge. *See id.* at 20:5–:24. Finally, unlike the plaintiff's economic expert, Dr. Hurdle deducted consumption, or the percent of the plaintiff's income she would be expected to spend on herself, from the amount of future wages she estimated. *Id.* at 15:9–:14. Based on these calculations, Dr. Hurdle determined the plaintiff's lost wages amount to between $116,176 and $139,740. *Id.* at 23:5–:9.

2. Both experts agreed that the plaintiff's economic damages would include the loss of household services, which refers to the services the plaintiff would have been able to provide to her children had the injury not occurred. Trial Tr. ECF No. 71 at 20:5–:13; Def.'s Ex. 36 at 25:20–:25, 26:1–:2. The plaintiff's expert calculated this loss by determining the cost of a live-in nanny for the plaintiff's two children until the youngest child turned eighteen or twenty-one and subtracted the value of the services the plaintiff will be able to provide for approximately the next two years. Trial Tr. ECF No. 71 at 20:25, 21:1–:4; 21:22–:25. Using this methodology, Dr. Lurito opined the plaintiff would suffer economic losses of between $508,122 and $652,939.[10] Dr. Lurito applied a 3.5 percent discount rate to his calculations.

---

[10] The lower end of the range is the number calculated until the plaintiff's youngest child reaches age eighteen while the higher end of the range is calculated until the plaintiff's youngest child reaches age twenty-one. Tr. ECF No. 71 at 21:7–:18.

*Id.* at 23:4–:7.  The defendant's expert, Dr. Hurdle, calculated loss of household services in two ways:  the wages for a live-in nanny and the statistical value of the plaintiff's time according to economic statistics tables.  Def.'s Ex. 36 at 23:18–:25; 24:17–:24.  The defendant calculated the value of the plaintiff's household services based on the plaintiff's youngest child needing services until age eighteen or twenty-one.  *Id.* at 23:23–:24.  Dr. Hurdle applied an 8.98 percent discount rate to these calculations, assuming the need to compensate for the risk that the plaintiff may not have been able to perform these services even without the injury and whether the plaintiff's "children would need that care."  *Id.* at 24:8–:12.  Using the live-in nanny method of calculation, Dr. Hurdle opined the plaintiff stood to lose $367,062.  *Id.* at 27:15.  Using the statistical table method, Dr. Hurdle opined the plaintiff would suffer between $166,521 and $191,239 in losses.  *Id.* at 27:6–:7.

**3.** To determine the cost of the plaintiff's future medical care, both economists relied upon the report submitted by Nurse Patterson, the plaintiff's expert.[11]  Trial Tr. ECF No. 71 at 24:5–:9; Def.'s Ex. 36 at 30:11–:17.  Nurse Patterson stated the plaintiff would require approximately 1.5 years of future care, *see* Trial Tr. ECF No. 56 at 94:13–:17, and in her report, Nurse Patterson identified four areas of future care costs: psychological counseling, hospice care, medical care, and nursing services.  Pl.'s Ex. 53.  Dr. Lurito, the plaintiff's expert, estimated the future medical care costs the plaintiff is likely to incur are between $146,682 and $149,886 based on the potential escalation of costs over the next 1.5 years and applying a 3.5 percent discount rate.  Trial Tr. ECF No. 71 at 25:21–:25; 26:1; 26:6–11.  The defendant's expert, Dr. Hurdle, adjusted Nurse Patterson's estimates to provide a range of estimated costs for obtaining counseling and in-home nursing services, with a low range

---

[11] Nurse Patterson's calculations include the recommendations of the plaintiff's social worker, Mila Tecala.  Tr. ECF No. 56 at 94:20–:22.

determined by using District of Columbia wage rates, and, for the upper range, using the actual costs to a client for such counseling. Def.'s Ex. 36 at 31:3–:11; 35:2–:23. For in-patient hospice care, Dr. Hurdle opined the plaintiff could move into a nursing home and use out-patient hospice care (being brought into the nursing home) instead of moving into a hospice. *Id.* at 36:5–:20. Overall, Dr. Hurdle estimated the lower bound for future care costs, including in-patient hospice care, to be $90,434 and the upper bound to be $111,889. *Id.* at 37:12–:13.

### N. The Plaintiff's Non-Economic Damages

1. The plaintiff is seeking non-economic damages in the amount of $6 million in addition to economic damages. Compl. at 8, ECF No. 1. To describe the plaintiff's non-economic damages for pain and suffering, the plaintiff provided, in addition to her own testimony, the testimony of her treating oncologist and the licensed social worker who evaluated her mental health.

2. The plaintiff's oncologist, Dr. Yoo, testified the plaintiff was "very saddened" when he informed her that her cancer was incurable. Trial Tr. ECF No. 56 at 23:16. With respect to her physical condition, he testified the plaintiff was complaining continuously of bone pain as of February 14, 2012. Trial *Id.* at 24:7–:8. As Dr. Yoo continued to treat the plaintiff, he testified, she complained of worsening bone pain, particularly in the "low back, hip and multiple joints." *Id.* at 28:4–:10. At times, the plaintiff was taking narcotic pain relievers to alleviate her bone pain. *Id.* at 33:17–:18. Dr. Yoo testified that he didn't "recollect there was a significant pain free, truly pain-free period" between the time he began treating her in January 2012 and the time of trial. *Id.* at 33:25–34:5. The treatments rendered the plaintiff

temporarily post-menopausal, *id.* at 30:6–:10, and caused her to be bloated and gain weight. *Id.* at 31:22–:23.

3. Ms. Tecala, who evaluated the plaintiff's mental health in 2012 and again in 2013, Trial Tr. ECF No. 70 at 94:13–16, testified that the plaintiff was diagnosed with depression in 2012. *Id.* at 95:23. Ms. Tecala testified the plaintiff told her "she only could sleep maybe four or five hours a night" and "stays in bed or stays on the couch and watches TV because she [is] too tired or too much in pain to do anything" other than take her children to school and pick them up from school. *Id.* at 97:2–:9. Ms. Tecala noted the plaintiff "had the saddest demeanor" and "spoke almost in a whisper, as if talking took so much effort." *Id.* at 97:13–:16. In testifying about the difference in evaluations between 2012 and 2013, Ms. Tecala opined that the plaintiff was more depressed in 2013, *id.* at 99:18–:21, and Ms. Tecala testified the plaintiff is suffering from the loss of health, body parts, and "body experiences like pain and suffering." Trial Tr. ECF No. 56 at 9:18–:23. She also testified the plaintiff is experiencing anticipatory grieving for her impending death. *Id.* at 10:5–:15. The plaintiff, Ms. Tecala testified, is "very concerned about her children . . . and what would happen to them when she dies." *Id.* at 12:12–:15. The plaintiff does not "have the energy or the wherewithal to [play with her children] because she is in pain." *Id.* at 14:7–:8.

4. The plaintiff testified that she had to quit her job because of "the pains that I had been having in my body, which was, I couldn't stand for a long period of time." Trial Tr. ECF No. 55 at 103:14–:16. She testified she is unable to pursue her goal of exploring the world because of her doctor appointments. *Id.* at 104:24–105:6. In addition, the chemotherapy has reduced the plaintiff's strength and energy levels. *Id.* at 105:12–:18. She has lost all of her hair. *Id.* at 105:22. The plaintiff testified she no longer wants to be around people and spends most of

her days in bed. *Id.* at 106:1–:7. She feels guilty she will not "be here for long for my kids to give them the things that they need." *Id.* at 107:6–:9.

## III. CONCLUSIONS OF LAW

In reaching the conclusions of law, the Court evaluates the evidence to determine whether the plaintiff has established each element of the negligence claim against the defendant by a preponderance of the evidence. *See District of Columbia v. Price*, 759 A.2d 181, 183 (D.C. 2000) ("In order to show negligence, a plaintiff must establish, by a preponderance of the evidence, the applicable standard of care, a breach of that standard by the defendant, and a causal relationship between the breach and the plaintiff's injury.") (citing *District of Columbia v. Wilson*, 721 A.2d 591, 597 (D.C. 1998)); *Clark v. Feder Semo & Bard, P.C.*, 895 F. Supp. 2d 7, 29 (D.D.C. 2012) (D.D.C. Aug. 15, 2012) ("The Court reviews the evidence under the 'default rule for civil cases,' the 'preponderance of the evidence' standard.") (citing *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011)); *see also Ascom Hasler Mailing Systems, Inc. v. United States Postal Service*, 885 F. Supp. 2d 156, 181 (D.D.C. 2012).[12] The Court first reviews the applicable legal standards for negligence claims for medical malpractice under the FTCA, and then assesses whether the plaintiff has proven, by a preponderance of the evidence, each of the elements for her negligence claim against the defendant.

### A. THE APPLICABLE LEGAL STANDARDS

#### 1. The Federal Tort Claims Act

The United States, as a sovereign, is absolutely immune from suit and, unless Congress has unequivocally consented to permit a cause of action, no court has jurisdiction to entertain a claim against the United States. *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941); *United*

---

[12] The defendant would bear the same burden of proof to establish any affirmative defense of contributory negligence, but, in this case, as discussed above, the Court precluded the defendant from belatedly asserting this defense. *See* Minute Order (June 18, 2013).

*States v. Testan*, 424 U.S. 392, 399 (1976). Congress created a limited waiver of sovereign immunity of the United States by enacting the FTCA, the provisions of which must be strictly construed in favor of the United States. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

The FTCA creates liability for certain torts committed by agencies of the United States or their employees "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008) ("In the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees."). The Supreme Court has explained that "the effect of the Tort Claims Act is to waive immunity from recognized causes of action, not to visit the Government with novel and unprecedented liabilities." *United States v. Brown*, 348 U.S. 110, 112-13 (1954) (internal quotation marks and citation omitted). Moreover, the liability of the United States for the negligent or wrongful acts or omissions of its employees, acting within the scope of their employment, is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State – the source of substantive liability under the FTCA." *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (collecting cases); *Molzof v. United States*, 502 U.S. 301, 305 (1992) (in medical malpractice cases "the extent of the United States' liability under the FTCA is generally determined by reference to state law"). Hence, the FTCA incorporates state law, including the elements of an alleged tort as defined by state tort law. *Tri-State Hosp. Supply Corp.*, 341 F.3d at 576. Since

the alleged acts and omissions giving rise to the plaintiff's negligence claim against the government occurred in the District of Columbia, the parties do not dispute that the law of the District of Columbia applies. *See* Pl.'s Corrected Proposed Concls. of Law ("Pl.'s Concls.") at 2; Def.'s Proposed Concls. of Law ("Def.'s Concls.") at 2. Thus, the liability of the United States is measured against the standards for medical malpractice in the District of Columbia.

### 2.    Negligence Standard for Medical Malpractice

Under District of Columbia law, the plaintiff in a medical malpractice action must demonstrate by a preponderance of the evidence three elements: (1) the applicable standard of care; (2) the fact that the defendant, through his or her actions or inactions, deviated from that standard of care; (3) and that a causal relationship exists between the defendant's deviation and the plaintiff's injuries. *Flores-Hernandez v. United States*, 910 F. Supp. 2d 64, 72, *17-18 (D.D.C. Dec. 18, 2012) (enumerating tripartite burden in medical malpractice actions) (citing *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990)); *Ornoff v. Kuhn & Kogan, Chartered*, 549 A.2d 728, 731 (D.C. 1998); *Psychiatric Inst. of Wash. v. Allen*, 509 A. 2d 619, 623-24 (D.C. 1986)); *see also Burton v. United States*, 668 F. Supp. 2d 86, 98 (D.D.C. 2009); *Appleton v. United States*, 180 F. Supp. 2d 177, 182 (D.D.C. 2002) (in FTCA negligence suit, the plaintiff "bears the burden of proof, by a preponderance of the evidence, to demonstrate the applicable standard of care, deviation from that standard, and the causal relationship between the deviation and plaintiff's injury") (citing *Messina v. District of Columbia*, 663 A.2d 535, 537-38 (D.C. 1995)); *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009); *Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C. 2007).

Each of these elements usually must be proven by expert testimony. *Porter v. McHugh*, 850 F. Supp. 2d 264, 267 (D.D.C. 2012) (citing *Cleary v. Group Health Ass'n*, 691 A.2d 148,

153 (D.C. 1997) ("Generally, in a medical malpractice negligence action, the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries")); *see also Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1245 (D.C. 1997). "While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted." *Sponaugle v. Pre-Term, Inc*., 411 A.2d 366, 367 (D.C. 1980). Indeed, the requirement of expert testimony is designed to mitigate the risk that findings might be "based on mere conjecture or speculation[,]" or incorrect assumptions. *Giordano*, 968 A.2d at 498. Where the experts disagree, the task of the finder of fact is to evaluate the sufficiency of the foundation for each proffered opinion, as measured against the factual evidence and the applicable medical or scientific principle. *See id.*; *Nwaneri*, 931 A.2d at 470; *Washington*, 579 A.2d at 181; *Haidak v. Corso*, 841 A.2d 316, 327 (D.C. 2004) ("Expert testimony may be excluded when the expert is unable to show a reliable basis for [his] theory."). As discussed below, the plaintiff has carried her burden on each of these elements.

### B.     THE DEFENDANT WAS NEGLIGENT IN FAILING TIMELY TO DIAGNOSE THE PLAINTIFF'S BREAST CANCER.

The parties agree that the applicable standard of care is a national standard, "not just a local custom." *Nwaneri*, 931 A.2d at 470 (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)); *Flores-Hernandez*, 910 F. Supp. 2d at 72. Generally, the applicable standard of care for all health care professionals and facilities is the "course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C. 2006) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)); *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C.

1979) (stating that the standard is "that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances"). Since Dr. Hill-Daniel is a family practice doctor, the parties agree that the applicable standard is the national standard of care for a reasonably prudent family practice doctor. The plaintiff alleges that Dr. Hill-Daniel breached that standard at multiple points during her treatment of the plaintiff. The Court agrees, and addresses each alleged breach below.

### 1. December 2009–April 2010

Based on the factual circumstances in this case and the testimony of the expert witnesses, the Court finds that Dr. Hill-Daniel's conclusions and the corresponding treatment plan that she prescribed during the plaintiff's December 3, 2009 visit were not within the national standard of care for a family practice doctor.

Both of the plaintiff's experts testified that Dr. Hill-Daniel first breached the national standard of care by failing to consider breast cancer as part of her "differential diagnosis," which is the list of possible diagnoses for a particular set of symptoms. Dr. Sutherland testified that breast cancer "absolutely" had to be included on the differential diagnosis of the plaintiff's breast complaints at the December 9, 2009 visit. Trial Tr. ECF No. 69 at 39:25–40:8. Dr. Margo expressed the same opinion. Trial Tr. ECF No. 70. at 64:6–:8. Notably, Dr. Margo's opinion was premised entirely on the words written on the progress note for the plaintiff's December 3, 2009, visit: that the plaintiff came in because of "pain and tenderness in her breasts," that she complained of "tenderness and lumpiness," that there was no change in this pain or lumpiness with her menstrual cycle, and that upon examination, Dr. Hill-Daniel found no masses, no retractions, and no visible lymph nodes. *See id.* at 54:12–58:22. Dr. Margo emphasized the significance of the notation that the symptoms did not change with the plaintiff's menstrual

cycle. According to Dr. Margo, women tend to get cysts in their breasts that go away after their period, so the fact that the plaintiff's lumpiness did not change with her menstrual cycle made that diagnosis less likely. *Id.* at 55:20–:23. Dr. Sutherland also focused primarily on the undisputedly non-cyclic nature of the plaintiff's complaints. Trial Tr. ECF No. 69 at 39:20–24 ("So the differential diagnosis in noncyclical breast pain would include potentially chest wall tenderness, breast cancer. But the differential diagnosis had to be developed that would consider all the different possibilities.").

Relying primarily on the plaintiff's young age and on what they perceived as the bilateral nature of her complaints, i.e., meaning that they pertained to both breasts, defendant's experts Dr. Bethea and Dr. Koch testified that the national standard of care did not require Dr. Hill-Daniel to consider breast cancer as part of her differential diagnosis. Trial Tr. ECF No. 73 at 32:8–:12 (Dr. Bethea's testimony that for a "[t]wenty-four year-old with bilateral benign fibrocystic findings, it would be inappropriate to list cancer as a very real concern simply because it would not be a very real concern. It would be a very rare occurrence."); *id.* at 89:8–:15 (Dr. Koch's testimony that Dr. Hill-Daniel's assessment was "perfectly reasonable" for a "twenty-four-year-old woman complaining of bilateral breast pain and lumpiness in her breasts.").

The Court finds, in addition, that the plaintiff's experts succeeded in showing that young age is not a credible reason for declining to list breast cancer on a differential diagnosis for a woman presenting with the plaintiff's complaints of feeling a "knot" in her breast and noncyclical pain, in the context of a medical history of both grandmothers' having breast cancer. Dr. Sutherland testified that "many breast cancers that are diagnosed in this country today come from the findings of the patient's own self breast examination, and that's particularly true in the

younger individuals when routine screening isn't necessarily done." Trial Tr. ECF No. 69 at 38:7–:12. Dr. Margo added that "young women often aren't that sensitized to their body, so a young woman coming in complaining of breast lumps, which is not a common complaint of young women, I would pay more attention to it." Trial Tr. ECF No. 70 at 78:25–79:4. Moreover, Dr. Margo testified that even though the incidence of breast cancer is rare in women of the plaintiff's age, "young women tend to have very aggressive breast cancers," so it is particularly important to diagnose a young woman's breast cancer early. *Id.* at 78:19–:22. In her expert opinion, breast cancer had to be on the differential diagnosis because "it was the most dangerous thing to miss." *Id.* at 64:6–:8; *see also id.* 65:16–:18 (Dr, Margo's testimony that "if it's something that would be really terrible if you missed it, then you need to make sure you're right" that the cause of the concerns is not that thing).

The defendants' experts' reliance on the bilateral nature of the plaintiff's complaints also diminishes the credibility of their opinions. *See Haidak v. Corso*, 841 A.2d 316, 327 (D.C. 2004) ("Expert testimony may be excluded when the expert is unable to show a reliable basis for [his] theory."). The plaintiff testified that she told Dr. Hill-Daniel during the December 3, 2009 visit that she had a pain and a knot in her left breast. Trial Tr. ECF No. 55 at 78:13–:14 ("I told her that I had soreness and tenderness in both of my breasts, and a pain and a knot in my left breast."). Dr. Hill-Daniel testified that the plaintiff did not specify that the knot was in one particular breast, Trial Tr. ECF No. 58 at 4:7–:12 ("As noted in the chart, [the plaintiff] came in with a new complaint of breast tenderness and lumpiness. She stated that her breasts were tender all the time. When I asked her in more detail about that, she actually held under her breasts and basically just motioned that both breasts were tender and felt lumpy."); *id.* at 18:18–:23 (Upon questioning by the Court about whether Dr. Hill-Daniel asked the plaintiff about her use of the

term "knot," Dr. Hill-Daniel responded, "So, during the course of our exam, I asked her, you know, is there a particular place, you know, where do you feel the knot? And she couldn't give me any specific place. And when I asked her, she just, again, said, they're all over. So basically saying that both breasts felt sore and knots in them [sic], not one specific knot."). Yet, the plaintiff's recollection that she complained of finding a knot in her left breast is wholly consistent with the description of symptoms that she undisputedly gave to medical providers at Howard University Hospital and Fort Washington Hospital in the following months, *see* Pl.'s Ex. 104, at 23061 (Howard University Hospital medical record from May 19, 2010 describing chief complaint as "knots on left breast"); Pl.'s Ex. 6, at 6003 (Fort Washington medical record from August 9, 2010 describing patient's complaint as "knot on LT breast"). The parties also agree that the notation on the Unity progress note for the December 3, 2009, visit is ambiguous as to whether the complaint of lumpiness pertained to one breast or both breasts. Pl.'s Ex. 1, at 1013; Def.'s Ex. 1, at 8 ("Pt also concerned that breast [singular] are [plural] lumpy."). When questioned about the significance of this notation, Dr. Hill-Daniel became particularly defensive. Trial Tr. ECF No. 58 at 59:18–:25 ("Q: And how did you spell breast? Just spell it out for us the way you wrote it in your note. A: B.R.E.S.T. [sic] Q: Okay. And that would indicate singular? A: The verb used after that is plural, [are]. So that breast is a typo. Q: Or the word [are] is a typo? A: It's more common to leave off an S than to change a verb."). In light of all of these factors, the Court is inclined to believe the plaintiff's testimony that she specifically complained to the healthcare providers at Unity about a knot in her left breast, in addition to complaining that she felt tenderness and lumpiness in her breasts generally.

Dr. Sutherland also testified that the plaintiff's family history of breast cancer increased the importance of including breast cancer on the differential diagnosis because the fact that her

two grandmothers were both diagnosed with breast cancer increased her risk. Trial Tr. ECF No. 69 at 40:4–:8 ("And one of the other reasons, you know, for that is she was at higher risk also because of the family history. She had two grandmothers that had family – or have a history of breast cancer, which increases her risk."). He testified that an article about screening guidelines for breast cancer, as part of the Guam breast and cervical cancer early detection program, supports that opinion, Trial Tr. ECF No. 55 at 4:6–:9, and, indeed, the article states that one or more first-or second-degree relatives with breast cancer at an early age (less than 40-50 years of age) can be a red flag suggestive of genetic susceptibility to breast cancer. Pl.'s Ex. 67, at 4.

Whether the plaintiff informed Dr. Hill-Daniel about her family history of breast cancer is another disputed matter. The plaintiff testified that she told both Dr. Hill-Daniel and the medical assistant at Unity that her two grandmothers had been diagnosed with breast cancer. Trial Tr. ECF No. 55 at 79:16 (responding to counsel's question "would you describe for us . . . the nature of the discussion [that she had with Dr. Hill-Daniel about cancer]," the plaintiff said, "I told her I had two grandmothers that had breast cancer,"); *id.* at 128:17–:18, 129:5–:6 (testifying that she "told them at Unity" that she had a family history of breast cancer and that she "told them numerous times when I was, when I seen the nurse before I seen Dr. Hill-Daniel"). Dr. Hill-Daniel's denial that the plaintiff mentioned her grandmothers' breast cancer is not inconsistent with the plaintiff's testimony that she disclosed this critical family medical history to the medical assistant. Doctors and medical assistants at Unity generally communicate only through written notes in the medical record, and any information obtained by the medical assistant at the short initial interview with a patient about the reason for the visit that is not documented by the assistant may never reach the treating physician. At the same time, a patient who has unburdened herself in an initial interview with a medical professional by describing

pertinent symptoms, history or concerns may rightly believe that the key information will be handled appropriately and passed along as needed without the need for repetition.

In this case, the medical assistant's notes concerning the December 9, 2009 visit do not relay any of the deep concern that the plaintiff described herself as having, in large part due to her grandmothers' history of breast cancer. Trial Tr. ECF No. 55 at 80:4–:12. Rather, this note consists of abbreviated descriptions of the plaintiff's concerns documented in three bullet points. Pl.'s Ex. 1, at 1013; Def.'s Ex. 1, at 8. Important medical history information that the plaintiff told the medical assistant may not have reached Dr. Hill-Daniel because of a lapse in the written communication of the medical assistant. The Court credits the plaintiff's recollection that she mentioned her grandmothers' breast cancer to Unity medical personnel based on her testimony that her knowledge of what happened with her grandmothers is what prompted her concern about her own breast pain and lumpiness in the first place, and her request for a mammogram. Trial Tr. ECF No. 55 at 80:4–:12. According to Dr. Sutherland, Dr. Hill-Daniel had the responsibility to pursue whether the plaintiff had any relatives with breast cancer beyond her mother and sisters. Trial Tr. ECF No. 69 at 71:7–:10. The progress note contains no evidence that Dr. Hill-Daniel even asked the plaintiff whether she had grandparents with breast cancer. The progress note states only that there is no history of breast cancer in "first-degree relatives," which is defined as a mother, sister, father, or brother, and it is silent as to all other degrees of relatives. Pl.'s Ex. 1, at 1013; Def.'s Ex. 1, at 8. In sum, Dr. Hill-Daniel's view that the plaintiff had no family history of breast cancer was incorrect because the plaintiff reported her family history at least to the medical assistant, the medical assistant clearly did not write it down, and Dr. Hill-Daniel never inquired further.[13]

---

[13] It is also worth noting that during the bench trial, Dr. Hill-Daniel testified that she would not have changed her assessment or her actions in December 2009 even if she had known about the plaintiff's grandmothers' history of

On the basis of the credible expert testimony, the Court therefore finds that the national standard of care required Dr. Hill-Daniel to consider breast cancer as part of her differential diagnosis for the plaintiff on December 3, 2009.

Yet Dr. Hill-Daniel testified that breast cancer was not on her differential diagnosis. Trial Tr. ECF No. 58 at 15:1–25, 55:11–:14 ("A:  And you knew [that breast cancer in women under thirty is most likely diagnosed by detection of a palpable mass] on December 3, 2009, yet with this knowledge, you did not have breast cancer on your differential diagnosis, correct?  A: Nothing in the -- correct.").  In fact, it is clear that Dr. Hill-Daniel determined at the December 2009 visit that the plaintiff's condition was decidedly not breast cancer.  Dr. Hill-Daniel testified that she reassured the plaintiff that her concerns were benign – meaning not cancer.  *Id.* at 13:21–:22 (Dr. Hill-Daniel's testimony that she reassured the plaintiff that her concerns were "benign"); *id.* at 63:9–:11 (Dr. Hill-Daniel's testimony agreeing that "the term benign refers to a condition, tumor or growth that is not cancerous").  Dr. Hill-Daniel's reassurance of the plaintiff and clear minimization of the plaintiff's own view about the need for a mammogram or some form of diagnostic testing clearly colored the urgency with which the future treatment of the plaintiff by this physician and Unity subsequently unfolded. When the Court asked Dr. Hill-Daniel why she did not tell the plaintiff to follow up within a specified time period, Dr. Hill-Daniel responded: "At the time, I felt this was a self-limiting process, meaning that I thought her breast pain, her tenderness, would spontaneously resolve on her own." *Id.* at 17:14–:19.[14]

---

breast cancer.  Trial Tr. ECF No. 58 at 7:21–8:6 ("Q:  And if she had told you that she had a family history of breast cancer, with respect to her two grandmothers, how would have changed your assessment, or would it have?  A: Well, for that particular visit, it may not have changed my plan of care.  But I would have counseled [the plaintiff] differently about the need for future screening . . . .").

[14] The defendant asserts that at the December 2009 appointment, Dr. Hill-Daniel diagnosed the plaintiff with "fibrocystic changes," also known as "fibrotic disease," *see* 3rd FOF Table ¶¶ 48(B) ("Her assessment was coded as 'breast disorders not otherwise specified.'  It gives reference to the patient's pain and that it is mostly fibrocystic changes."), 62(B) ("Dr. Hill-Daniel believed from her initial assessment that the plaintiff had fibrocystic disease of both breasts.").  This characterization is simply not supported by the medical record, the diagnostic code that Dr.

The plaintiff's experts next testified that because Dr. Hill-Daniel was required to have breast cancer on the differential diagnosis for the plaintiff, she was also required to take steps to rule it out. Dr. Sutherland was the only expert who opined that based on the plaintiff's presentation as a twenty-four year old non-lactating woman with noncyclic pain and no suspicious findings on examination, the national standard of care required Dr. Hill-Daniel to refer her for a diagnostic ultrasound. Trial Tr. ECF No. 69 at 42:1–:7. He based his opinion on an algorithm published by the California Department of Health as a guideline for primary care physicians in 2005, and incorporated into the Guam Breast and Cervical Cancer Early Detection Program Screening Guidelines for Breast Cancer. Pl.'s Exs. 67, 106; Trial Tr. ECF No. 69 at 43:23–44:3. Although the defendant attacks this study as inapplicable to a twenty-four year old woman, there is no indication that the algorithm is dependent on age. Moreover, the defendant's experts did not present any competing study or protocol based in the scientific literature that would suggest that whether to order diagnostic imaging depends on the patient's age.[15]

Dr. Sutherland ultimately testified that at the very least, the national standard of care required Dr. Hill-Daniel to schedule the plaintiff for a return visit in the next thirty to sixty days to see whether or not her complaints of noncyclic pain and knots remained and to repeat the breast examination. Trial Tr. ECF No. 69 at 37:19–:24. Dr. Margo also testified that the next step required by the national standard of care was to schedule an appointment for the plaintiff to follow-up about her breast complaints in the next four to six weeks. Trial Tr. ECF No. 70 at 61:15–:23. Even the defendant's expert, Dr. Koch, opined that Dr. Hill-Daniel had "an

---

Hill-Daniel used, or the testimony in this case. In fact, Dr. Carter testified that fibrotic disease "comes and goes with menses," Trial Tr. ECF No. 72 at 133:15–:16, and Dr. Hill-Daniel clearly documented in the medical record "no change with menstrual cycle," Pl.'s Ex. 1 at 1013; Def.'s Ex. 1 at 8.

[15] Although defendant's counsel alluded to a competing protocol during her cross-examination of Dr. Sutherland, Trial Tr. ECF No. 69 at 83:23 –87:6, the article to which she referred was not admitted as evidence in this case and none of defendant's expert witnesses testified that their opinions were informed by it.

obligation to say, if your symptoms do not go away . . . with the interventions that I suggested, please come back to be reevaluated." Trial Tr. ECF No. 73 at 127:17–:21. Dr. Hill-Daniel took no such steps to further assess whether the plaintiff had breast cancer. Rather, she reassured the plaintiff of the benign nature of her concern, told her that no imaging was warranted, recommended that she change her bra, and prescribed her a strong dose of Ibuprofen.

While there is no dispute that Dr. Hill-Daniel did not schedule, or insist on the scheduling of, a follow-up appointment for the plaintiff in the next two months, there is some dispute over what Dr. Hill-Daniel did tell the plaintiff regarding follow-up, if anything. Dr. Hill-Daniel testified that she recalled telling the plaintiff "to follow up if she didn't have any relief of the pain, or if her symptoms persisted," Trial Tr. ECF No. 58 at 16:12–:18. The plaintiff, on the other hand, testified that Dr. Hill-Daniel never mentioned any follow-up to her at all. Trial Tr. ECF No. 70 at 20:22–21:7. Under the heading of "follow-up," the progress note contains only the nonspecific notation, "PRN," – meaning "as needed." Pl.'s Ex. 1, at 1066; Def.'s Ex. 1, at 8; Trial Tr. ECF No. 58 at 16:8–:9 (Dr. Hill-Daniel's testimony that PRN stands for "as needed"). Accordingly, the Court finds the plaintiff's testimony to be credible and finds that Dr. Hill-Daniel did not adequately explain to the plaintiff when, or even if, she should follow up.

Whatever Dr. Hill-Daniel told the plaintiff about follow-up, there is no question that she unwarrantedly told the plaintiff that her symptoms were not cause for concern. Dr. Hill-Daniel testified that she told the plaintiff that her symptoms were benign, i.e. non-cancerous, Pl.'s Ex. 1, at 1013 & Def.'s Ex. 1, at 8 (progress note for December 3, 2009 visit, stating under "treatment" that "Pt reassured about benign nature iof [sic] her concern"); *see also* Trial Tr. ECF No. 58 at 63:9–:11 (Dr. Hill-Daniel's testimony agreeing that "the term benign refers to a condition, tumor or growth that is not cancerous"), which, according to Dr. Margo, Dr. Hill-Daniel did not have

enough information to do. Trial Tr. ECF No. 70 at 60:10–:14. The problem with making such an unsubstantiated assurance, according to Dr. Margo, is the patient will stop paying attention to the symptoms or will not bring them up to the physician again in the future because she thinks that the problem is benign. *Id.* at 61:3–:11. Dr. Margo explained that Dr. Hill-Daniel "didn't leave the door open for something other than a benign problem." *Id.* at 60:16–:19. Even if Dr. Hill-Daniel had told the plaintiff during her December 2009 visit that she should follow-up if her symptoms persisted, she also conveyed the clear indication that the plaintiff should have no concern about any danger from the persistence of her symptoms. The defendant's expert, Dr. Koch, conceded to the Court that the only reason a patient would follow-up about persistent symptoms after being assured of their benign nature would be for further pain management. Trial Tr. ECF No. 73 at 91:20–92:5 (suggesting other medical modalities for pain management that the doctor could have prescribed if the patient were to return complaining that her symptoms were persisting).[16]

The defendant's experts, Dr. Bethea and Dr. Koch, testified that in their opinions the national standard of care did not require Dr. Hill-Daniel to schedule a follow-up appointment or order diagnostic imaging. As with their opinions about the differential diagnosis, both of them relied primarily on the plaintiff's age and the fact that her complaints of pain and lumpiness were "bilateral" or occurring in both breasts. Trial Tr. ECF No. 73 at 32:8–:12 ("Twenty-four year-old with bilateral benign fibrocystic findings, it would be inappropriate to list cancer as a very real concern simply because it would not be a very real concern. It would be a very rare

---

[16] Despite Dr. Hill-Daniel's failure to schedule a follow-up visit for the plaintiff, Dr. Hill-Daniel had additional opportunities to follow-up with the plaintiff when she saw the plaintiff for unrelated complaints on January 8, 2011, and April 30, 2011. While the Court declines to hold as a general matter that doctors must review all of a patient's past symptoms and discuss them with the patient to ensure that they are not persisting, in this case, the progress notes for the January and April, 2011 visits reflect that the plaintiff was still being prescribed pain-killing medication for her breast pain and this, at a minimum, could have prompted an inquiry into whether that medication was still needed. Dr. Hill-Daniel missed these two opportunities to inquire into the persistence of the plaintiff's breast symptoms. Trial Tr. ECF No. 58 at 21:5–:9; 77:21–:23.

occurrence."); *id.* at 86:19–87:7 (explaining that the national standard of care does not require a referral for imaging when "if you listen to the patient, you listen to what she has to say, she's talking about a bilateral issue. She is talking about the breasts being uncomfortable, and she feels that they are lumpy, and you do a physical examination on the patient, and you don't find anything there"); *id.* at 89:8–:15 ("[S]he took in the chief complaint; she did a physical exam; she made an assessment, and she gave the patient suggestions for management, and then she invited the patient to come back should the symptoms continue. It was a perfectly reasonable thing to do in a twenty-four-year-old woman complaining of bilateral breast pain and lumpiness in her breasts."). The Court discounts the value of these opinions for the same reasons the defendant's experts' opinions regarding the differential diagnosis are discounted: not only is the age of the patient not dispositive as to whether a breast "knot" is benign, the plaintiff's testimony that she complained specifically about a knot in her left breast is credible. Moreover, the defense experts did not address the fact that the plaintiff's breast complaints were noncyclical. Thus, the grounds on which the defense experts based their opinion about the defendant's compliance with the national standard of care at the December 2009 visit in terms of diagnosis, follow-up care, and treatment are not predicated on the material factual findings in this case. This faulty premise also invalidates Dr. Bethea's testimony that if a physician were to schedule a follow-up with every patient presenting with the plaintiff's symptoms, it would "flood the system unnecessarily with essentially zero return on your effort." Trial Tr. ECF No. 73 at 27:1–:4.

Accordingly, the Court finds that Dr. Hill-Daniel breached the national standard of care on December 3, 2009 by, at the very least, not scheduling a follow-up visit for the plaintiff in thirty to sixty days to reassess the plaintiff's complaints of bilateral breast pain and a knot in her left breast, and to repeat a breast examination.

## 2.    August–October 2010

The plaintiff next argues that Dr. Hill Daniel and Unity breached the national standard of care by delaying for more than two months the plaintiff's appointment for a mammogram referral after the plaintiff first attempted to make the appointment.  The plaintiff testified that, after her visit to the emergency room at Fort Washington Hospital where she was advised that obtaining a mammogram was "very important,"[17] she called Unity the very next day and asked the receptionist to schedule the first available appointment to see Dr. Hill Daniel because she needed a mammogram.  Trial Tr. ECF No. 55 at 92:1–:13.  She was first given an appointment date of September 9, 2010, but Unity cancelled that appointment and another rescheduled appointment for September 24, 2011 before the plaintiff finally saw Dr. Hill-Daniel on October 18, 2010.  Pl.'s Ex. 33.

The plaintiff's expert, Dr. Sutherland, testified that when Unity cancelled the plaintiff's September 9, 2010, appointment, the standard of care required Unity to reschedule it "as quickly as possible, and I think certainly within a week at the maximum."   Trial Tr. ECF No. 69 at 51:16–:18.  He opined that if it were not possible for Dr. Hill-Daniel to see her during that time, she should have been scheduled to see one of Dr. Hill-Daniel's colleagues.  *Id.* at 51:18–22.  As to the second time the appointment was rescheduled, Dr. Sutherland opined that rescheduling the appointment as quickly as possible was particularly imperative because the plaintiff had already been waiting to be seen for several extra weeks.  *Id.* at 52:5–:9.

---

[17] The defendant appears to dispute that the health-care providers at Fort Washington Hospital told the plaintiff that she needed a mammogram.  *See* 3rd FOF Table ¶ 90(B) ("There is no indication from the Fort Washington medical record that the Plaintiff was told to get a mammogram.").  However, the progress note from the plaintiff's October 18, 2011 visit with Dr. Hill-Daniel, which states "P tseen [sic] in ER regarding mass but was told to f/u with PMD for mammogram," is consistent with the plaintiff's testimony that she was told at Fort Washington Hospital that she needed a mammogram, Trial Tr. ECF No. 55 at 90:12–:14.

Dr. Sutherland based his opinion on "the fact that the reason for that request [for a mammogram] was the fact that a mass had been found at Fort Washington and she was told to proceed to get – see her primary care physician for further testing." *Id*. at 51:2–:7. There is no evidence in the record, however, that the plaintiff actually told the receptionist at the time that she called to make her appointment, or during the period of time over which her appointments were rescheduled, about her experience at Fort Washington, the mass they palpated in her left breast, or their recommendation that it was "very important" that she follow up with her primary care physician. As described above, the plaintiff testified only that she asked for the first available appointment because she needed a mammogram. Trial Tr. ECF No. 55 at 92:1–:13.

The Court is troubled that the receptionist did not inquire into the basis for the urgency that the plaintiff expressed in seeing Dr. Hill-Daniel, particularly in the face of her explicit request for a mammogram referral, and with the length of time that that it took for Unity to fit the plaintiff in to be seen by a physician. While clerical personnel certainly are not expected to have the same level of expertise as other medical professionals, personnel responsible for cancelling and re-scheduling appointments at a medical clinic should have sufficient training to inquire into a patient's perspective or understanding regarding the timing needs for an doctor's visit, or to confer with a physician when the schedule does not permit an appointment within the time-frame the patient believed is required. Instead, the Unity scheduling personnel, with whom the plaintiff spoke, approached the making of an appointment as a purely ministerial task without any medical implications, and this is simply not the case when the context is a medical clinic providing primary care.

Moreover, the defendant's assertion that the plaintiff should have made an appointment with another doctor or visited the clinic as a "walk-in" is simply not persuasive. Def.'s Concls.

at 11–12.  The doctor at the Fort Washington Hospital Emergency Room specifically told the plaintiff to "go back to your doctor."  Trial Tr. ECF No. 55 at 90:22–:24.  At the time, Dr. Hill-Daniel was the plaintiff's primary care physician and she was the doctor that the plaintiff had initially gone to with her breast complaints.  The defendant also presented no evidence that the plaintiff was advised by anyone at Unity at the time of the cancellation of her two appointments with her primary care physician, or at any other time, that she had the option of scheduling an appointment with another doctor, or that she could continue to come in for walk-in visits after she had been assigned a primary care physician.  Although the plaintiff had visited Unity as a walk-in patient in the past, all of the records of her walk-in visits are from before Dr. Hill-Daniel became assigned as the plaintiff's primary care physician.  Def.'s Ex. 1, at 14–16; *see also* Trial Tr. ECF No. 72 at 82:5–:10.

Yet, because the plaintiff has not provided any expert opinion regarding the national standard of care applicable to medical clinics for the re-scheduling of cancelled doctor visits in light of the facts as presented in this case, the Court cannot find that the plaintiff has proven by a preponderance of the evidence that the delay attendant to the cancellation and re-scheduling of two appointments that the plaintiff had with Dr. Hill-Daniel in September and October, 2011 constituted a breach of the national standard of care.

### 3.      October 18, 2010–March 8, 2011

Finally, the plaintiff asserts that Dr. Hill-Daniel was negligent in permitting almost five months to pass between the October 18, 2010 appointment and her March 8, 2011 breast cancer diagnosis.

There is no dispute that Dr. Hill-Daniel examined the plaintiff on October 18, 2010, and palpated "multiple small mobile nodules" in her left breast and lymph nodes in her left axilla.

Pl.'s Ex. 1, at 1060; Def.'s Ex. 1, at 8.  While all of the experts agreed that Dr. Hill-Daniel ordered the correct tests in a permissible progression, both of the plaintiff's family medicine experts testified that under these circumstances, the national standard of care required a quick evaluation through this progression of imaging and biopsy to determine whether the abnormalities were breast cancer.  *See* Trial Tr. ECF No. 70 at 81:15–:17 (Dr. Margo's testimony that the national standard of care required "very quick evaluation with imaging and referral to a specialist to take care of it if it turns out, in fact, to be breast cancer"); Trial Tr. ECF No. 69 at 53:16–:18 ("In light of those findings with the history, it was Dr. Hill-Daniel's responsibility to expedite diagnostic testing as soon as possible.").  Both of the plaintiff's experts also testified that the national standard of care required that the plaintiff's breast cancer be diagnosed in no more than two to three weeks in total.  Trial Tr. ECF No. 70 at 82:10–:25 (Dr. Margo); Trial Tr. ECF No. 69 at 54:19–55:5 (Dr. Sutherland).  Within this overarching timeframe, Dr. Sutherland testified that the national standard of care required that the diagnostic ultrasound be done within a week of the October visit, Trial Tr. ECF No. 69 at 54:2–:12, and Dr. Margo testified that the required time was two weeks, Trial Tr. ECF No. 70 at 82:10–82:25.

The defendant's expert, Dr. Koch, testified that the national standard of care was satisfied by the physician prescribing a six-week follow-up period during which the patient should get the ultrasound.  When pressed on the appropriate timeframe for obtaining diagnostic tests, however, Dr. Koch expressed significant doubt about his qualifications to make any judgment about how long diagnostic measures for breast cancer should take.  Trial Tr. ECF No. 57 at 11:16–:22 ("I think an oncologist could speak to that much better than I . . . . I would probably let an oncologist, you know, speak [to] that.").  The Court therefore does not credit his judgment about what the standard of care requires with respect to the diagnostic process for breast cancer.

The defendant's expert, Dr. Bethea, testified that Dr. Hill-Daniel's actions did not violate the national standard of care, but said, in response to questioning by the Court, that Dr. Hill-Daniel's detection of lymph node involvement was a "game-changer," and that once that happened, it was not appropriate to wait six weeks before an ultrasound was performed. Trial Tr. ECF No. 73 at 40:24–41:2. He then attempted to backpedal by redefining the national standard of care as dependent on the practical circumstances under which the care is delivered – in particular, the financial circumstances of the medical institution and the type of insurance that the patient has. *See id.* at 44:4–47:11. Finally, he confused the matter by opining that "[t]he time frame does not dictate the compliance with the standard of care. It dictates compliance with best practice." *Id.* at 49:6–:9. The law in this jurisdiction, however, establishes that the conduct of a health care provider, whether a physician or institution, should be measured against the national standard of care, which in turn depends on the course that is followed nationally by physicians or institutions in the same field as the defendant. *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990) (defining national standard of care for an institution as reliant on what a reasonably prudent institution, at the time of the plaintiff's injury, and according to national standards, would have done). Moreover, the standard must be established through "reference to a published standard, [discussion] of the described course of treatment with practitioners outside the District . . . at seminars or conventions, or through presentation of relevant data." *Strickland v. Pinder*, 899 A.2d 770, 770 (D.C. 2006); *see also Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996) ("There must be, then, evidence that a particular course of treatment is followed nationally."). Dr. Bethea's opinion that it was appropriate for Dr. Hill-Daniel to prescribe a six-week follow up period is not based on a national standard for family care physicians or for institutions that offer primary care services to patients. Rather, it

seems to be based on his opinion that different standards apply depending on the institutional context in which treatment is delivered. *See, e.g.*, Trial Tr. ECF No. 73 at 46:19–:23 ("These days, unfortunately, doctors lose control of the situation in big medical centers, such as where this occurred. They don't lose control of it in a practice like mine. So it's two entirely different circumstances."). That understanding does not comport with the law in this jurisdiction.

Assessing whether Dr. Hill-Daniel satisfied any of the expert witness's constructions of the national standard of care, the Court must consider that Dr. Hill Daniel did nothing to expedite any of the tests that she ordered for the plaintiff, and that there is no evidence that she or any of her staff explained to the plaintiff the appropriate timeframe for obtaining the tests or the reason why it was important to obtain them quickly. As to the ultrasound, Dr. Hill-Daniel wrote a referral and sent it to Ms. Jones for processing. Although Dr. Hill-Daniel asked Ms. Jones to expedite the insurance authorization process, the plaintiff was not notified that Dr. Hill-Daniel had asked Ms. Jones to expedite the referral, and Dr. Hill-Daniel did not direct Ms. Jones to discuss the timing of the ultrasound with the plaintiff. Dr. Hill-Daniel testified that she "basically stressed the importance of her to get the study done and come back to me for the results so we could figure out what else we needed to do," Trial Tr. ECF No. 58 at 29:1–:3, but this nonspecific recollection does not speak to the timeframe she used or the explanation she gave for why "figure[ing] out what else we needed to do" was important. Moreover, there is no notation on the progress note that Dr. Hill-Daniel actually told the plaintiff the importance of having the procedure done quickly, and the plaintiff testified that Dr. Hill-Daniel did not give her any indication of how quickly the procedure should be done. Trial Tr. ECF No. 55 at 97:4–:6 ("Q: [D]id Dr. Hill-Daniel tell you about how quickly you were supposed to have the ultrasound performed? A: She didn't give me no discussion about the ultrasound."). Dr. Hill-Daniel also

testified on cross-examination that she did not remember specifically telling the plaintiff that she should get an appointment for the ultrasound within one to two weeks.  Trial Tr. ECF No. 58 at 96:25–97:3.  Rather, the notation in the progress note says that the prescribed follow-up is six weeks, and Dr. Hill-Daniel testified that "I felt six weeks was enough time for her to get the referral, make her appointments, get the exam done and report back to me."  *Id.* at 28:24–29:5.

Thus, reviewing the evidence as a whole shows that while Dr. Hill-Daniel may have told the plaintiff that the ultrasound was important to diagnose her symptoms, she did not tell the plaintiff that she needed to get it done quickly or explain that the reason it was important was to rule out the possibility that she had breast cancer.  Relaying the urgency of having the test performed quickly would have been particularly important in this case, given that Dr. Hill-Daniel had assured the plaintiff that her concerns were benign and could be treated with a change in her bra, only ten months earlier.

Moreover, although it is not clear that Dr. Hill-Daniel told the plaintiff to follow-up at all, the best-case scenario is that Dr. Hill-Daniel told the plaintiff that the follow-up time was six-weeks.  This is far longer than the one to two-week timeframe that the plaintiff's experts testified that the national standard of care required.  Even the defendant's expert, Dr. Bethea, testified that Dr. Hill-Daniel's detection of lymph node involvement was a "game changer," and that once that happened, it was not appropriate to wait six weeks before an ultrasound was performed.  Trial Tr. ECF No. 73 at 39:23–41:2.  The defendant's other family medicine expert, Dr. Koch, who asserted that Dr. Hill-Daniel was within the standard of care by giving the plaintiff a six-week follow-up for the October 18, 2011 appointment, also testified that "there's certainly an obligation on a physician's part to impart some need to expedite things."  *Id.* at 113:2–:3.

More troubling is that on November 3, 2011 – more than two weeks after the October 18, 2011 visit – Dr. Hill-Daniel became aware that the plaintiff had gone to Providence Hospital to have the ultrasound done, and that she was unable to have the procedure because of an error that Dr. Hill-Daniel herself had made with the IDC-9 code on the plaintiff's referral form.  When Dr. Hill-Daniel corrected the code, she was aware that the ultrasound technician had already left for the day and, thus, that the plaintiff would have to reschedule the ultrasound appointment. Nonetheless, Dr. Hill-Daniel still did nothing to ensure that the plaintiff would be able to have the ultrasound done quickly.  She did not call the radiologist at Providence Hospital or direct her staff to call.  She did not even call the plaintiff to make sure she was aware that she should try to have the procedure rescheduled quickly.  Dr. Sutherland testified that as the physician responsible for the management of the patient, Dr. Hill-Daniel was required to take a leadership role and/or delegate to her staff to make sure that the ultrasound was done within a week.  Trial Tr. ECF No. 69 at 55:14–57:7.  Yet, two weeks after she wrote the referral, Dr. Hill-Daniel knew that the plaintiff still had not been able to have the ultrasound and Dr. Hill-Daniel did nothing.

Dr. Hill-Daniel finally received the ultrasound report on December 27, 2011, with the alarming finding that "a more aggressive lesion cannot be excluded."  Pl.'s Ex. 13, at 1; Def.'s Ex. 5, at 1.  Dr. Hill-Daniel also saw the radiologist's recommendation that she refer the plaintiff for a mammogram.  At this point, Dr. Hill-Daniel had to be aware that it had taken the plaintiff two months to have the diagnostic ultrasound.  In addition, Dr. Hill-Daniel knew that the abnormal result from the ultrasound meant that the plaintiff potentially had breast cancer.  Trial Tr. ECF No. 58 at 98:3–:9 ("Q:  You knew [the plaintiff] potentially might have cancer.  And you knew now that you had an abnormal result from an ultrasound, right?  A:  Yes.  Q:  And you didn't tell her anything about how quickly she should get the mammogram?  A:  No, I can't

recall speaking to her."). Yet, Dr. Hill-Daniel still did nothing to ensure that the plaintiff received a quick diagnosis or at least was aware of the urgency of the situation. Dr. Hill-Daniel did not even contact the plaintiff herself, let alone take the time to explain to the plaintiff that the mammogram needed to be done quickly and why. Trial Tr. ECF No. 73 at 113:2–:3. Rather, Dr. Hill-Daniel generated a referral for a mammogram of the left breast as directed by the radiologist, sent it to Ms. Jones for authorization, and asked Ms. Jones to call the plaintiff to pick up the referral form and schedule an appointment. Trial Tr. ECF No. 58 at 41:11–:15. In fact, while Dr. Hill-Daniel marked the referral for the mammogram as urgent and sent it to Ms. Jones electronically on December 30, 2011 in order to expedite the insurance authorization process, she did not even take care to discover that Ms. Jones was out of the office and would not return – or therefore process the referral – for an entire week. As a result, the plaintiff's diagnosis was delayed further.

The plaintiff finally had the mammogram, which she had originally requested in December, 2009 and, again, in September, 2010 and, again, in October, 2010, performed on February 9, 2011. After receiving a call from the radiologist at Providence Hospital regarding the abnormal results of the plaintiff's mammogram, Dr. Hill-Daniel contacted the plaintiff on February 10, 2011. Dr. Hill-Daniel told the plaintiff during this telephone call that the plaintiff needed to be seen by a surgeon for a biopsy, but she still did not communicate the urgency of the situation to her or the reason for the biopsy. Trial Tr. ECF No. 58 at 111:8–112:1. In fact, Dr. Hill-Daniel testified that she would not have used the word cancer with the plaintiff because you "don't have that diagnosis until the biopsy is done." *Id.* at 111:23–:25. Despite knowing how long the diagnostic process had already taken, and despite having admitting privileges at Providence Hospital, Dr. Hill-Daniel did not call the surgeon to whom she referred the plaintiff

in order to expedite the biopsy. *See id.* 116:21–:25 (Dr. Hill-Daniel acknowledged that it was more likely that the test would have been scheduled quicker if she had called Providence Hospital than if the plaintiff called). The biopsy was not performed until March 8, 2011 – nearly a month after Dr. Hill-Daniel first learned about the mammogram results, and nearly five months after she had palpated the nodules in the plaintiff's left breast and the lymph nodes in the axilla.

Defendant cites *Forman v. Pillsbury*, 753 F. Supp. 14, 19 (D.D.C. 1990), for the proposition that a rule requiring a physician to take significant measures to ensure that a properly informed patient follows the doctor's instructions would be unworkable and overly paternalistic. Def.'s Concls. at 14. That case is distinguishable. In *Forman*, doctors at Mt. Sinai Hospital had prescribed a medication for the patient and, aware that the medication could suppress white blood cell production, they recommended in a clear communication to the patient that he follow a schedule to closely monitor his white blood cell count while on the medication. *Id.* at 15–17. The patient failed to adhere to the schedule, however, and while on the medication, the patient's white blood cell count dropped, causing him to suffer coronary arrest and die. *Id.* at 16. His mother sued his physician for medical malpractice, arguing that the monitoring schedule represented the standard of care and that her son's physicians were required to abide by it. *Id.* The only allegation of negligence at trial was the doctor's failure to monitor the patient's white blood cell count on one particular occasion. The court first found that the plaintiff had not proved that the failure to monitor on that one occasion was the proximate cause of the patient's harm. *Id.* at 18. It next found that even if there were sufficient evidence to support a finding of proximate cause, the plaintiff had not presented sufficient expert testimony to support her theory of the standard of care. *Id.* The court stated that the plaintiff's expert discounted the fact that the plaintiff "was well aware of the schedule and the importance of monitoring the patient's white

blood count" and that nonetheless, the plaintiff failed to take the patient to the doctor consistently. *Id.* at 19. The court rejected the expert's testimony that a doctor has "the duty to make sure that a patient comes to the office for treatment," holding instead that the "defendant's obligation consisted of informing plaintiff of the need for monitoring and performing the tests with plaintiff's cooperation." *Id.*

This Court agrees that the patient must take responsibility for following a doctor's orders, but the problem here is that the patient was not given the information that she needed and to which the national standard of care entitled her, in order to obtain the appropriate level of care. Dr. Hill-Daniel failed to express the urgency with which the plaintiff needed to have the diagnostic tests performed and failed to explain to her the appropriate time frame to schedule the tests. Moreover, after discovering that her own error delayed the plaintiff's ability to obtain the medically necessary tests, Dr. Hill-Daniel still did nothing to expedite the timeframe or even to impart to the plaintiff that the timeframe should be expedited. With clear knowledge of the length of time it took for the plaintiff to have the ultrasound performed, Dr. Hill-Daniel still took no steps to assist the plaintiff in obtaining the follow-on mammogram and the biopsy in a more expedited fashion or even to explain to the plaintiff that it was important that she do so. Unlike in *Forman*, there is no evidence here that the plaintiff was "well aware" of the appropriate schedule for obtaining her diagnostic tests or why it was important that they be done quickly.

At a minimum, all four experts ultimately agreed that the national standard of care required Dr. Hill-Daniel to impart some need to expedite testing once she palpated the nodules in the plaintiff's left breast and lymph nodes and to not impede the plaintiff's ability to do so.[18] Dr.

---

[18] As explained above, plaintiff's experts' reliably testified that the appropriate schedule was one to two weeks to obtain the diagnostic ultrasound, and two to three weeks to reach the ultimate diagnosis. As a practical matter, however, the Court finds that the standard is well short of the eight weeks it actually took to obtain the diagnostic ultrasound and the five months that it took to reach the ultimate diagnosis in this case.

Hill-Daniel failed to do that. Therefore, the plaintiff has successfully proven that Dr. Hill-Daniel's actions – or inaction – breached the national standard of care.

### C. THE TREATING PHYSICIAN'S BREACH OF THE NATIONAL STANDARD OF CARE WAS THE PROXIMATE CAUSE OF THE PLAINTIFF'S PROGRESSION FROM STAGE I TO STAGE IV CANCER.

The Court also finds that the plaintiff has proven by a preponderance of the evidence that Dr. Hill-Daniel's breach of the national standard of care caused her breast cancer to progress from a Stage I curable disease to the Stage IV incurable disease that she now faces.

"It is a bedrock rule of . . . tort . . . law that a defendant is only liable for harms he proximately caused." *United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011) (citing RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. a (2010) (calling proximate cause a "requirement[] for liability in tort")); *see also McGaughey v. District of Columbia*, 684 F.3d 1355, 1358 (D.C. Cir. 2012) ("A plaintiff claiming negligence must prove not only that the defendant owed her a duty of care that was breached but that the breach proximately caused her injury. Failure to show proximate cause is fatal to a negligence claim.") (internal citations omitted); W. Page Keeton *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 263 (5th ed. 1984) ("An essential element of the plaintiff's cause of action for negligence, or . . . any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called 'proximate cause' . . . .")). To show proximate cause, a plaintiff must proffer expert testimony "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Giordano v. Sherwood*, 968 A.2d 494, 502 (D.C. 2009) (quoting *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 624 (D.C. 1986)). "The

'more likely than not' standard is firmly embedded in our law." *Grant v. Am. Nat'l Red Cross*, 745 A.2d 316, 319 (D.C. 2000).

The parties do not grapple with the application of this standard to a case, like this one, where the plaintiff claims that the physician's negligence was her failure to diagnose an existing condition that, when left untreated, would progress to an incurable and deadly disease. In *Flores-Hernandez v. United States*, 910 F. Supp. 2d 64 (D.D.C. 2012), another judge on this Court addressed application of the causation standard to a physician who was negligent in failing to diagnose the plaintiff's cancer at an earlier stage. The plaintiff alleged that the physician negligently delayed referring her for diagnostic gynecological testing for cervical cancer and that, had the doctor referred her for testing earlier, specialists would have diagnosed and completely treated her condition as a pre-malignancy or early stage cancer, rather than Stage IVA cervical cancer, as it was ultimately diagnosed two years later. *Id.* After finding that the plaintiff had sustained her burden on negligence, the court characterized the plaintiff's burden on causation as proving that if the plaintiff had been referred to a gynecologist sooner, it was more likely than not that the course of treatment she received would have led to the treatment and eradication of her condition sooner, before it advanced to stage IVA. *See id.* at 77–78.[19]

Similarly here, the plaintiff bears the burden of showing that if Dr. Hill-Daniel had satisfied the national standard of care, it is more likely than not that the course of treatment she

---

[19] There is some ambiguity as to whether the "more likely than not" standard applies in the narrow category of cases involving negligent treatment of a potentially fatal condition. In *Grant v. Am. Nat'l Red Cross*, the D.C. Court of Appeals left open the possibility that a previous case, *Ferell v. Rosenbaum*, 691 A.2d 641 (D.C. 1997), had eased the burden of proof in such cases to the "lost chance" doctrine, i.e., that if proper treatment had been given in accordance with the standard of care, the patient would have a greater chance of avoiding harm. 745 A.2d 316, 322 (D.C. 2000). The *Grant* court stated: "In such a case, the lost chance doctrine may well make sense because of the difficulty of differentiating between the consequences of a pre-existing condition and those flowing from the negligent failure to ameliorate it." *Id.* at 322. The court, however, refused to establish such a separate standard, *id.* at 321 ("Upon analysis, we do not read *Ferrell* as deviating from the basic standard of proof of causation by probability."), and ultimately, the court distinguished the case before it from *Ferell* on the facts. *Id.* at 322–23. This court need not determine whether *Ferrell* eased the burden of proof for causation in this case, because the plaintiff has proved causation under the well-established stricter standard.

would have received would have led to the treatment and cure of her breast cancer. To determine whether the plaintiff has satisfied that burden, the Court will evaluate the sufficiency of the plaintiff's expert testimony to show, based on a reasonable degree of medical certainty, first, that Dr. Hill-Daniel's satisfaction of the standard of care would have led to a diagnosis when the cancer was at an earlier stage, and next, that if the plaintiff's cancer had been diagnosed at that earlier stage, is it more likely than not that the course of treatment she would have received would have led to the treatment and eradication of her cancer.

    **1.   A Follow-up Examination In Compliance With the Standard of Care Within Thirty to Sixty Days after the Plaintiff's December 3, 2009 visit Would More Likely Than Not Have Produced A Cancer Diagnosis While the Condition was Stage I.**

Relying on the opinions of her experts Dr. Tucker and Dr. Pushkas, the plaintiff argues that if Dr. Hill-Daniel had satisfied the standard of care on December 3, 2009 by setting up an appointment for the plaintiff to return after thirty to sixty days in order to reevaluate her breast pain and knots, instead of reassuring her during that visit that her symptoms were benign, the plaintiff's breast cancer was more likely to have been diagnosed while it was Stage I. Notably, the defendant has not contested that diagnostic imaging would have led to a breast cancer diagnosis, even as early as December 2009. Instead, the defendant argues, based on testimony from its expert Dr. Feigert, that the plaintiff's breast cancer was already at Stage III-B or even Stage IV at the time of her first appointment with Dr. Hill-Daniel expressing concerns about her breasts and requesting a mammogram. Thus, according to the defendant, even if Dr. Hill-Daniel breached the standard of care in her treatment of the plaintiff in December 2009, this was not the proximate cause of her Stage IV breast cancer. For the reasons explained below, Dr. Feigert's opinion is simply not persuasive. The Court concludes that the plaintiff has carried her burden of showing that had Dr. Hill-Daniel directed the plaintiff to return for another visit in thirty to sixty

days after December 3, 2009, it is more likely than not that her breast cancer would have been detected while it was Stage I.

To explain this conclusion, the Court will first address the expert testimony regarding when the plaintiff's cancer would have been diagnosed if Dr. Hill-Daniel had satisfied the standard of care, and it will then address the expert testimony concerning the stage of the cancer at that point. *See Flores-Hernandez v. United States*, 910 F. Supp. 2d at 77–78 (stating that "[t]he question is not solely whether [the plaintiff] already had cancer" at the time of the alleged negligence, but whether if the physician had complied with the national standard of care, "the course of treatment she received would have led to the treatment and eradication of her condition sooner, before it advanced to Stage IVA").

> a) *Reevaluation of the Plaintiff Within Thirty to Sixty Days of The December 3, 2009 visit Would Likely Have Resulted in Diagnosis of Her Cancer Between January and July 2010.*

As already pointed out, the defendant presented no expert opinion that would dispute the plaintiff's position that her cancer would have been diagnosed earlier had Dr. Hill-Daniel satisfied the standard of care at the December 3, 2009 visit. While conceding this point, the defendant relies upon the testimony of its expert Dr. Feigert that by December 2009, the plaintiff's cancer was already at such an advanced stage that it would have been incurable no matter what Dr. Hill-Daniel had done at that appointment. Nonetheless, since the plaintiff bears the burden of proof on all aspects of her claim, the Court must still assess the sufficiency of the plaintiff's evidence on this question, and the Court finds that the evidence demonstrates to a reasonable degree of medical certainty that had Dr. Hill-Daniel scheduled an appointment for the plaintiff to return for re-evaluation of her breast complaints within thirty to sixty days after December 3, 2009, the plaintiff's cancer would have been diagnosed sometime between January and July 2010.

First, it is clear to the Court that had Dr. Hill-Daniel not told the plaintiff at the December 3, 2009 visit that her breast concerns were benign, but instead scheduled a follow-up appointment for the plaintiff in order to rule out the possibility of breast cancer, the plaintiff would have attended the follow-up appointment and reported that the knot in her breast was still present. The evidence at trial showed that the plaintiff attended every scheduled appointment with her health care providers concerning her breast complaints. Moreover, the plaintiff raised the concern about her breast in the first instance, and she obviously thought it was important enough to schedule and attend the initial visit, so the Court has no doubt that she would have attended the follow-up visit. In addition, the plaintiff testified that in January 2010, the knot in her left breast remained about the same as it had been in December. Trial Tr. ECF No. 70 at 20:5–:9 ("Q: And the lumps in your breasts were still there; is that correct? A: The knot in my left breast? Q: Were still there; isn't that correct? Q: Yeah. It was about the same."). Even by April 30, 2010, the knot in her left breast had not changed. Trial Tr. ECF No. 55 at 83:24–:25 ("Q: Was the knot still present? A: It was the same thing as from the first visit in 2009.").

In addition, Dr. Sutherland testified that if Dr. Hill-Daniel had conducted another breast examination thirty to sixty days after the December 3, 2009 appointment, Dr. Hill-Daniel would have felt the mass in the plaintiff's left breast. Trial Tr. ECF No. 69 at 50:10–:11 ("[M]y opinion is that Dr. Hill-Daniel would have felt the mass at that point[.]"); *see also* Trial Tr. ECF No. 70 at 78:10–:13 (Dr. Margo's testimony that Dr. Hill-Daniel "well may have felt something [abnormal in the plaintiff's left breast] in January and/or April [2010]" given the outcome). The opinion of Dr. Feigert, the defendant's expert, that by that time the plaintiff's cancer was already Stage III-B or Stage IV, only bolsters the credibility of Dr. Sutherland's opinion that the knot would have been palpable to Dr. Hill-Daniel in January or February of 2010.

Regardless of whether Dr. Hill-Daniel would have felt the knot at the follow-up visit, the national standard of care would have required Dr. Hill-Daniel to order a diagnostic ultrasound merely on the grounds that the plaintiff's symptoms had not changed with her menstrual cycle. *Id.* at 77:4–:7 (Dr. Margo's testimony that the reason that the patient should be followed up in four to six weeks is to check whether the symptoms are actually cyclical in nature even if the patient told the physician that they were not cyclical because "sometimes people aren't aware that there's a cyclical nature, even if there is, so that by waiting for another period, you can take that into account as well"); Trial Tr. ECF No. 69 at 46:22–47:23 (Dr. Sutherland's testimony that when a nonlactating woman presents with noncyclic breast pain, the national standard of care for a family medicine doctor requires referral for diagnostic imaging).

The plaintiff presented adequate expert testimony that diagnostic imaging would have uncovered plaintiff's cancer at that stage. *Id.* at 47:23–48:5 (Dr. Sutherland's testimony that if diagnostic imaging had been ordered at the December 3, 2009 visit, it is more likely than not that an ultrasound would have revealed a suspicious mass in the left breast). The defendant presented no evidence that disputed that opinion and, again, Dr. Feigert's opinion that the plaintiff's cancer was already Stage III-B or Stage IV by that point supports Dr. Sutherland's testimony that the cancer would have been visible on a diagnostic imaging test, such as an ultrasound.

Finally, it is likely that if Dr. Hill-Daniel had satisfied the national standard of care by communicating to the plaintiff the importance of the test and the appropriate timeframe for scheduling those tests, as well as encouraging, rather than impeding, her ability to have the tests performed when scheduled, the plaintiff's diagnostic process would have proceeded from ultrasound referral to ultimate diagnosis in less time than the five months it eventually took. If ultrasound referral to ultimate diagnosis had taken the mere two to three weeks that the

plaintiff's experts Dr. Sutherland and Dr. Margo testified that it should have taken, the plaintiff's cancer would have been diagnosed sometime between January 18, 2010 (thirty days from December 3, 2009 plus an additional two weeks for diagnosis) and February 22, 2010 (sixty days from December 3, 2009 plus an additional three weeks for diagnosis). Even if it had taken five months to proceed from the ultrasound referral to the ultimate diagnosis, the plaintiff's cancer would have been diagnosed by July 1, 2010 (sixty days after December 3, 2009 plus an additional five months for diagnosis).

Using the most conservative estimate, the Court concludes that plaintiff's expert testimony showed to a reasonable degree of medical certainty that had Dr. Hill-Daniel satisfied the national standard of care by scheduling a follow-up visit for the plaintiff thirty to sixty days after December 3, 2009, the plaintiff's breast cancer would have been diagnosed before July 2010.

b) *The Plaintiff's Cancer was Stage I Until Sometime Before July 2010 at the Earliest, When it Progressed to Stage II.*

The Court must next determine whether the plaintiff's expert testimony showed, to a reasonable degree of medical certainty, that her cancer would have been less advanced than Stage IV if it had been diagnosed before July 1, 2010. At the outset, the parties do not dispute that the stage of breast cancer at diagnosis is the best predictor of prognosis. *See* Trial Tr. ECF No. 55 at 21:24–22:1 (Dr. Tucker); *see also* 3rd FOF Table ¶ 345–46 (listing as "not disputed" the facts: (1) "Most of the outcome of breast cancer is determined by the AJCC stage," and (2) "[AJCC] stage is the single most important predictor of outcome"). The experts in this case presented two completely divergent opinions on the issue of the staging of the plaintiff's cancer in December 2009 and in the few months following that visit. Specifically, the plaintiff's experts, Dr. Tucker and Dr. Pushkas, testified that the plaintiff's breast cancer was Stage I at the

December 3, 2009 visit and remained Stage I until at least July 2010.  The defendant's expert, Dr. Fiegert, testified that the plaintiff's breast cancer was already Stage III-B – meaning it had invaded her skin – or even more likely Stage IV – meaning that the distant metastasis beyond the breast was widespread – at the time of her December 2009 visit.  The Court finds the opinions of plaintiff's expert Dr. Tucker to be entirely persuasive, and corroborated by Dr. Pushkas.[20]

Dr. Tucker's opinions about the progression of the plaintiff's cancer are supported in several ways.  First, his opinions are straightforward and consistent.  As a general matter, he founded his opinions in the scientific and medical literature, and did not overstate the conclusiveness of new and untested scientific conclusions.  For example, he testified on direct examination that cancers have a relatively uniform growth rate, but that the growth rate may increase as a small tumor gets larger, especially as the tumor becomes metastatic.  Trial Tr. ECF No. 55 at 31:22–32:4.  This influenced his conclusion that the growth rate of the plaintiff's cancer may have increased over time.  *Id.* at 64:1–:6.  At the same time, he acknowledged that the variations were relatively small and that to try to determine how the growth rate of a particular tumor might change "would be conjecture."  *Id.* at 32:1–:4.  As a result, he used the more conservative linear growth rate to extrapolate the size of the plaintiff's tumor in December 2009 from measurements that were taken in 2011.  *Id.* at 34:13–:21, 36:3–:8 ("[T]his would be a linear scale proportionate linear scale on calendar days from this point on.").  During cross-examination, Dr. Tucker was steady and consistent, as illustrated by the following unsuccessful attempt by defense counsel to impeach him:

> Q:  . . . You have testified during your deposition and stated in your report not only that Ms. Rhodes' cancer was growing very rapidly between December

---

[20] Although both Dr. Tucker and Dr. Pushkas testified that the plaintiff had Stage I breast cancer in December 2009, and that it did not progress to Stage II until July 2010, at the earliest, the Court will rely on the expert opinion of Dr. Tucker because he provided a more comprehensive foundation for his opinions.

2009 and the time of the diagnosis in March 2011, but that the growth rate was accelerating, correct?

A: More likely than not, it probably was accelerating, yes.

Q: And you have stated that the cancer started out as a low grade cancer, but that it transformed into a higher grade cancer over time, correct?

A: No, that is a mischaracterization of my deposition testimony. I never said that it was a low grade cancer. My deposition testimony was that it may have been a lower grade at some point in time, but I don't believe that it was ever a low grade cancer. We just don't see that.

*Id*. at 64:1–:14. Moreover, Dr. Tucker grounded his opinion in the scientific literature: he cited an article from the American Journal of Roentgenology, which – despite defense counsel's skepticism, *id*. at 65:25–69:6, – appears to the Court to support his conclusions. Pl.'s Ex. 52, at D-46 (table summarizing the histological grade of cancer by size and pattern).

What most distinguishes Dr. Tucker's and Dr. Feigert's opinions regarding the stage of the plaintiff's cancer in December 2009, is that Dr. Tucker's opinion corresponds with the medical evidence that was presented at trial, whereas Dr. Feigert's opinion simply does not. *Cf. Flores-Hernandez*, 910 F. Supp. 2d 64, 79 (finding expert witness's opinions to be not credible in part because they were inconsistent with the medical evidence presented at trial). First, it is undisputed that by the end of March 2011, the cancer had metastasized to approximately eight bony sites in the plaintiff's right shoulder and left scapula, which, Dr. Tucker testified, is relatively few for patients with metastatic breast cancer. Trial Tr. ECF No. 55 at 50:2–:13; *see also* Pl.'s Ex. 8 at 8097; 3rd FOF Table ¶ 374. There was no evidence of visceral involvement, meaning involvement of the brain, lungs, liver, or other body sites. *Id.* at 50:14–:15. In addition, the report from the May 12, 2011 MRI of the plaintiff's pelvis notes that the results were "suspicious for early bone metastatic disease." Pl.'s Ex. 21 at 1. The radiologist who read the MRI and wrote the report, Dr. Bowers, testified at trial that the lesions on the pelvis were not visible on the March 2011 CT scan and bone scan, which had been taken just two months earlier.

Trial Tr. ECF No. 56 at 54:3–:18.  He testified that in his experience, these circumstances demonstrate that the metastasis had been present for less than a year and probably less than six months.[21]

Second, the defendant produced no evidence that the plaintiff had any physical manifestations of metastases until October 18, 2010, when Dr. Hill-Daniel palpated possible lymph node involvement, despite the fact that multiple medical providers examined her breast complaints between December 2009 and October 2010.   A brief review of this evidence, including the testimony of the plaintiff's actual treating physicians and their documented observations of the plaintiff's condition in her medical records, demonstrate the purely speculative and unsupported nature of Dr. Feigert's opinion.

Multiple experts, including the defendant's expert, Dr. Bethea, testified that the spread of cancer to the lymph nodes is often detected by palpation of lymph nodes in the axilla, or armpit. *See* Trial Tr. ECF No. 70 at 58:19–:22 (plaintiff's expert Dr. Margo's testimony that if a physician feels a lymph node, it is worrisome because it can indicate lymph node involvement); Trial Tr. ECF No. 73 at 24:22–:25 (defendant's expert Dr. Bethea testifying that "no lympdenopathy" – or no palpable lymph nodes – "says there's no evidence of cancer that has spread to the axilla.  That's one of the areas or sites of spread of cancer."); Trial Tr. ECF No. 56 at 75:4–:5 (plaintiff's expert Dr. Pushkas testifying that "palpable lymph nodes are more likely to be involved than non-palpable lymph nodes").  Yet, the first physical evidence of lymph node involvement is Dr. Hill-Daniel's notation in the progress note for the plaintiff's October 18, 2011 visit:  "palpable LN in L Axilla."  Pl.'s Ex. 1, at 1024.

---

[21] The Court notes, however, that it is not entirely clear whether this statement referred to the plaintiff's metastatic disease generally or only to the two metastasis sites in her pelvis.  Trial Tr. ECF No. 56 at 56:1–:11.

Similarly, plaintiff's expert Dr. Pushkas testified that metastasis to the skin often has visible signs. Trial Tr. ECF No. 56 at 80:21–81:2 (Dr. Pushkas's testimony that skin involvement is "usually visible" and can look like ulcerations or nodules on the skin or can sometimes make the skin look like the skin of an orange"). Even Dr. Feigert testified that while microscopic involvement of the skin might not show any changes to the surface of the skin, gross infiltration can cause thickening or hardening or nodules on the skin. Trial Tr. ECF No. 57 at 39:12–:19. Yet, at the plaintiff's December 3, 2009 visit to Unity, Dr. Hill-Daniel detected no palpable lymph nodes and no evidence of discoloration or hardening of the skin. Moreover, Dr. Carter, who examined the plaintiff at Howard University Hospital in May, 2010, did not make any notations about palpable lymph nodes or abnormalities in the skin despite making thorough notations about the nodules he palpated in the plaintiff's breasts. *See* Pl.'s Ex. 104. Likewise, the healthcare provider who examined the plaintiff at Fort Washington Hospital on August 9, 2010, did not note any palpable lymph nodes or lesions. While the defendant asserts that there is purportedly a note on the Fort Washington Medical Center record that there were "lesions" present on the plaintiff's breast, 3rd FOF Table ¶ 432(B), no such notation is apparent on the record that was admitted into evidence. Pl.'s Ex. 6. In fact, the record of the visit contains a printed portion that says, "Return to the ER if you feel worse or if you have any problems. You should especially return if you develop any of the symptoms circled below." Pl.'s Ex. 6, at 6004. Two of the options were "worse redness" and "worse swelling," but the provider circled only "redness" and "swelling," and excluded the word "worse," suggesting that the plaintiff did not have those symptoms at the time of her visit. *Id.* The provider also wrote "skin ulceration" under the list of symptoms that should trigger a return visit, suggesting that he or she detected no signs of skin infiltration. *Id.*

Finally, the plaintiff's treating oncologist, Dr. Yoo, testified that the plaintiff's bony metastases have caused her acute pain at the metastasis sites. Trial Tr. ECF No. 56 at 46:3–:8, 47:14–:18, 50:2–:25, 51:14–52:13. Even Dr. Feigert agreed that "maybe other patients don't have painful bony metastatic disease, but we know the plaintiff does." Trial Tr. ECF No. 57 at 90:22–:24 ("Sadly she does, that's correct."). Yet, for the ten month period between December 2009 and October 2010, no medical record for the plaintiff documents any complaint about bone pains, undermining Dr. Feigert's opinion that her cancer had already metastasized to such an extent as Stage IV.[22]

In an apparent effort to get around the lack of any medical evidence supporting his opinion, Dr. Feigert testified that in December 2009, the metastases might have been only a single malignant cell that had spread to the skin or bones, and that such a small-scale spread would not necessarily cause symptoms. Trial Tr. ECF No. 57 at 95:13–:21. He did not adequately explain, however, why the plaintiff had no symptoms associated with a metastatic breast cancer for the next ten months.[23]

---

[22] In addition, Dr. Feigert's opinion that the plaintiff's cancer had already spread to her skin by December 2009 was based primarily on what he described as the extensive infiltration of the breast cancer to the plaintiff's skin ten months later, in October 2010. Trial Tr. ECF No. 57 at 31:15–:18. That description, however, is simply not supported by the record. No reference to "discoloration" of the breast is contained in the progress note for the plaintiff's October 18, 2010 appointment, Pl.'s Ex. 1 at 1024; Def.'s Ex. 1 at 12, despite Dr. Hill-Daniel's recollection during her testimony that the "first thing [she] noticed" at the plaintiff's October 18, 2010 appointment was that she had a discoloration over the left breast. Trial Tr. ECF No. 58 at 27:10–:12. The only notation in the progress note that might suggest skin involvement states "multiple scars on L breast some overlying nodules," but neither party provided testimony about the meaning of this notation, and whatever Dr. Hill-Daniel observed did not prompt her to the conclusion that the plaintiff had such advanced breast cancer that it had progressed to "extensive infiltration" of the skin. The Court also notes that the defendant's assertion in the FOF Table that "[i]n October of 2010, Dr. Hill-Daniel is able to palpate 'obvious evidence of gross skin infiltration' on Ms. Rhodes' skin and she describes it in her October 2010 note" is misleading as those words – "obvious evidence of gross skin infiltration" – are not written or described in the progress note for the October 18, 2010 visit. *See* 3rd FOF Table ¶ 430(B).

[23] Perhaps Dr. Feigert expected the Court to find his opinion more credible, despite the lack of corroborating medical evidence in the plaintiff's medical records, in light of his view that her cancer had a slow to average growth rate. For the reasons that will be explained below, the Court also does not find his views on the growth rate of the cancer to be persuasive.

The Court is satisfied that Dr. Tucker provided a sufficient scientific and medical foundation for his opinion that the plaintiff's breast cancer was Stage I between December 2009 and July 2010. He estimated the size of the plaintiff's tumor by extrapolating from the size as measured in three different studies – an ultrasound, CT scan, and PET CT scan – and a linear growth rate, which both parties agree best characterizes the way that cancer tumors grow, 3rd FOF Table ¶ 354. He further testified that the conclusion he reached about the small size of the tumor in December 2009 was consistent with the high growth rate of the cancer, as illustrated by the high grade on the AJCC-endorsed Nottingham grading system that the radiologist who read the plaintiff's ultrasound report assessed it to have. His opinion that the plaintiff had no nodal involvement or distant metastases on December 3, 2009, was based on the evidence that Dr. Hill-Daniel did not palpate any lymph nodes at the December 3, 2009 visit or see any evidence of spreading to the skin, and that the plaintiff did not complain of any symptoms that are associated with lymph node or distant metastasis. No physical evidence of lymph node involvement is corroborated by the low probability of lymph node involvement with a one centimeter tumor. Trial Tr. ECF No. 55 at 44:24–45:1 ("85 percent of patients even with a high grade one centimeter invasive duct cancer, don't have lymph node metastases.").

Defendant unconvincingly challenges the scientific foundation for this opinion by attacking Dr. Tucker's method of estimating the cancer's growth rate. To determine relative growth rate, Dr. Tucker relied on the tumor's overall histological grade on the AJCC-endorsed Nottingham grading system. According to Dr. Tucker, the fact that the plaintiff's cancer has the highest Nottingham grade of 3 indicates that it is a fast growing cancer. Dr. Feigert, on the other hand, testified that while the overall Nottingham grade conveys the "aggressiveness" of the cancer, which he defined as the potential to invade the blood stream and spread into the body,

Trial Tr. ECF No. 57 at 48:12–:18, the growth rate is controlled by one particular component of the grade:  the mitotic rate, which is the number of cells dividing at one point in time.  *Id.* at 48:7–:8.  According to Dr. Feigert, while the high Nottingham grade of the plaintiff's cancer showed that it was aggressive, its mitotic rate score of 2 out of a potential score of 3 indicated that it does not have a particularly high growth rate.  *Id.* at 46:12–:15, 46:22–47:14.  Dr. Feigert cited the low expression of a substance called Ki-67 in the plaintiff's cancer cells, which is a measure of the cancer cells' expression of synthesizing DNA, as suggesting that its growth rate was slow to average.  *Id.* at 51:8–:19.

By contrast to Dr. Feigert's reliance on mitotic rate, Dr. Tucker provided a convincing scientific argument for why mitotic rate alone is not an accepted way of measuring growth rate.  Dr. Tucker explained that many cancer cells may have defective DNA, so despite the appearance of many cells dividing, not many will survive.  Thus, even if the mitotic rate is elevated, that might not correspond to tumor growth directly.  Trial Tr. ECF No. 55 at 61:10–:23.  Dr. Tucker's testimony was both consistent and grounded in the AJCC guidelines, which do not parse out mitotic cell division scores to evaluate a tumor's prognosis but rely on a combination of three attributes.  *See id.* at 25:23–:25 ("It is the combination of these three attributes together in this scoring system that has the greatest correlation with growth rate."); *id.* at 58:15–:19 ("We do not use the individual features to determine prognosis.  Prognosis is solely derived from the combined score.  It is not allowed to pick out individual attributes and make judgments on outcome or growth rate or prognosis based on solitary findings."); *id.* at 61:10–:12 ("[A]s I said with the other attributes, we can't take the individual characteristics and draw conclusions about growth rate from them[.]").  Even Dr. Feigert admitted that in practice, pathologists utilize the overall Nottingham grade to predict tumor growth without parsing out the individual components

of the system. Trial Tr. ECF No. 57 at 78:5–:18. At one point, Dr. Feigert also admitted that the grade reflects both the aggressiveness of the cancer and its growth potential. *Id*. at 78:5–:7.

Dr. Tucker also convincingly and unwaveringly testified that despite the label of Ki-67 as a "proliferation marker," Ki-67 expression is a prognostic indicator that tells doctors whether a patient would be likely to benefit from chemotherapy. Trial Tr. ECF No. 55 at 63:12–:25. The way that many chemotherapy drugs work is by disrupting DNA synthesis, so if the cancer shows a high Ki-67 expression, it is more likely that those drugs will work with that particular type of cancer. *Id.* Even Dr. Feigert admitted that the AJCC has rejected the incorporation of proliferation markers such as Ki-67 in its staging system, and instead relies on the Nottingham grading system with reliance of multiple attributes to predict growth rate. Trial Tr. ECF No. 57 at 76:11–78:6. Dr. Feigert did not produce any medical protocol that accepted Ki-67 expression as a reliable measure of growth rate in the manner that he was using it as a basis of his opinion.[24]

It is also worth mentioning that several aspects of Dr. Feigert's testimony cast doubt on the reliability of his opinions. First, cross-examination revealed that Dr. Feigert submitted two very different expert reports – one dated December 15, 2012, and a second dated February 15, 2013. *Id.* at 74:10–:16. The first report characterized the plaintiff's cancer as "very aggressive," contained no mention of Ki-67, and did not characterize the plaintiff's cancer as slow-growing.

---

[24] Dr. Feigert and Dr. Tucker also disagreed about what imaging test provides the most reliable measurement of tumor size. The measurements that Dr. Tucker relied on were derived from ultrasound and CT scan images, whereas the measurements that Dr. Feigert relied on were derived from MRI images. The CT scan images from March 24 and March 28, 2011 showed the size of the plaintiff's tumor as 2.8 centimeters and 2.6 centimeters, respectively. Trial Tr. ECF No. 55 at 33:24–34:12. The MRI image from April 4, 2011 showed the size of the plaintiff's tumor as up to 10 centimeters. Trial Tr. ECF No. 57 at 38:8–:10, 44:3–:5; Trial Tr. ECF No. 56 at 44:10–:17. Dr. Tucker testified that MRI imaging provides a good measure of overall tumor size, but it is not used for purposes of grading the tumor under the AJCC system. Trial Tr. ECF No. 55 at 38:10–:15. That is because the staging system is only concerned with invasive cancer, not cancer with no potential to spread (called carcinoma *in situ*). According to Dr. Tucker, the MRI test is not used for staging purposes because it shows both invasive cancer as well as carcinoma *in situ*. *Id*. at 36:13–:20. Ultrasound is the preferred method for staging purposes because ultrasound is not as good at picking up carcinoma *in situ*. *Id.* The Court is inclined to accept Dr. Tucker's opinion because it found his opinions generally more grounded in the plaintiff's medical records than those of Dr. Feigert; however, it need not resolve this particular dispute because the defendant did not specifically challenge Dr. Tucker's estimation of tumor size; it only disputed whether any cancer had spread beyond the left breast before July 2010.

*Id.* at 74:19–75:14.  Only in the second report – submitted a mere two months after the first – did Dr. Feigert parse the definition of an "aggressive" cancer, and opine that the plaintiff's cancer was slow-growing.  *Id.* at 75:11–:14.  In addition, there were significant inconsistencies in how Dr. Feigert characterized the extent of the plaintiff's cancer in December 2009.  He acknowledged at trial that his report described "extensive progression of bony metastatic disease in December of 2009."  *Id.* at 90:20–:21.  Yet, to explain how the plaintiff remained generally free of symptoms of metastatic cancer (*e.g.*, no lymph node involvement, no skin involvement, and no bone pains), he testified that "it reflects the fact that many patients with metastatic breast cancer don't have symptoms.  Certainly now when it's microscopic."  *Id.* at 90:16–:19.  These inconsistencies trigger concern about the bases of his opinions.

The Court acknowledges that it is impossible to know with certainty the stage of the plaintiff's cancer in December 2009 because no imaging or other testing was performed at that time.  The negligence standard does not require absolute certainty, however, but only a reasonable degree of certainty.  *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 367 (D.C. 1980) ("While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted.").  Accordingly, the Court finds, based on Dr. Tucker's expert opinions, that plaintiff has proved the following to a reasonable degree of medical certainty:

- On December 3, 2009, the plaintiff's tumor was between one centimeter and one and a half centimeters in diameter, giving her a T value of 1 on the AJCC scale.

- On December 3, 2009, the plaintiff' had no nodal involvement, giving her an N value of 0 on the AJCC scale.

- On December 3, 2009, the plaintiff had no distant metastases, giving her an M value of 0 on the AJCC scale.

- Because a T1/N0/M0 breast cancer corresponds to Stage I on the AJCC staging scale, the plaintiff had Stage I breast cancer on December 3, 2009.

- The earliest that the plaintiff' breast cancer became Stage II was July 2010.

Since the Court has already found that the plaintiff met her burden of showing by a preponderance of the evidence that Dr. Hill-Daniel's satisfaction of the national standard of care would have led to a diagnosis of the plaintiff's breast cancer by July 1, 2010 at the very latest, and the plaintiff has shown with a reasonable degree of medical certainty that her cancer still would have been at Stage I at that point, the Court finds that plaintiff has proven that had Dr. Hill-Daniel satisfied the national standard of care, it is more likely than not that the plaintiff's cancer would have been diagnosed at Stage I.

### 2. If the plaintiff's Breast Cancer Had Been Diagnosed at Stage I, the Treatment She Would Have Received Would Likely Have Cured It.

Finally, the Court concludes that plaintiff's evidence at trial demonstrated that had the plaintiff's breast cancer been diagnosed at Stage I, it is more likely than not that the treatment she would have received would have cured it. *See Ferrell*, 691 A.2d at 651–52 (stating that to determine whether the negligence was a "substantial factor" in causing the harm, a court must find that there was a substantial possibility of survival and that the defendant destroyed it). Plaintiff's expert Dr. Pushkas testified that overall survival for Stage I breast cancer is 98%. Trial Tr. ECF No. 56 at 77:14–:16. His opinion is grounded in statistics from the SEER Survival Monograph for breast cancer, a compilation of over 300,000 cases reported from all over the United States. *Id*. at 63:13–:19. Defendant does not dispute Dr. Pushkas's testimony that the SEER Survival Monograph is a reliable and authoritative source for determining the probability of survival from breast cancer in its various stages. 3rd FOF Table ¶ 390 (citing Trial Tr. ECF No. 56 at 63:5–:11). Moreover, Dr. Tucker testified that a Stage I lesion has a cure rate in the

order of about 80 to 85% over five years, Trial Tr. ECF No. 55 at 11:18–:19, and that it is treatable for cure in a great majority of cases. *Id.* at 47:5–:9. Although Dr. Feigert testified that not all patients with Stage I disease survive, he acknowledged that "most do." Trial Tr. ECF No. 57 at 49:21–:23. He also testified that the plaintiff's cancer is subtype Luminal A, which generally carries the highest survival rates of all forms of cancer, and that it has other biological features that are characteristic of favorable prognosis. *Id.* at 69:1–:14. This expert testimony satisfies the Court that had the plaintiff's cancer been diagnosed and treated at Stage I, it is more likely than not that it would have been cured. Since the plaintiff's cancer was not diagnosed until it was Stage IV, however, all of the experts, as well as the plaintiff's treating oncologist, agreed that Dr. Hill-Daniel's negligence eliminated any possibility that Ms. Hill-Daniel will survive her disease. Trial Tr. ECF No. 55 at 12:1–:2 (Dr. Tucker); Trial Tr. ECF No. 56 23:9–:16 (Dr. Yoo); 3rd FOF Table ¶ 11 (listing as "not disputed" the fact that "Stage IV breast cancer is incurable").

Accordingly, the Court finds that Dr. Hill-Daniel's negligence is more likely than not to have been a proximate cause of the injuries the plaintiff has suffered and will continue to suffer as a result of having incurable breast cancer.

### D. Damages

In determining the amount of damages to be awarded to the plaintiff, the Court is guided by the fundamental principle underlying the "American rule on damages" as set forth in the "seminal case" of *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931). *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). In *Story Parchment Co.*, the Supreme Court stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental

principles of justice to deny all relief to the injured person, and thereby relieve the wrong-doer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of damages as a matter of just and reasonable inference, although the result be only approximate.

282 U.S. at 562.  The Supreme Court emphasized "the clear distinction" in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages. *Id.* ("[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount").  While a plaintiff must prove entitlement to damages with reasonable certainty or preponderance of the evidence, proof of the amount of damages only requires a reasonable estimate. *See id.; see also Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (plaintiff must "prove the fact of injury with reasonable certainty, [and prove] the amount of damages . . . based on a reasonable estimate"); *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988) (plaintiff need only provide "some reasonable basis on which to estimate damages") (*quoting Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982)); *Abraham v. Gendlin*, 172 F.2d 881, 883 (D.C. Cir. 1949)("[T]here is a clear distinction between the measure of proof necessary to establish the fact of damage and the measure of proof necessary to enable the jury to fix the amount.").

Thus, the Court's task is to "'make a just and reasonable estimate of the damage based on relevant data,'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871, 905 (D.C. Cir. 2010) (quoting *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264 (1946)).  Such relevant data may include "probable and inferential as well as direct . . . and positive proof." *Bigelow,* 327 U.S. at 264.

In setting about this task, the Court is mindful that damages "may not be determined by

mere speculation or guess . . . although the result may be only approximate." *Hill,* 328 F.3d at

684. Moreover, under District of Columbia law, "[a]n award of damages must . . . avoid[]

extravagant awards that bear little or no relation to the actual injury involved." *Campbell-Crane*

*& Assocs. v. Stamenkovic*, 44 A.3d 924, 945 (D.C. 2012) (internal citations omitted). In other

words, the damages award "must be proportional to the harm actually suffered." *Phillips v.*

*District of Columbia*, 458 A.2d 722, 726 (D.C. 1983).

Finally, the D.C. Circuit has instructed that the trial court must explain the reasons for the

determination of the damages award and tether these reasons to the record. *See Eureka Inv.*

*Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932, 940 (D.C. Cir. 1984) ("[I]t is essential that the trial

court give sufficient indication of how it computed the amount so that the reviewing court can

determine whether it is supported by the record.") (citing *Hatahley v. United States*, 351 U.S.

173, 182 (1956)); *see also Safer v. Perper*, 569 F.2d 87, 100 (D.C. Cir. 1977) ("The measure of

damages and method of computation [must] be exposed so as to inform the litigants and afford a

possibility of intelligent review."). The Court now turns to this important task.

The plaintiff has requested both economic and noneconomic damages in five distinct

categories: past medical expenses, future care costs, future lost earnings, loss of household

services, and pain and suffering. *See* Pl.'s Concls. at 46–47. At the outset, the Court finds that

the plaintiff has proven she is entitled to damages in all five categories. "[A] plaintiff may

recover damages for past economic losses if such losses are 'reasonably proved,' while a

plaintiff may recover for future harm only by a reasonable certainty or preponderance of the

evidence." *Hill*, 328 F. 3d at 684. In this case, the plaintiff has "reasonably proved" that her past

medical expenses have been incurred as a result of the defendant's negligence.

The other four categories of damages address future costs. When damages are sought for the "future consequences of a tort, damages are available only if such consequences are reasonably certain." *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988) (internal citation omitted); *see also Hill*, 328 F. 3d at 684; *Green v. United States Postal Serv.*, 589 F. Supp. 2d 58, 69 (D.D.C. 2008). The District of Columbia views "reasonably certain" consequences to be those where "it is more likely than not (a greater than 50% chance) that the projected consequence will occur." *Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435, 439 (D.C. 1997) (quoting *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 119 (D.C. Cir. 1982)). The parties do not dispute that the plaintiff will continue to need substantial medical care. Def.'s Ex. 36 at 30:11–:17 ("I used . . . the number of years that Ms. Patterson estimated . . . and she said that Ms. Rhodes would need one and a half years of future care costs."); Pl.'s Ex. 53 at 10 (projecting costs for future care through the end of the plaintiff's life). It is equally beyond dispute that the plaintiff will suffer some amount of lost wages, incur costs through the loss of household services, and incur non-economic damages for pain and suffering. Thus, each of the future costs is "reasonably certain" to occur. Therefore, the only issue before the Court is the amount of damages to award for these future costs.

The Court explains below the basis for its ruling on the amount of damages in each of these categories.

### 1.    Past Medical Expenses

The parties have stipulated that the plaintiff's medical bills included in the plaintiff's Exhibit 31, totaling $33,285.17, "are fair and reasonable and that they are related to medical services that were made necessary as a result of the evolution of Miss Rhodes' cancer into stage IV." Trial Tr. ECF No. 70 at 8:22–9:11. This amount apparently excludes those medical

expenses, which had originally been part of the plaintiff's claim for past medical expenses but the parties agreed were "not properly recoverable." *Id.* at 8:11–:13. It is axiomatic that a defendant is only liable for those damages proximately caused by the defendant's actions. *See, e.g., Monzel*, 641 F.3d at 535; *cf. Graham v. Roberts*, 441 F.2d 995, 997 n.3 (D.C. Cir. 1970) (in dental malpractice case in which the defendant permitted the patient's condition to worsen progressively by failing to refer the patient to a specialist, defendant was liable for all damages unless he introduces evidence from which a fair apportionment can be made) (citing RESTATEMENT (SECOND) OF TORTS, §§ 433A, 433B, and 450 (1965), and PROSSER ON TORTS § 43 (3rd ed. 1964)); *Cooper v. Berzin*, 621 A.2d 395, 400-401 (D.C. 1993) ("[W]here the plaintiff met its burden to prove culpability and damages and neither party offered evidence of apportionment, the plaintiff was entitled to recover fully unless the defendant offered evidence why he should not fairly be held responsible for all of the damages").

Based upon the parties stipulation that the medical bills contained in exhibit 31 would not have been incurred but for the progression of the plaintiff's cancer to Stage IV, the Court finds that these bills are attributable to the defendant's negligence in the diagnosis and treatment of the plaintiff. *See* Trial Tr. ECF No.70 8:22–9:11. Therefore, the Court awards past medical expenses to the plaintiff for all of these medical bills, in the total amount of $33,285.17.

## 2. Future Care Costs

Both parties' economics experts based their opinions about the cost of the plaintiff's future care at least in part on the recommendations of the plaintiff's rehabilitation nurse expert, Nurse Patterson, and the plaintiff's social worker, Mila Tecala. Trial Tr. ECF No. 71 at 24:5–:9; Def's Ex. 36 at 30:11–:17.[25] Nevertheless, the estimates for future care costs differ due to

---

[25] The parties generally agree on the cost the plaintiff will incur for outpatient hospice case, (the plaintiff's expert estimates $18,000 and the defendant's expert estimates $17,516), and the cost of medical consultations (the

differences in the cost estimates for: (1) psychological services (ranging from a lower bound estimated by the defendant's expert to be $2,932, and an upper bound estimated by the plaintiff's expert to be $12,814); (2) the cost of a home health aide (estimated by the defendant's expert to be $32,980 and by the plaintiff's expert to be $49,680); and (3) the cost for inpatient hospice care (estimated by the defendant's expert to be $35,032 and by the plaintiff's expert to be $63,152). *See* Pl.'s Ex. 54 at 4; Def.'s Ex. 37 at 20.

The method used by the defendant's expert, Dr. Hurdle, to estimate future care costs is unconvincing. For counseling and for a home health aide, Dr. Hurdle makes a fundamental error in logic. Dr. Hurdle calculated the costs for these services using the average *wages* for a person in the home health and counseling fields. Def.'s Ex. 37 at 16–18. By Dr. Hurdle's logic, the plaintiff would be required to enter the employment market, hire her own counselor and home health aide *as employees*, and pay them the average hourly wage in the District of Columbia (including "legally required benefits"). *See id.* The Court will not require the plaintiff to become an employer in order to meet her health care needs. It is far more logical that the plaintiff will use a service to obtain home health care and counseling assistance, and that the service will charge her, as a client, the market rate for this special assistance. The plaintiff's experts correctly calculated the costs of her future home health care and counseling service on this basis rather than based on the amount that the services pay to their employees in wages, as the defendant's expert suggests. S*ee* Pl.'s Ex. 54 at 4; Trial Tr. ECF No. 56 at 94:20–:25; 95:1–:7.

---

plaintiff's expert estimates $6,240 and the defendant's expert estimates $6,108). *See* Pl.'s Ex. 54, at 4; Def.'s Ex. 37, at 18–19. The differences are accounted for by the application of slightly different inflation rates by each estimate. *See id.* The total of these additional services is $24,240 from the plaintiff's expert's estimate and $23, 624 for the defendant's expert's estimate. *See id.*

The method used by the plaintiff's expert, Dr. Lurito, to estimate the cost of a home health aide and individual counseling is far more realistic. He relied upon Nurse Patterson's calculations, which are derived from the recommendation of a counselor, who based these costs on her knowledge of actual costs in this area for these services, Trial Tr. ECF No. 56 at 94:20–:22, and the expertise of Nurse Patterson, an undisputed expert in the field of nurse rehabilitation who provides life care planning, case management and care coordination. *Id.* at 93:7–:19.

In estimating the cost of in-patient hospice care, Dr. Hurdle's reasoning is, again, flawed. By contrast to the plaintiff's expert, Dr. Hurdle declined to accept Nurse Patterson's cost estimate, which was based on the cost of the specific hospice facility recommended by the plaintiff's treating physician. Trial Tr. ECF No. 56 at 94:22–:25. Instead, Dr. Hurdle posited that, if in-patient hospice care is necessary, the plaintiff "could go to a nursing home and receive outpatient hospice care at that nursing home." Def.'s Ex. 37 at 19. She then used a private insurance company study of the 2012 market rates in the Washington, D.C. area to determine the minimal cost for a nursing home at $200 a day. Yet, she admits in her report that the same study indicated the average cost of a nursing home in the D.C. area is more than 30 percent higher than $200 a day and she uses this average cost as the upper bound for her calculations. *See id.* The Court believes in-patient hospice care means hospice care *in a hospice*, not in an assisted living facility designed for another purpose.

The difference in damage amount estimates between the plaintiff's expert and the defendant's expert is the difference between reality and abstraction. The Court finds that Dr. Lurito's calculations are logical and reasonable based on actual surveys and health care expertise from practitioners. S*ee* Pl.'s Ex. 54 at 4; Trial Tr. ECF No. 56 at 94:20–:25; 95:1–:7. Dr. Hurdle's estimates, on the other hand, are based on theoretical economics that appear focused

only on yielding the lowest possible cost.  Such economic theory provides limited usefulness in compensating the plaintiff for the very real and actual cost of health care she will need in the short amount of time she has left to live.  Therefore, the Court finds the plaintiff's expert's estimates of future health care costs to be reliably based on actual costs for the requisite services in this area, and awards $149,886 for this component of the damages award.

### 3.    Future Lost Earnings

The economics experts in this case developed widely divergent numbers when estimating the value of the plaintiff's future lost earnings. The estimate from the plaintiff's expert, Dr. Lurito, is $737,715, Trial Tr., ECF No. 71 at 15:22–:23, and the estimate from the defendant's expert, Dr. Hurdle, ranges from $106,020 to $129,219.  Def.'s Ex. 37 at 20.  The discrepancy in the numbers results from three major differences in the two experts' calculations: (1) the deduction of "consumption" expenses, (2) the difference in discount rates, and (3) the difference in the estimated number of years the plaintiff would be expected to work. The Court discusses each of these differences below.

#### a)   *Consumption Expenses*

Consumption expenses account for the "things that [the plaintiff] personally would be using, such as food, clothing, her own personal entertainment, her own personal health insurance or life insurance, things that are just related to her own personal expenditures that no longer would be needed if she . . . had passed away."  Def.'s Ex. 36 at 15:22–25; 16:1–3.  Dr. Hurdle deducted these consumption expenses from the wages the plaintiff could be expected to earn.  *Id.* at 15:9–12.  Dr. Lurito did not.  Trial Tr. ECF No. 71 at 19:22.  Dr. Lurito bluntly explained that his reason for not deducting consumption expenses was "[b]ecause Miss Rhodes is not dead." *Id.* at 19:24.  That explanation is correct under District of Columbia law.

Lost wages "represent[] the amount that the injured party would have earned but for the injury." *Moattar*, 694 A.2d at 438 (quoting *District of Columbia v. Barriteau*, 399 A.2d 563, 567 n.6 (D.C. 1979)). "The allowance for such recovery is consonant with the principal purpose for compensatory damages in such cases, which is to make the victim whole." *Id.* Consumption or personal maintenance expenses are typically deducted in wrongful death actions where "the amount the deceased would have required to maintain himself" is deducted from a lost wages claim. *See Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972); *Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48, 79 (D.D.C. 2011) (deducting personal maintenance expenses from lost wages in wrongful death action); *Burton v. United States*, 668 F. Supp. 2d 86, 111-12 (D.D.C. 2009) (same); *Hughes v. Pender*, 391 A.2d 259, 262 (D.C. 1978) (same). These deductions are made because the money the deceased would have spent on personal maintenance during her lifetime "would not have been available to her estate." *Baker*, 775 F. Supp. 2d at 79. This consideration simply does not come into play outside the context of a wrongful death action.

In a personal injury action, the party suing is the actual party injured and the recovery will go to her. Thus, it makes no sense to deduct the plaintiff's own consumption costs from her award, as she is the one who will be using the lost wages for maintenance *of herself*. The Supreme Court acknowledged this fundamental difference in *Jones and Laughlin Steel Corporation v. Pfeifer,* 462 U.S. 523 (1983). In that case, the Supreme Court noted that lost wages are "intended to compensate the worker for the diminution" of her income stream. *Id.* at 533. The Court pointed out that one difference between the lost wages awarded in a personal injury action and those awarded in a wrongful death action is that the former benefits the injured party while the latter benefits the injured party's heirs. *See id.* at 533 n.8.

In urging the Court to accept her analysis, the defendant's expert noted that she used the methodology of deducting consumption expenses in an estimate she prepared for the special master for distribution of the 9/11 Victim's Fund. Def.'s Ex. 36, 17:6–:11. In that context, Dr. Hurdle admits, however, that "the people that I was doing it for were already dead." *Id.* at 40:14–:16. Significantly, Dr. Hurdle testified that she has never deducted personal consumption expenses before in a personal injury case. *Id.* at 41:15–:18 ("[P]ersonal consumption is only deducted in a case where the person . . . whose income we are projecting is dead and not using that portion of her income for her own benefit.").

Nevertheless, the defendant persists in urging Dr. Hurdle's deduction of personal consumption from the lost wages award in this personal injury case. The defendant relies on pure dictum in a footnote in *George Washington University v. Waas*, 648 A.2d 178, 182 n.7 (D.C. 1994), where the District of Columbia Court of Appeals briefly mentioned that an expert in that case calculated the lost wages of a living victim with "an increase of 7% annually to account for inflation, promotions and productive growth, and a reduction for state and federal taxes and personal maintenance." Def.'s Concls. at 21. No other analysis was offered in *Waas* regarding why the personal maintenance was deducted, under what circumstances such a deduction would be appropriate, or why it mattered for the resolution of that case. Indeed, the computation of damages was apparently not an issue before the court, which focused instead on whether the trial court appropriately gave a contributory negligence jury instruction to the jury. *Waas*, 648 A.2d at 179. This Court declines to give any weight to this dictum.

In any event, *Waas* predates *Moattar v. Foxhall Surgical Associates*, 694 A.2d 435 (D.C. 1997), where the District of Columbia Court of Appeals held that, in a personal injury action, unlike in a wrongful death action, the appropriate measure of future economic damages is "the

amount that the injured party would have earned but for the injury." *Moattar*, 694 A.2d at 438.

At issue in *Moattar* was whether it was appropriate for a jury to consider the wages a plaintiff

would have earned had her life expectancy not been substantially shortened by the defendant

physician's negligence. [26] *Id.* The court held that loss of future wages in a personal injury action

is "*not* a premature attempt to recover wrongful death and survival damages . . . but an element

of damages recoverably by the injured party during her lifetime," even when the plaintiff's

imminent death was predicted. *Id.* at 437–38 (emphasis in original).

The defendant's precise argument—that lost future income in a personal injury case

should be treated the same as it is treated in wrongful death actions—was clearly rejected by the

District of Columbia Court of Appeals in *Moattar*. Indeed, not even the dissent in *Moattar*

agreed with the defendant's argument, but instead expressly noted that damages for lost future

wages "serve different purposes and are measured differently" when awarded to the living victim

on a personal injury claim than when awarded to survivors in a wrongful death claim. *Id.* at 444

n.5 (King, J. dissenting). One difference in the measurement identified by the dissent is that

"[p]ost-death economic damages represent the sum that would accrue to the estate," and

"[b]ecause the deceased has no living expenses," those personal consumption expenses "must be

subtracted from the income determined to be lost." *Id.* In short, the legal support in this

jurisdiction for the defendant's proposed method of deducting consumption expenses from the

damages awarded for future lost wages on a personal injury action involving a plaintiff with a

---

[26] Expert testimony in *Moattar* indicated it was "more likely than not" that the plaintiff would die within four years of trial due to the delayed diagnosis of her breast cancer attributable to the defendant's negligence. *See Moattar*, 694 A.2d at 436–37.

shortened life span due to the defendant's negligence, just as such expenses are deducted in wrongful death actions, is sparse to nonexistent.[27]

The Court rejects the defense expert's suggested consumption deduction. While such a deduction has been applied in wrongful death actions, it is not appropriate in a personal injury action to deduct an amount to reflect the plaintiff's personal consumption from the damages awarded for future lost wages.

### b) *Discount Rates*

The parties' experts also dispute the discount rate that should apply to the plaintiff's award. The discount rate is the amount an award is reduced to account for the investment income an individual may make upon receipt of a lump sum award. *See Dugar v. Wash. Metro Area Transit Auth.*, 565 F. Supp. 2d 120, 126 n.11 (D.D.C. 2008) (explaining that the amount that the injured party would have earned but for the injury "must be reduced to [its] present value, using a valid discount rate" to produce "the present value of the loss of future earnings") (quoting *District of Columbia v. Barriteau*, 399 A.2d 563, 567 n.6 (D.C. 1979)). The plaintiff's expert, Dr. Lurito, used a discount rate of 3.5 percent, which he considered to be "high in today's market." Trial Tr. ECF No. 71 at 17:19–:21. He based his analysis on the amount of interest that could be earned from investing the lump sum in United States government bonds, which, according to Dr. Lurito, are yielding between 2.4 percent and 3.5 percent, based on the bond's maturity date. *Id.* at 18:20–:25.

---

[27] The defendant also cites *Doe v. United States*, 737 F. Supp. 155 (D.R.I. 1990), for the proposition that consumption must be deducted from estimates of lost wages in a personal injury action. Reliance on this case is misplaced, however, for at least two reasons. First, the court in *Doe* was applying Rhode Island law, which makes this case from outside this jurisdiction inapplicable. *See Doe*, 737 F. Supp. at 162 (applying Rhode Island law to damages calculation). Second, the court in *Doe* adopted the government's argument that, under the circumstances at issue in that case, the personal injury action was "more analogous to a wrongful death action in which deductions are made for the living expenses a decedent would have incurred" because of the plaintiff's imminent death. *See id.* at 164. The defendant in this case has never made or even suggested an argument here that this case should be converted into and treated as a wrongful death action. The Court therefore finds *Doe* unpersuasive.

The defendant's expert, Dr. Hurdle, used an 8.98 percent discount rate, which approximately reflects the rate at which a person would be able to receive a credit card loan. Def.'s Ex. 36, at 20:5–:24; 21:14–:16. In Dr. Hurdle's opinion, the higher discount rate "reflects the riskiness of the future earnings that the plaintiff would have but for this injury." Def. Ex. 36 at 18:16–:18. Dr. Hurdle indicated that a discount rate that incorporates considerations of risk is used in the commercial context, because in determining what profit a company would have made, "[i]t is pretty common now, I think, with respect to lost profit cases to consider the riskiness of the firm that is losing their profits." *Id.* at 19:22–:25.

Dr. Hurdle did not testify that she had used this form of discount rate in any other personal injury suit. Nor did the defendant point to a single personal injury case which used this method of essentially bumping-up the discount rate to account for risk. Indeed, in support of Dr. Hurdle's novel theory, the defendant cites only a single case from outside this jurisdiction that, ironically, declined to incorporate risk into the discount rate. *See O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1201 (7th Cir. 1982) (upholding jury award where damages were calculated using only inflation rate and real interest rate with no additional discount for risk).

The Supreme Court has been clear as to how the discount rate should be determined, stating: "The discount rate should be based on the rate of interest that would be earned on 'the best and safest investments.'" *Pfeifer*, 462 U.S. at 537 (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491 (1916)). Courts both in and outside this jurisdiction have used the *Pfeifer* standard to calculate net after tax discount rates in personal injury awards. *See United States v. Williams*, No. 09-0026, 2013 WL 2285165, at *5 (D.D.C. May 24, 2013) (applying 7 percent discount rate but noting it was "relatively high"); *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 296-98 (D.D.C. 2003) (following *Pfeiffer* standard and using a 4.5 percent

discount rate); *see also Ammar v. United States*, 342 F.3d 133, 147 (2d Cir. 2003) (stating "the discount rate should reflect only the time value of the money" and noting a default discount rate of two percent is appropriate); *Trevino v. United States,* 804 F.2d 1512, 1517 (9th Cir. 1986) (following *Pfeifer* in calculating discount rate and noting "[t]he reason that risk-free investments are preferred to more remunerative but riskier investments is that the plaintiff should not be faced with the burden of becoming a full-time broker merely to safeguard his award").

Dr. Lurito based his discount rate on the yield rates for United States government bonds, which he considered to be "the best and safest investments" available.  Trial Tr. ECF No. 71 at 18:11–:25.  The Court concludes that Dr. Lurito's discount rate has a firm and reliable basis that comports with the legal principles for application of a discount rate set forth in *Pfeifer*.

c)  *Working Life*

The final major difference between the two expert economists' assumptions in determining the plaintiff's future lost wages is the estimated length of time that the plaintiff would continue working but for the defendant's negligence.  The plaintiff's expert, Dr. Lurito, based his estimate of 38.8 years on the plaintiff's stated intent to work until age 65.  Trial Tr. ECF No. 71 at 13:13–:16.  The defendant's expert, Dr. Hurdle, based her estimate on tables from a single economics journal article, published in 2006, that indicated the statistical average work life for a woman of the plaintiff's age was 27.37 years. Def.'s Ex. 37 at 8.  Thus, a gap of over a decade separates the experts' assumption about the plaintiff's work expectancy period and this has a concomitant effect on the calculation of damages.

"The amount that the injured party would have earned but for the injury is not susceptible to precise measurement."  *Nat'l R.R. Passenger Corp. v. McDavitt*, 804 A.2d 275, 290 (D.C. 2002) (internal quotation omitted).  The District of Columbia Court of Appeals has noted "in

evaluating lost earning capacity, the plaintiff's occupational abilities, industriousness, work habits, and experience are relevant." *Id.* Thus, the focus in determining a plaintiff's work expectancy is on the particular plaintiff herself. "Statistics . . . are only one tool which may be used by an expert in forming an opinion."[28] *Weil v. Seltzer*, 873 F.2d 1453, 1465 (D.C. Cir. 1989).

Here, Dr. Lurito relied on the plaintiff's express intent to work until the age of 65, which was a very reasonable assumption for an expert to make given the plaintiff's circumstances. The plaintiff is a single mother of two small children, with a high school education, and without an independent source of wealth. *See* Trial Tr., ECF No. 55 at 74:17–:23; 75:1–11. It is entirely reasonable to believe that a woman in the plaintiff's position would work (indeed, may find herself without a choice but to work) continuously until the age of 65. Moreover, the plaintiff's work ethic was on display during the trial, where she mentioned actively seeking a job even in her debilitated condition. *See id.* at 102:25; 103:1–9 (stating she had recently secured employment with a cleaning company). It is also entirely common for courts in this district and the local courts in the District of Columbia to credit an injured party's intent to work until retirement age. *See Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, Nos. 06-727, 08-529, 2013 WL 351546, at *25 (calculating lost wages up to retirement age); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 15 (D.D.C. 2009) (same); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 137 (D.D.C. 2005) (same); *United Mine Workers of Am., Int'l Union v. Moore*, 717 A.2d 332, 340 (D.C. 1998) (crediting injured party's statement for worklife expectancy); *Charles H. Tompkins Co. v. Girolami*, 566 A.2d 1074, 1076 n.4 (D.C.

---

[28] In *Weil*, the jury was faced with the same choice with which the Court is faced here: the testimony of the injured party (in *Weil* it was the injured party's spouse) that she would work until a certain age, on the one hand, and a statistical model, on the other. *See Weil*, 873 F.2d at 1464-65. The D.C. Circuit made clear that it was appropriate for an expert to rely upon the "self-serving testimony" of the injured party "concerning the anticipated work-life expectancy" so long as that expert was open to cross-examination. *Id.* at 1465.

1989) ("The court properly instructed the jury that [statistical] tables are only one factor (not conclusive) for it to consider in connection with other evidence of the claimant's 'health, habits, and activity' in determining this claimant's work-life expectancy.").

Notably, while Dr. Hurdle cites statistics from one economics journal article to calculate the plaintiff's expected working life, she offers no reasons why the Court should accept those statistics, why they are reliable, or why she chose those particular statistics or source. *See* Def.'s Ex. 37 at 8 n.17 (citing Kurt Krueger *et al.*, WORKLIFE IN A MARKOV MODEL WITH FULL-TIME AND PART-TIME ACTIVITY, 19 J. FORENSIC ECON. 80 (2006)). Set against the plaintiff's statement of intent and circumstances, as well as the caselaw that generally uses the retirement age of 65 in determining the work expectancy period, the Court finds that the assumption of the plaintiff's expert, Dr. Lurito, that the plaintiff would have worked until age 65 to be firmly grounded in the record and imminently reasonable.

\*     \*     \*

In sum, the Court rejects as legally suspect or unreliable the key assumptions underlying the defendant expert's calculation of lost wages in favor of the plaintiff's expert's method for computing this aspect of the damages award. Therefore, the Court awards the plaintiff $737,715 for future lost wages.

### 4.     Loss of Household Services

Both parties concede that the loss of household services, which are described by the plaintiff's expert as "the value of the services . . . Miss Rhodes would have provided to the children absent what's happened to her," are appropriate in this case. *See* Trial Tr. ECF No. 71 at 20:22–25; Def.'s Ex. 37 at 12–13. The plaintiff's expert estimates the loss of household services to range from $508,121 to $652,939, Pl.'s Ex. 54 at 5, while the defendant's expert

estimates the loss to range from $164,729 to $347,628, depending on the method the defendant's expert used to calculate the loss. *See* Def.'s Ex. 37 at 15. Both parties calculate the loss of household services to when the plaintiff's youngest child reaches either the age of 18 or 21, well past the plaintiff's estimated life expectancy. *See* Pl.'s Ex. 54 at 3; Def.'s Ex. 37 at 12–15.

The value of household services awarded in a personal injury case is to compensate the injured party for her inability to do all of the things she was once able to do. *See Lariscy v. United States*, 655 F. Supp. 1053, 1058 (D.D.C. 1987). The plaintiff's children are not parties to this action and therefore the computation of the loss of household services do not inure to their benefit but must be limited to the anticipated lifespan of the plaintiff. *See* Trial Tr. ECF No. 71 at 20:22–25.

Here, there is no doubt the plaintiff is unable to do everything she was once able to do in taking care of her children and her household. *See, e.g.*, Trial Tr. ECF No. 56 at 14:7–:8 ("[The plaintiff] doesn't have the energy or the wherewithal to do it because she is in pain."). Nurse Patterson also testified that there will come a time when, as a result of her Stage IV cancer, the plaintiff will be virtually unable to function at home and will need hospice care, quite possibly necessitating a move into an assisted care facility. *See* Trial Tr. ECF No. 56 at 96:12–:24.

Both economics experts based their loss of household services estimates on the assumption that the plaintiff would be unable to provide for herself or her children as of January 1, 2014, and that her life expectancy does not extend beyond October, 2014. *See* Pl.'s Ex. 54, at 3–4; Def.'s Ex. 37, at 3, 12. Thus, the value of the household services the plaintiff will not be able to provide for during that ten month period must be determined. Once again, the parties' experts differ as to how they calculate the value of lost household services.

Dr. Lurito, the plaintiff's expert, derived his valuation by determining the replacement cost, or what it would cost to hire a live-in nanny to provide the "household/parental services" the plaintiff will no longer be able to provide due to her illness. Pl.'s Ex. 54, at 3. He estimated that "the cost for a live-in homemaker to care for the children is at least $124 per day in the District of Columbia area." *Id.*

Dr. Hurdle, the defendant's expert, offered two different estimates to account for the loss of household services. First, Dr. Hurdle accepted the plaintiff's expert's estimate for the cost of a live-in nanny ($124 per day) and reduced the cost using an 8.98 percent discount rate to account for the "risks associated with the need for a homemaker. For example, Ms. Rhodes herself may be able to provide these services for longer than assumed . . . or a relative other than a live-in homemaker may choose to care for the children." Def.'s Ex. 37, at 12. She also offered an alternative methodology where she used economic statistics tables to estimate the "average hourly value of household production in the District of Columbia." *Id.* at 13 (citing Expectancy Data, THE DOLLAR VALUE OF A DAY: 2010 DOLLAR VALUATION (2011)). The tables are apparently based on a survey conducted by the U.S. Department of Labor's Bureau of Labor Statistics to determine "the number of hours that the average person spends performing household services and the average wage that a person performing those services would earn." *Id.* This statistic does not appear to take account of the level of supervision required for small children, which is the actual circumstance of the plaintiff's situation. Once again, Dr. Hurdle's theory is not grounded in the reality the plaintiff will experience.

Even if, as Dr. Hurdle suggests, the plaintiff is able to provide some household services in 2014, Def.'s Ex. 37, at 12, the plaintiff's young children will require constant supervision and the plaintiff's home will require housekeeping when the plaintiff becomes incapacitated. It is

reasonable to assume, in estimating the cost to the plaintiff for the loss of household services, that she will have to pay market rates for a child care professional and/or a housekeeper to keep her household running. Dr. Lurito's estimate uses such a market rate in determining the costs the plaintiff will incur. Therefore, the Court finds the plaintiff's expert's daily cost estimate to be well-grounded in the record and particularized to the plaintiff's circumstances.

The plaintiff's expert estimates it will cost approximately $124 per day to compensate the plaintiff for her loss of household services. Pl.'s Ex. 54, at 3. The plaintiff is expected to be unable to provide household services beginning on January 1, 2014, which would represent a ten month gap before the end of her life expectancy during which she will need to pay for such services. *See* Pl.'s Ex. 54, at 3–4; Def.'s Ex. 37, at 3, 12. At $124 per day for 304 days (the number of days in the year ending October 31), the Court finds $37,696 to be an appropriate award for the plaintiff's loss of household services.[29]

### 5.     Pain and Suffering

Finally, the plaintiff requests a non-economic damages award of $6 million for her pain and suffering. Pl.'s. Concls. at 47. The defendant has failed to address the issue of non-economic damages at all in its proposed conclusions of law. *See generally* Def.'s Concls. Thus, the Court is left with virtually no response to the plaintiff's request in determining the "notoriously difficult" matter of "determining an appropriate figure for intangible losses such as emotional suffering." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 86 (D.D.C. 2006). Any decision is obviously fact specific and the fact finder "has broad discretion in calculating damages for pain and suffering." *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 150 (D.C. Cir. 1969)).

---

[29] Considering the amount awarded covers less than one year, it is unnecessary to apply any discount rate to this award.

A brief survey of other medical malpractice and FTCA cases has yielded a wide variety of non-economic damages awards. *See, e.g., Dugar v. Wash. Metro. Area Transit Auth.*, 565 F. Supp. 2d 120, 127–28 (D.D.C. 2008) ($90,000 for pain and suffering awarded to plaintiff who experienced a fractured clavicle in a bus accident); *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 294-95 (D.D.C. 2003) ($5 million in non-economic damages awarded to plaintiff, who suffered brain damage and significant physical disfigurement as a result of defendant's negligence in vehicular accident); *Primus v. Galgano*, 329 F.3d 236, 239-240 (1st Cir. 2003) ($960,000 award for future pain and suffering upheld in case where plaintiff, due to her physician's malpractice, was not diagnosed with breast cancer for two years after the doctor initially examined the patient); *Kasongo v. United States*, 523 F. Supp. 2d 759, 762 (N.D. Ill. 2007) ($1 million awarded in pain and suffering to the family of an AIDS patient, whose doctor failed to diagnosis her lactic acidosis, which resulted in her death); *Fairhurst v. United States*, No. 03CV601, 2006 WL 2190553, at *4 (N.D. Fla. Aug. 1, 2006) ($400,000 awarded for pain and suffering for a cancer misdiagnosis).

More recently, a District of New Jersey court was confronted with a similar challenge of determining the amount of damages in an FTCA case brought by a plaintiff, who visited her doctor when she was 41-years-old "requesting a mammogram and complaining of pain and a lump," but was not diagnosed with breast cancer for an additional twenty-one months because her doctor violated the national standard of care. *Fletcher v. St. Joseph Reg'l Med. Ctr.*, No. 10-1499, 2013 WL 1651806, at *7 (D.N.J. Apr. 15, 2013). In *Fletcher*, the plaintiff's survival rate dropped from an 87.4 percent 10-year survival rate to zero. *Id.* at *11. The court awarded the plaintiff $3.25 million in non-economic pain and suffering damages. *Id.* at *10. The plaintiff in *Fletcher*, like the plaintiff here, lost her breast and experienced "pain, suffering, loss of

enjoyment of life, anxiety, and fear of dying." *Id.* at *10. Both the *Fletcher* plaintiff and the plaintiff in this case saw their breast cancer prognosis drop from likely survival to imminent death as a result of their physicians failing to follow the national standard of care and appropriately diagnose their breast cancer. *See id.* at *7-8. Both women now face cancers that have metastasized into their bones, leading to great pain and suffering. *Id.* at 9. The Court finds the facts in *Fletcher* remarkably similar to the facts here and therefore views it as a useful benchmark.

A prerequisite for a pain and suffering damage award under District of Columbia law is that the victim's suffering must be "conscious" in order to be compensable. *See Doe*, 492 A.2d at 861. Juries in the District of Columbia are further instructed, when considering a damages award, that they may consider: (1) the extent and duration of any physical injuries sustained by the plaintiff; (2) the effects that any physical injuries have on the overall physical and emotional well-being of the plaintiff; (3) any physical pain and emotional distress that the plaintiff has suffered in the past; (4) any physical pain and emotional distress that the plaintiff may suffer in the future; (5) any disfigurement or deformity suffered by the plaintiff, as well as any humiliation or embarrassment associated with the disfigurement or deformity; (6) any inconvenience the plaintiff has experienced; and (7) any inconvenience the plaintiff may experience in the future. D.C. Standardized Civil Jury Instruction §13.01, 1-7; *see also Allstate Ins. Co. v. Ramos*, 782 A.2d 280, 282 (D.C. 2001) (describing jury instruction provided in automobile accident case). These instructions provide useful reference here.

Here, the plaintiff lives in constant pain and has not had a "significant pain free, truly pain free period" since at least January, 2012. Trial Tr. ECF No. 56 at 34:4–:5. Thus, the "extent and duration" of her injuries is continuous and will be so until her death. As for the

effect her injuries "have on the overall physical and emotional well-being of the plaintiff" and emotional distress, the plaintiff experiences sadness and deep and constant feelings of guilt about the way her impending death will affect her children. *See* Trial Tr. ECF No. 55 at 107:6–:9; Trial Tr. ECF No. 56 at 12:12–:15. She also fears death and the prospect of being unable to take care of herself. *See* Trial Tr. ECF No. 56 at 14:2–:4 ("Her fear of death is probably just as strong as her fear of living . . . with pain and suffering and not able to function at all and play with her children."). The District of Columbia also instructs jurors to consider "disfigurement or deformity" and, here, the plaintiff has suffered through the loss of her breast and her hair due to her mastectomy and the effects of her chemotherapy. *Id.* at 9:19–:21; 31:22–:23; Trial Tr. ECF No. 55 at 105:19–:22. Finally, regarding past and future inconvenience, the plaintiff is conscious every day of her life that she will die soon, leaving her young children without a mother. *See* Trial Tr. ECF No. 55 at 107:6–:9. Furthermore, at some point in the future, efforts at treating her symptoms will fail and her pain will continue to grow worse. *See* Trial Tr. ECF No. 56 at 34:10–:20 (noting "at some point in the future . . . no treatment will be available" to the plaintiff and hospice care will be necessary).

Any determination of a non-economic damages award is, by necessity, fact-intensive and tailored to the specific circumstances of the plaintiff. As in the determination of past care costs, however, it is necessary to determine to what extent the plaintiff's non-economic damages are caused by the progression of her cancer to Stage IV and are segregable from damages she would have suffered had her cancer been properly diagnosed and treated at Stage I. *See* III.D.1 *supra.* The plaintiff does not allege, nor could she prove, that she would have endured no pain and suffering if not for the defendant's negligence. Indeed, as the plaintiff's experts noted, the plaintiff most likely would have undergone a mastectomy and chemotherapy even had her cancer

been caught at Stage I. *See* Trial Tr. ECF No. 56 at 72:12–:20; 73:2–:10. Although her survival rate would have been nearly 100 percent, the plaintiff would always have lived in some fear that her cancer would return. *See* Trial Tr. ECF No. 56 at 77:14–:16. The Court is mindful in evaluating the plaintiff's request for an award of $6 million that, even absent the defendant's negligence, she would have suffered some level of pain and suffering.

Nevertheless, the fact that the defendant's negligence converted what was a likely survivable diagnosis to a certain death sentence has caused and will continue to cause pain and suffering far beyond what the plaintiff would have endured had the defendant caught the plaintiff's cancer when she first presented with symptoms. Again, the Court finds the *Fletcher* court's award instructive, but notes that the plaintiff here has the added feelings of sadness and worries about leaving her children motherless and is more than a decade younger than the plaintiff in *Fletcher* and is therefore losing that much more of her life. Consequently, the Court finds, upon consideration of the seven factors enumerated in the District of Columbia's jury instructions and the decisions in this and other Districts in similar FTCA cases, that an award of $3.5 million for non-economic damages is reasonably appropriate.

\*     \*     \*

In total, the Court awards the following in economic and non-economic damages to the plaintiff:

- \$33,285.17 for the cost of past medical care;

- \$149,886 for the cost of future medical care;

- \$737,715 for future lost wages;

- \$37,696 for the loss of household services; and

- \$3,500,000 for pain and suffering.

These costs total $4,458,582.17.

**IV.  CONCLUSION**

For the aforementioned reasons, the Court finds Dr. Hill-Daniel breached the applicable national standard of care in her treatment of the plaintiff as her primary care physician and this negligence was the proximate cause of the progression of the plaintiff's breast cancer from Stage I to incurable Stage IV.  The Court further finds that the plaintiff has proven the costs she has already incurred for medical expenses directly attributable to the defendant's negligence and a reasonable estimate of the costs she will incur going forward.  Therefore, the Court will enter judgment in favor of the plaintiff and award damages in the amount of $4,458,582.17.

A separate order accompanies this Memorandum Opinion.

**DATED: September 9, 2013**

_____
BERYL A. HOWELL
United States District Judge